SILLS CUMMIS & GROSS P.C.
Newark, NJ 07102

COVINGTON & BURLING LLP
Washington, DC 20005

*Counsel for Janssen Biotech, Inc.,*
*Janssen Oncology, Inc., and Janssen*
*Research & Development, LLC*

WALSH PIZZI O'REILLY FALANGA LLP
Newark, NJ 07102

WHITE & CASE LLP
New York, NY 10020-1095

*Counsel for Defendant BTG*
*INTERNATIONAL LIMITED*

(Counsel Detail Provided on Signature Page)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY D/B/A/ BLUE CROSS AND BLUE SHIELD OF LOUISIANA, and HMO LOUISIANA, INC., *et al.*, on behalf of themselves and all others similarly situated,<br><br>                                    Plaintiffs,<br><br>        v.<br><br>JANSSEN BIOTECH, INC., JANSSEN ONCOLOGY, INC., JANSSEN RESEARCH & DEVELOPMENT, LLC, and BTG INTERNATIONAL LIMITED,<br><br>                                    Defendants. | Civil Action No. 2:19-cv-14l46 (KM) (ESK)<br><br>**DEFENDANTS' BRIEF IN SUPPORT OF THEIR JOINT MOTION TO DISMISS THE IPP COMPLAINT**<br><br>Motion Day: TBD<br><br>*Document Electronically Filed* |

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY ..................................................... 1

BACKGROUND ................................................................................. 6

    A.    The Development of Zytiga Therapy and the Issuance of the '438 Patent ................................................................................. 6

    B.    The Hatch-Waxman Litigation Over the '438 Patent ......................... 7

    C.    Plaintiffs' Antitrust Allegations ......................................................... 10

LEGAL STANDARD .......................................................................... 11

ARGUMENT ...................................................................................... 16

I.    The IPPs' Sherman Act Claim Is Barred by the *Noerr-Pennington* Doctrine. ......................................................................................... 16

    A.    The Claim of "Sham" Litigation Requires a Showing of "Objective Baselessness." ................................................................ 16

    B.    The Court's Statements Preclude a Showing of "Objective Baselessness." ................................................................................ 18

    C.    The Patent Litigation Record Further Precludes a Showing of "Objective Baselessness." ................................................................ 20

    D.    The Extensive Evidence in the Patent Record Supported the Validity of the '438 Patent. ............................................................... 25

    E.    The IPPs' Allegations Are Not Sufficient to Allege "Objective Baselessness." ................................................................................ 26

II.    The IPPs' Federal Antitrust Claims Are Barred by *Illinois Brick*'s Indirect Purchaser Rule ................................................................... 29

III.    The *Noerr-Pennington* Doctrine Also Bars the IPPs' State Law Claims. ........................................................................................... 34

IV.    The IPPs' State Law Conspiracy Claims Fail as a Matter of Law Under *Copperweld*. ........................................................................ 36

V.    The Majority of the IPPs' State Law Claims Also Fail For a Variety of
      State-Specific Reasons. .................................................................... 39

      A.    The IPPs Fail to Adequately Allege Standing in 24 States, the
            District of Columbia and Puerto Rico. ................................... 39

      B.    The IPPs' State Statutory Claims Have a Myriad of Other
            Deficiencies. ........................................................................ 44

            1.    The IPPs' Cursory and Threadbare Allegations Are
                  Insufficient to Support Their State Statutory Claims. ............. 46

            2.    The IPPs Fail to Plead the Required Elements of Their
                  State Antitrust Claims. ............................................. 48

                  a)    State antitrust statutes requiring that Defendants'
                        conduct have a significant nexus with those states ....... 48

                  b)    State antitrust statutes requiring allegations of
                        concerted activity .......................................... 49

                  c)    State antitrust statutes that do not permit indirect
                        purchaser claims .......................................... 50

            3.    The IPPs Fail to Plead the Required Elements of Their
                  State Consumer Protection Claims. ........................... 51

                  a)    State consumer protection statutes that permit only
                        consumers to bring suit .................................. 51

                  b)    State consumer protection statutes requiring that
                        the conduct have a significant nexus with the state ....... 54

                  c)    State consumer protection statutes that require an
                        unconscionable, unfair, or deceptive act, and
                        consumer reliance on such an act ................................. 56

      C.    The IPPs' Unjust Enrichment Claims Similarly Warrant
            Dismissal. ........................................................................ 59

            1.    Unjust Enrichment Claims Brought Under the Laws of
                  States That Have Not Repealed *Illinois Brick* Should Be
                  Dismissed. .......................................................... 61

ii

2.   "Stand Alone" Unjust Enrichment Claims Brought Under the Laws of States That Do Not Expressly Allow Them Should Be Dismissed. ............................................................ 62

3.   Unjust Enrichment Claims Should Be Dismissed as to Those States That Require the Plaintiff to Confer a Direct Benefit on the Defendant as an Element of the Claim............. 64

CONCLUSION ...................................................................... 65

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*,
  903 F.3d 1310 (Fed. Cir. 2018) .......................................................................29

*In re Actos End Payor Antitrust Litig.*,
  2015 WL 5610752 (S.D.N.Y. 2015)...............................................................60

*Adams v. Children's Hosp. of the King's Daughters*,
  2018 WL 9392997 (Va. Cir. Ct. 2018).............................................................59

*In re Aftermarket Filters Antitrust Litig.*,
  2010 WL 1416259 (N.D. Ill. Apr. 1, 2010)......................................................64

*In re Aggrenox Antitrust Litig.*,
  94 F. Supp. 3d 224 (D. Conn. 2015)................................................................47

*Allegheny General Hosp. v. Philip Morris, Inc.*,
  228 F.3d 429 (3d Cir. 2000) ............................................................................60

*In re Aluminum Warehousing Antitrust Litig.*,
  2014 WL 4743425 (S.D.N.Y. 2014)................................................................60

*In re Aluminum Warehousing Antitrust Litig.*,
  833 F.3d 151 (2d Cir. 2016) ............................................................................47

*Am. Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010)........................................................................................38

*Am. Safety Ins. Serv., Inc. v. Griggs*,
  959 So. 2d 322 (Fla. Dist. Ct. App. 2007)........................................................64

*Animal Science Prods., Inc. v. China Minmetals Corp.*,
  34 F. Supp. 3d 465 (D.N.J. 2014)....................................................................32

*Apple Inc. v. Pepper*,
  139 S. Ct. 1514 (2019)...............................................................................30, 31

*In re Asacol Antitrust Litig.*,
  2016 WL 4083333 (D. Mass. July 20, 2016) ...................................................52

iv

*Asahi Glass Co. v. Pentech Pharm., Inc.*,
   289 F. Supp. 2d 986 (N.D.Ill. 2003) ........................................................... 15, 17

*Asahi Kasei Pharma Corp. v. CoTherix, Inc.*,
   138 Cal. Rptr. 3d 620 (Cal. Ct. App. 2012) ....................................................... 50

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...............................................................................44, 46, 47

*AstraZeneca AB v. Mylan Labs., Inc.*,
   2010 WL 2079722 (S.D.N.Y. May 19, 2010) ................................. 11, 12, 15, 20

*In re Auto. Parts Antitrust Litig.*,
   2013 WL 2456612 (E.D. Mich. June 6, 2013) .................................................... 53

*In re Automotive Parts Antitrust Litig.*,
   2018 WL 1135504 (E.D. Mich. Jan. 16, 2018) ............................................48–49

*Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*,
   229 F.3d 1135 (2d Cir. 2000) ............................................................................ 36

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)......................................................................................43, 46

*Benson Tower Condo. Owners Ass'n v. Victaulic Co.*,
   22 F. Supp. 3d 1126 (D. Or. 2014) ..................................................................... 54

*Braintree Labs., Inc. v. Schwarz Pharma, Inc.*,
   568 F. Supp. 2d 487 (D. Del. 2008)...............................................................12, 16

*Brenner v. Future Graphics, LLC*,
   258 F.R.D. 561 (N.D. Ga. 2007) ......................................................................... 64

*Bristol-Myers Squibb Co. v. IVAX Corp.*,
   77 F. Supp. 2d 606 (D.N.J. 2000)...................................................................34, 36

*Brown v. TD Bank, N.A.*,
   2016 WL 1298973 (E.D. Pa. Apr. 4, 2016)........................................................ 14

*BTG Int'l Ltd. v. Amneal Pharm. LLC*,
   923 F.3d 1063 (Fed. Cir. 2019) .....................................................................10, 25

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
  157 F.3d 1340 (Fed. Cir. 1998) .......................................................17

*In re Cast Iron Soil Pipe and Fittings Antitrust Litig.*,
  2015 WL 5166014 (E.D. Tenn. June 24, 2015) ...........................48, 49

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
  168 F.3d 119 (3d Cir. 1999) .............................................................35

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
  993 F. Supp. 271 (D.N.J. 1998)........................................................16

*In re Chocolate Confectionary Antitrust Litig.*,
  749 F. Supp. 2d 224 (M.D. Pa. 2010)..........................................53, 61

*Ciardi v. F. Hoffman-La Roche, Ltd.*,
  762 N.E.2d 303 (Mass. 2002).........................................................51

*Coll v. First Am. Title Ins. Co.*,
  642 F.3d 876 (10th Cir. 2011) .........................................................35

*Commonwealth Elec. Inspection Servs. v. Town of Clarence*,
  776 N.Y.S.2d 687 (N.Y. App. Div. 2004).........................................50

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984)...................................................................37, 49

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
  398 F.3d 666 (D.C. Cir. 2005)..............................................13, 15, 22

*Davric Me. Corp. v. Rancourt*,
  216 F.3d 143 (1st Cir. 2000).............................................................35

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
  903 F. Supp. 2d 198 (S.D.N.Y. 2012) ..............................................64

*De Vito v. Liquid Holdings Grp., Inc.*,
  2018 WL 6891832 (D.N.J. Dec. 31, 2018)...................................40–41

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  362 F. Supp. 3d 510 (N.D. Ill. 2019)................................................55

*Dimidowich v. Bell & Howell*,
    803 F.2d 1473 (9th Cir. 1986) ...........................................................50

*In re Ditropan XL Antitrust Litig.*,
    529 F. Supp. 2d 1098 (N.D. Cal. 2007).............................................50

*In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust
Litig.*, 2013 WL 5503308 (D.N.J. Oct. 2, 2013)..................................41

*Duke Univ. v. Akorn, Inc.*,
    2019 WL 4410284 (D.N.J. Sept. 16, 2019)................................17–18

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    516 F. Supp. 2d 1072 (N.D. Cal. 2007)........................................58, 59

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961)...........................................................................4

*In re Effexor Antitrust Litig.*,
    357 F. Supp. 3d 363 (D.N.J. 2018).....................................................41

*Fiskars, Inc. v. Hunt Mfg. Co.*,
    221 F.3d 1318 (Fed. Cir. 2000) .........................................................27

*In re Flonase Antitrust Litig.*,
    692 F. Supp. 2d 524 (E.D. Pa. 2010)..........................................*passim*

*Freeman Indus., LLC v. Eastman Chem. Co.*,
    172 S.W.3d 512 (Tenn. 2005) ...........................................................49

*Glob. Reinsurance Corp. U.S. Branch v. Equitas Ltd.*,
    969 N.E.2d 187 (N.Y. 2012)..............................................................50

*Goshen v. Mut. Life Ins. Co.*,
    774 N.E.2d 1190 (N.Y. 2002).............................................................55

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007)........................................58, 59

*Green Mountain Realty Corp. v. Fifth Estate Tower, LLC*,
    161 N.H. 78 (2010) ...........................................................................35

*Hood v. Tenneco Texas Life Ins. Co.*,
    739 F.2d 1012 (5th Cir. 1984) ..............................................................37

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
    424 F.3d 363 (3d Cir. 2005) ...........................................................32, 33

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
    602 F.3d 237 (3d Cir. 2010) ...........................................................32, 33

*In re Humira Antitrust Litig.*,
    465 F. Supp. 3d 811 (N.D. Ill. 2020)..........................................*passim*

*In re Hypodermic Prods. Antitrust Litig.*,
    484 F. App'x 669 (3d Cir. 2012) ........................................................31

*IGEN Int'l, Inc. v. Roche Diagnostics GmbH*,
    335 F.3d 303 (4th Cir. 2003) ..............................................................36

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977)........................................................................29, 30

*Indivior Inc. v. Dr. Reddy's Labs. S.A.*,
    2020 WL 4932547 (D.N.J. Aug. 24, 2020) .......................................13

*In re Insulin Pricing Litig.*,
    2019 WL 643709 (D.N.J. Feb. 15, 2019) ...............................41, 43–44

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*,
    458 F.3d 244 (3d Cir. 2006) .................................................................2

*In re K-Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004)....................................................65

*Kaul v. Christie*,
    372 F. Supp. 3d 206 (D.N.J. 2019).......................................................2

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) ........................................48, 51

*Klein v. General Nutrition Cos., Inc.*,
    186 F.3d 338 (3d Cir. 1999) ...............................................................40

*Kottle v. Nw. Kidney Ctrs.*,
   146 F.3d 1056 (9th Cir. 1998) ............................................................35

*Kramer v. Pollock-Krasner Found.*,
   890 F. Supp. 250 (S.D.N.Y. 1995) ...................................................60

*Kuehn v. Stanley*,
   91 P.3d 346 (Ariz. Ct. App. 2004)....................................................56

*LaChance v. U.S. Smokeless Tobacco Co.*,
   931 A.2d 571 (N.H. 2007) .................................................................62

*In re Lantus Direct Purchaser Antitrust Litig.*,
   2018 WL 6629708 (D. Mass. Oct. 24, 2018) .......................14, 18, 21

*In re Lidoderm Antitrust Litig.*,
   103 F. Supp. 3d 1155 (N.D. Cal. 2015).......................................*passim*

*In re Loestrin 24 FE Antitrust Litig.*,
   410 F. Supp. 3d 352 (D.R.I. 2019) ...............................................51, 57

*In re Magnesium Oxide Antitrust Litig.*,
   2011 WL 5008090 (D.N.J. Oct. 20, 2011) ........................................40

*Marvin Lumber & Cedar Co. v. Sapa Extrusions, Inc.*,
   964 F. Supp. 2d 993 (D. Minn. 2013)................................................53

*McGuire v. BMW of N. Am., LLC*,
   2014 WL 2566132 (D.N.J. June 6, 2014)..........................................41

*Merck & Co. Inc. v. Lyon*,
   941 F. Supp. 1443 (M.D.N.C. 1996) .................................................55

*Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*,
   404 F. Supp. 2d 1214 (E.D. Cal. 2005) .............................................55

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
   948 F. Supp. 2d 538 (D. Md. 2013)...................................................23

*In re Microsoft Corp. Antitrust Litig.*,
   2003 WL 22070561 (D. Md. Aug. 22, 2003) ....................................48

*Minuteman, LLC v. Microsoft Corp.*,
795 A.2d 833 (N.H. 2002) ...................................................................................51

*Mueller Co. v. U.S. Pipe & Foundry Co.*,
2003 WL 22272135 (D.N.H. Oct. 2, 2003) ........................................................55

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
350 F. Supp. 2d 160 (D. Me. 2004) ........................................................57, 59, 63

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) ......................................................42, 61, 64

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014) .....................................................................................15, 23

*In re Opana ER Antitrust Litig.*,
162 F. Supp. 3d 704 (N.D. Ill. 2016) ...........................................................47, 51

*Or. Laborers-Emp'rs Health & Welfare Tr. Fund v. Philip Morris, Inc.*,
17 F. Supp. 2d 1170 (D. Or. 1998) .....................................................................54

*In re Packaged Ice Antitrust Litig.*,
779 F. Supp. 2d 642 (E.D. Mich. 2011) .............................................................43

*In re Packaged Seafood Prods. Antitrust Litig.*,
242 F. Supp. 3d 1033 (S.D. Cal. 2017) ...............................................................53

*Par. Disposal Indus., LLC v. BFI Waste Servs., LLC*,
2014 WL 6886007 (W.D. La. Dec. 5, 2014) ......................................................37

*Pearson v. Sec'y Dep't of Corr.*,
775 F.3d 598 (3d Cir. 2015) ...............................................................................46

*Plumbers' Local Union No. 690 Health Plan v. Apotex Corp.*,
2017 WL 4235773 (E.D. Pa. Sept. 25, 2017) .....................................................41

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus. Inc.*,
508 U.S. 49 (1993) ......................................................................................*passim*

*In re Refrigerant Compressors Antitrust Litig.*,
2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) ...................................................64

x

*In re Remicade Antitrust Litig.*,
   345 F. Supp. 3d 566 (E.D. Pa. 2018) ................................................................58

*Rothman v. Target Corp.*,
   556 F.3d 1310 (Fed. Cir. 2009) .........................................................................27

*Schechner v. Whirlpool Corp.*,
   237 F. Supp. 3d 601 (E.D. Mich. 2017) ............................................................64

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action*,
   678 F.3d 235 (3d Cir. 2012) ...............................................................................40

*Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*,
   113 F.3d 405 (3d Cir. 1997) ...............................................................................43

*Scott v. Mamari Corp.*,
   530 S.E.2d 208 (Ga. Ct. App. 2000)...................................................................64

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*,
   2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) ..................................52, 53, 54, 63

*Shaw v. Marriott Int'l, Inc.*,
   605 F.3d 1039 (D.C. Cir. 2010)..........................................................................52

*Sheet Metal Duct, Inc. v. Lindab, Inc.*,
   2000 WL 987865 (E.D. Pa. July 18, 2000) ........................................................38

*Sheet Metal Workers Local 441 Health & Welfare Plan v.
   GlaxoSmithKine, PLC*,
   737 F. Supp. 2d 380 (E.D. Pa. 2010)...........................................................*passim*

*Shionogi Pharma, Inc. v. Mylan, Inc.*,
   2011 WL 2550835 (D. Del. June 10, 2011) ........................................................38

*Solvay Pharms., Inc. v. Global Pharms.*,
   298 F. Supp. 2d 880 (D. Minn. 2004)..................................................................53

*Spinner Consulting LLC v. Bankr. Mgmt. Sol. Inc.*,
   604 B.R. 660 (D.N.J. 2019) ................................................................................30

*Staley v. Gilead Sciences, Inc.*,
   446 F. Supp. 3d 578 (N.D. Cal. 2020)...........................................................50, 54

*Standard Oil Co. of Ky. v. State ex rel. Attorney Gen.*,
  65 So. 468 (Miss. 1914)................................................................48

*State of New York v. Mobil Oil Corp.*,
  38 N.Y.2d 460 (1976)..................................................................50

*State v. Daicel Chem. Indus., Ltd.*,
  106 P.3d 428 (Idaho 2005) ..........................................................56

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
  171 F.3d 912 (3d Cir. 1999) ........................................................60

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust
  Litig.*, 2017 WL 4642285 (E.D. Pa. Oct. 17, 2017)...........................37

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust
  Litig.*, 64 F. Supp. 3d 665 (E.D. Pa. 2014) ...............................42, 44

*Trustees of Univ. PA v. St. Jude Children's Research Hosp.*,
  940 F. Supp. 2d 233 (E.D. Pa. 2013)......................................13, 14

*Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag*,
  207 F. Supp. 2d 221 (S.D.N.Y. 2002) ................................6, 15, 21

*Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*,
  762 F.3d 1338 (Fed. Cir. 2014) ....................................................17

*United Food & Com. Workers Unions & Emp'rs Midwest Health
  Benefits Fund v. Novartis Pharm. Corp.*,
  902 F.3d 1 (1st Cir. 2018)......................................................13, 18

*In re Vitamins Antitrust Litig.*,
  2001 WL 849928 (D.D.C. Apr. 11, 2001)......................................49

*Walker Process Equip. Inc. v. Food Mach. & Chem. Corp.*,
  382 U.S. 172 (1965)......................................................................4

*Warren Gen. Hosp. v. Amgen Inc.*,
  643 F.3d 77 (3d Cir. 2011) ..........................................................31

*Warth v. Seldin*,
  422 U.S. 490 (1975)....................................................................40

*In re Wellbutrin XL Antitrust Litig.*,
    260 F.R.D. 143 (E.D. Pa. 2009)............................................................42, 44, 53

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
    868 F.3d 132 (3d Cir. 2017) ........................................................................*passim*

*Whouley v. Shoreham, Inc.*,
    2009 WL 762315 (D.R.I. Mar. 23, 2009).........................................................54

*Wilcox Indus. Corp. v. Hansen*,
    870 F. Supp. 2d 296 (D.N.H. 2012)..................................................................55

*Winer Family Trust v. Queen*,
    503 F.3d 319 (3d Cir. 2007) ............................................................................40

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)..............................................................................................24

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    2019 WL 6977405 (E.D. Va. Dec. 20, 2019)...................................................32

*Zimmerman v. HBO Affiliate Grp.*,
    834 F.2d 1163 (3d Cir. 1987) ..........................................................................40

**Statutes**

35 U.S.C. § 282..........................................................................................................17

35 U.S.C. § 285..........................................................................................................23

740 Ill. Comp. Stat. § 10/7(2) ..................................................................................50

Cal. Bus. & Prof. Code § 16720 ........................................................................5010/

D.C. Code § 28-3901 .................................................................................................52

D.C. Code § 28-4501 .................................................................................................48

Haw. Rev. Stat. § 480-1 ............................................................................................52

Kan. Stat. Ann. § 50-101 ..........................................................................................50

Mass. Gen. Laws Ch. 93, §1, *et seq.*........................................................................51

Mass. Gen. L. ch. 93A, § 1 ...................................................................52

Mich. Comp. Laws. Ann. § 445.903 .....................................................57

Minn. Stat. § 325F.68 ...........................................................................53

Minn. Stat. § 325F.69 ...........................................................................57

Miss. Code Ann. § 75-21-3 ...................................................................48

Mo. Rev. Stat. §§ 407.025 ....................................................................53

Mont. Code Ann. § 30-14-102 ..............................................................53

Nev. Rev. Stat. § 598.0915 ...................................................................58

Nev. Rev. Stat. § 598.0977 ...................................................................53

N.H. Rev. Stat. Ann. § 356 ...................................................................51

N.M. Stat. Ann. § 57-12-2 ....................................................................58

N.Y. Gen. Bus. Law § 340 .....................................................................50

N.Y. Gen. Bus. Law § 349(a), (h) .........................................................58

Or. Rev. Stat. § 646.605, *et seq.* ..........................................................54

Or. Rev. Stat. § 646.608 ........................................................................58

P.R. Laws Tit. 10, § 260 ........................................................................51

R.I. Gen. Laws § 6-13.1-1 .....................................................................58

R.I. Gen. Laws § 6-13.1-5.2 ..................................................................54

S.D. Codified Laws § 37–1–3.1 ............................................................49

S.D. Codified Laws § 37-24-6(1) ..........................................................58

Tenn. Code Ann. § 47-25-101 ..........................................................49, 50

Va. Code Ann. § 59.1-200(A) ................................................................59

Vt. Stat. Ann. Tit. 9, § 2451, *et seq.* .....................................................54

W. Va. Code § 46A-6-102 ........................................................................59

W. Va. Code § 47-18-3 ...........................................................................49

**Other Authorities**

Fed. R. App. P. 34(a)(2)(A) .....................................................................24

Fed. R. App. P. 38 ...................................................................................24

Defendants Janssen and BTG submit this Joint Memorandum in Support of Their Motion to Dismiss the Second Consolidated Class Action Complaint ("SCCAC") filed by the Consolidated Indirect Purchaser Plaintiffs ("IPPs") (ECF No. 147) in Civil Action No. 19-14146.[1]

## INTRODUCTION AND SUMMARY

Some antitrust cases are difficult to resolve on a motion to dismiss. This one is not. This Court presided over the hard-fought patent litigation that is now alleged to have been a "sham." Litigation alleged to be a "sham" is immune from the antitrust laws under the *Noerr-Pennington* doctrine if the patent litigation had an objective basis, which "requires no more than a 'reasonabl[e] belie[f] that there is a *chance* that [a] claim may be held valid upon adjudication." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus. Inc.*, 508 U.S. 49, 62–63 (1993) ("*PRE*") (quoting *Hubbard v. Beatty & Hyde, Inc.*, 343 Mass. 258, 262 (1961) (modifications in original) (emphasis added); *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 150 (3d Cir. 2017) ("*In re Wellbutrin XL Antitrust Litig.*")

---

[1] "Janssen" refers to Defendants Janssen Biotech, Inc., Janssen Oncology, Inc., and Janssen Research & Development, LLC, collectively. "BTG" refers to Defendant BTG International Limited. "Indirect Purchaser Plaintiffs" refers collectively to Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc., (collectively, "Louisiana BCBS"), the Mayor and City Council of Baltimore, Iron Workers District Council (Philadelphia and Vicinity) Health Benefit Plan, Kentucky Laborers District Council Health and Welfare Fund, and Pipe Trades Services MN Welfare Fund. "KPH" refers to the Direct Purchaser Plaintiff KPH Healthcare Services, Inc., a/k/a/ Kinney Drugs, Inc., Health Direct Pharmacy Services, and Noble Health Services.

("[T]he question here is whether [defendants] *could have perceived* 'some likelihood of success' in their case at the time of filing.") (emphasis added) (quoting *PRE*, 508 U.S. at 65).  On a motion to dismiss a claim of "sham" litigation, the Court may look to the undisputed record of the patent litigation, including the Court's own statements on the record.  That record conclusively establishes that Janssen and BTG had an objective basis for their patent claims.

The three-year patent litigation before this Court concerned U.S. Patent No. 8,822,438 ("the '438 patent"), which claims a method for treating advanced prostate cancer with a combination of abiraterone acetate and prednisone that Janssen markets as Zytiga®.  (SCCAC ¶¶ 126–27, 179, 239.)  Following a nine-day trial before this Court involving Janssen, BTG and generic manufacturers of Zytiga, Janssen and BTG prevailed on the issues of infringement and the sufficiency of the patent's written description, but the Court held that the patent was invalid for obviousness.  (*Id.* ¶¶ 233–34 & n.30; Dkt. 571 at 3, 51.)[2]

The Court's statements on the record reflect that this was a close case where reasonable minds could differ—the essence of litigation where the plaintiffs "could

---

[2] All citations by docket number ("Dkt.") refer to filings in the prior patent infringement proceeding in this Court, *BTG Int'l Ltd. v. Amneal Pharm. LLC*, Civil Action No. 15-cv-5909 (D.N.J.).  The public records of the prior proceeding are subject to judicial notice and may be considered on a motion to dismiss.  *See Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 256 n.5 (3d Cir. 2006); *see also Kaul v. Christie*, 372 F. Supp. 3d 206, 229 (D.N.J. 2019) (McNulty, J.) (considering court records on motion to dismiss where such records "are intrinsic to the allegations of the complaint").

have perceived some likelihood of success" and legitimately could have held a

"reasonable belief" that there was at the very least "a chance" that their patent claims

"may be held valid upon adjudication":

- The Court stated that the patent positions of Janssen and BTG were "far from frivolous." (Dkt. 581 at 64:16–17.)

- The Court noted that its invalidity determination was "a judgment call for sure, and one that could be made differently by another jurist." (Dkt. 581 at 60:13–14.)

- The Court found "preliminarily that the merits of this case present a potentially appealable issue. . . ." (Dkt. 561 at 2 n.2.)

- The Court stated that the Federal Circuit "could see it differently" on the Court's finding of patent invalidity. (Dkt. 581 at 64:14–15.)

- The Court recognized that "even where I determined that [certain] factors were in plaintiffs' favor, I did not find they did so heavily enough to overcome the showing of obviousness from the prior art. Once again, a judgment call, one someone else could have made differently." (Dkt. 581 at 60:20–24.)

These statements by the Court refute the IPPs' claim that Janssen and BTG had no

objective basis for the patent litigation. *See PRE*, 508 U.S. at 62 ("sham litigation

must constitute the pursuit of claims so baseless that no reasonable litigant could

realistically expect to secure favorable relief") (citation omitted).

In contrast to the undisputed record of the patent litigation reflecting the

legitimate bases for Janssen and BTG's claims, the IPPs point to statements in the

patent prosecution to claim that the litigation was a "sham."  The IPPs allege in

conclusory terms that Janssen committed a "ruse" before the PTO in obtaining the

'438 patent (SCCAC ¶ 9), because Janssen supposedly "never called the PTO's attention" to U.S. Patent No. 5,604,213 ("the '213 patent"), which covers the active ingredient in Zytiga, when making commercial success arguments to the PTO. (*Id.* ¶ 8.)

The IPPs' allegation can be rejected as a matter of law. The legal question in a "sham" litigation case is whether Janssen and BTG had an objective basis for suing to enforce the '438 patent *after* it had issued.[3] The question whether Janssen should have said something more or different to the patent examiner in prosecuting the '438 patent is not the legal issue presented here. The IPPs do not allege that Janssen committed fraud before the PTO in obtaining the '438 patent, and their only legal claim is that it was a "sham" for Janssen and BTG to assert in federal court a presumptively valid patent after it had been issued by the PTO. The IPPs allege no basis to find that Defendants could not have perceived some likelihood of success when they filed their patent lawsuit. As a result, the IPPs have not met their burden to plead facts sufficient to overcome Defendants' *Noerr-Pennington* immunity.

---

[3] Courts recognize only two exceptions to *Noerr-Pennington* immunity: (1) litigation that is a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor," *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961); and (2) the "enforcement of a patent procured by fraud on the Patent Office," *Walker Process Equip. Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 174 (1965). The IPPs have not pleaded the second exception.

This is especially the case because Janssen did in fact disclose the '213 patent to the PTO, which is referenced on the face of the '438 patent.  (Dkt. 366-3 ('438 Patent) at 5:23–29, 7:26–33.)  So their complaint is merely that Janssen should have made its commercial success arguments to the patent examiner in a different way. That allegation, even accepted as true, cannot establish that Defendants' assertion of the '438 patent in the subsequent litigation before this Court was a sham and "objectively baseless."  Moreover, this Court took full account of the '213 patent in holding that the '438 patent was invalid.  Although the IPPs suggest that the '213 patent would have prevented the patent examiner from finding that the '438 patent was non-obvious on the basis of commercial success, this Court expressly considered this argument in the patent litigation and found in favor of Janssen and BTG on that point, concluding that the '438 patent was a commercial success notwithstanding that the '213 patent was a blocking patent.  (Dkt. 571 at 48.) Ultimately, the Court invalidated the '438 patent, but at the same time observed that the validity determination was "a judgment call for sure, and one that could be made differently by another jurist."  (Dkt. 581 at 60:13–14.)

The "sham" litigation exception is narrow and must be strictly construed, given *Noerr-Pennington*'s core purpose of protecting the First Amendment right of petition.  *See In re Wellbutrin XL Antitrust Litig*., 868 F.3d at 147 ("A plaintiff claiming that a lawsuit is, by its very existence, anticompetitive and unlawful faces

an uphill battle.  It is well-established that the First Amendment protects the right to petition the government and to have access to the courts.") (citing *PRE*, 508 U.S. at 56–57).  The fact that the undisputed record of the patent case presented a close call that could have gone either way is the essence of an objective basis for patent litigation.  And it defeats the IPPs' antitrust claim of "sham" as a matter of law.  *Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag*, 207 F. Supp. 2d 221, 223 (S.D.N.Y. 2002) (where the facts are undisputed, the "analysis [of a claim of sham] should be addressed to the face of the complaint, in order to avoid chilling a litigant's exercise of the right to petition") (citations omitted).

## BACKGROUND

### A.   The Development of Zytiga Therapy and the Issuance of the '438 Patent

In 1997, BTG obtained U.S. Patent No. 5,604,213 ("the '213 patent"), covering the class of compounds that includes abiraterone acetate.  (SCCAC ¶¶ 111–13.)  BTG subsequently licensed the '213 patent to Cougar Biotechnology.  (*Id.* ¶ 114; Dkt. 571 at 10.)  Janssen later obtained a license to the '213 patent when it purchased Cougar in 2009.  (SCCAC ¶ 114.)

In 2011, the FDA approved Janssen's application to market abiraterone tablets indicated for use with prednisone for the treatment of certain metastatic castration-resistant prostate cancer ("mCRPC"), which Janssen marketed as Zytiga.  (*Id.* ¶ 126–27; Dkt. 571 at 21.)  When administered with prednisone, Zytiga has been shown to

extend the lives of advanced prostate cancer patients by an average of four months (and in many cases much longer).  (Dkt. 571 at 15–16, 50.)  Zytiga has also had significant commercial success, generating roughly $5.7 billion in net sales from its launch in 2011 through 2017.  (*Id.* at 41; *see also* SCCAC ¶ 130 & n.21.)

In 2007, Cougar Biotechnology filed an application to patent the combination of abiraterone and prednisone.  Janssen continued to prosecute the patent application following its acquisition of Cougar.  (SCCAC ¶¶ 116–17, 119–20.)  The patent examiner initially rejected the application based on her view that the claims would have been obvious to a person of ordinary skill in the art (*id.* ¶¶ 6, 118, 121–24, 134–38, 143–44, 147), but she eventually determined that the claims were not obvious due to Zytiga's "unexpected commercial success," after Janssen provided evidence of Zytiga's performance relative to two other recently-approved prostate cancer treatments (*id.* ¶¶ 154, 156).  The PTO issued the '438 patent, covering the combination of abiraterone and prednisone, in September 2014.  (*Id.* ¶ 165.)  Janssen and BTG co-own the '438 patent.  (*Id.* ¶ 167.)

### B.    The Hatch-Waxman Litigation Over the '438 Patent

In 2015, in anticipation of the expiration of the '213 patent, eleven generic drug manufacturers filed applications with the FDA to market generic versions of Zytiga.  (*Id.* ¶¶ 168–69.)  All eleven manufacturers filed a Hatch-Waxman Paragraph IV certification as to the '438 patent, effectively asserting its invalidity.  (*Id.* ¶ 169.)

One manufacturer, Actavis, also filed a Paragraph IV certification challenging the validity of the '213 patent.  (*Id.* ¶¶ 169, 171.)  Following the procedure established by the Hatch-Waxman Act, Janssen and BTG responded by filing a single patent infringement suit against all eleven manufacturers in July 2015.  (*Id.* ¶ 170.)

The ensuing Hatch-Waxman litigation before this Court lasted over three years.  (*Id.* ¶¶ 170, 230.)  Actavis dropped its challenge to the '213 patent after approximately one year, after which the only remaining assertions of invalidity related to the '438 patent.  (*Id.* ¶¶ 187–89.)  This Court accepted the claim construction proposed by Janssen and BTG in November 2016.  (*Id.* ¶¶ 190–91; Dkt. 239 at 30.)  In November 2017, certain generic manufacturers filed a motion for summary judgment on the issue of patent infringement.  (Dkt. 364, 366.)  The Court terminated the motion before ruling on it, finding that it would be "dealt with most efficiently with the benefit of a trial record."  (Dkt. 483 at 1.)

A nine-day trial was held from July 23 through August 2, 2018 (SCCAC ¶ 229), after which this Court issued a detailed 70-page final written opinion on October 26, 2018 (*id.* ¶ 230; Dkt. 560, 571).  Janssen and BTG prevailed on the issues of infringement and the sufficiency of the patent's written description, but the Court held that the patent was invalid for obviousness.  (SCCAC ¶¶ 230, 233–34 & n.30; Dkt. 571 at 3, 51.)  The Court based its invalidity ruling on the prior art at the time of the '438 patent application, as well as objective considerations of non-

obviousness.  (Dkt. 571 at 34–51.)  After weighing the record evidence in a detailed analysis, the Court held that, on balance, the evidence supported a finding of obviousness.  (*Id.* at 51.)  Along with its opinion, the Court *sua sponte* issued a stay of any generic launch until the parties submitted briefing on a stay pending appeal, stating "I find preliminarily that the merits of this case present a potentially appealable issue."  (Dkt. 561 at 2 n.2; SCCAC ¶ 235.)

The Court thereafter granted a preliminary injunction maintaining the stay of any generic launch, which the Federal Circuit kept in place until November 20, 2018.  (Dkt. 568, 580; *see also* SCCAC ¶ 240.)   At the hearing on the motion for a preliminary injunction, the Court noted several times that Janssen and BTG might prevail on appeal.  The Court explained that, although it had "stated [the Court's] view of the merits," the Federal Circuit "could see it differently.  The issues are appealable, and [Janssen and BTG's] contentions are far from frivolous."  (Dkt. 581 at 64:14–17.)  The Court also recognized that its validity determinations were "a judgment call for sure, and one that could be made differently by another jurist." (Dkt. 581 at 60:13–14; *see also id.* at 60:20–24 ("[E]ven where I determined that [certain] factors were in plaintiffs' favor, I did not find they did so heavily enough to overcome the showing of obviousness from the prior art.  Once again, a judgment call, one someone else could have made differently.").)

In parallel to the Hatch-Waxman litigation in this Court, several generic manufacturers also initiated challenges to the '438 patent through *inter partes* review proceedings before the Patent Trial and Appeal Board ("PTAB"). (SCCAC ¶¶ 174, 184–85.) The PTAB ultimately found the '438 patent invalid for obviousness, and issued lengthy final written decisions explaining that conclusion. (*Id.* ¶¶ 203–26.)

Janssen and BTG appealed this Court's decision and the PTAB rulings to the Federal Circuit, which consolidated the appeals and heard oral argument in March 2019. (*Id.* ¶¶ 245–46.) In May 2019, the Federal Circuit affirmed the PTAB's invalidity determination in a precedential opinion, thereby mooting the appeal of this Court's decision. *BTG Int'l Ltd. v. Amneal Pharm. LLC*, 923 F.3d 1063, 1076 (Fed. Cir. 2019). (SCCAC ¶ 247.)

During the course of the Hatch-Waxman litigation, the generic defendants did not assert any antitrust counterclaims, did not assert that the '438 patent had been procured through inequitable conduct, and did not file a motion for attorneys' fees against Janssen and BTG.

## C.    Plaintiffs' Antitrust Allegations

Two sets of plaintiffs—on behalf of a putative Indirect Purchaser Class and a putative Direct Purchaser Class—now assert that the prosecution of the '438 patent, followed by Janssen and BTG's efforts to enforce that patent through litigation, was "sham" litigation in violation of the antitrust laws. (*Id.* ¶¶ 3–11.) Plaintiffs allege

that the underlying patent litigation was a "sham" (*id.* ¶¶ 173, 253, 615) that Janssen and BTG "could never ultimately win in the courts" (*id.*¶¶ 10, 615).  They seek damages under federal antitrust law against Janssen under Count 58 (*id.* ¶¶ 11, 823) and the IPPs also seek damages under the antitrust, consumer protection, and unjust enrichment laws of numerous states against Janssen and BTG under Counts 1–57 (*id.* ¶¶ 11, 287–801).

## LEGAL STANDARD

The filing of patent litigation is a form of government petitioning that is protected by the First Amendment and is generally immune from antitrust liability under the *Noerr-Pennington* doctrine.  *See PRE*, 508 U.S. at 56; *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d at 147–48 ("[T]he First Amendment protects the right to petition the government and to have access to the courts.") (citing *PRE*, 508 U.S. at 56–57).  Thus, "[t]o avoid turning every patent case into an antitrust case, some threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase . . . ."  *AstraZeneca AB v. Mylan Labs., Inc.*, 2010 WL 2079722, at *6 n.3 (S.D.N.Y. May 19, 2010), *aff'd sub nom In re Omeprazole Patent Litig.*, 412 Fed. Appx. 297 (Fed. Cir. 2011)  (quoting *Asahi Glass Co. v. Pentech Pharm., Inc.*, 289 F. Supp. 2d 986, 995 (N.D.Ill. 2003) (Posner, J.)).

In *PRE*, the Supreme Court established a two-part definition of "sham" litigation. "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *PRE*, 508 U.S. at 60. Second, the lawsuit must be brought subjectively in bad faith, "through 'the use [of] governmental *process*—as opposed to the outcome of that process—as an anticompetitive weapon'. . . ." *Id.* at 60–61 (quoting *Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 380 (1991)) (modifications and emphasis in original). "[A]n unsuccessful lawsuit, without more, is not a sham," *AstraZeneca*, 2010 WL 2079722, at *4 (citing *PRE*, 508 U.S. at 61 n.5), and "a court must 'resist the understandable temptation to engage in *post hoc* reasoning by concluding' that an ultimately unsuccessful 'action must have been unreasonable or without foundation,'" *PRE*, 508 U.S. at 61 n.5 (quoting *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 421–22 (1978)). Further, the sham exception must be proven by clear and convincing evidence. *See Braintree Labs., Inc. v. Schwarz Pharma, Inc.*, 568 F. Supp. 2d 487, 495–97 (D. Del. 2008) ("To invoke the 'sham' exception, a defendant must prove, by clear and convincing evidence, that a plaintiff's activities were not really efforts to vindicate its rights in court. . . . [T]o proceed with its antitrust . . . counterclaims, it is [antitrust plaintiffs'] burden to establish, by clear and convincing evidence, that [defendants'] lawsuits were 'objectively baseless' . . . .") (citation omitted).

12

The "objective basis" for a lawsuit is a question of law that can and should be decided on a motion to dismiss where the relevant facts are not disputed. *See PRE*, 508 U.S. at 63 ("where . . . there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide probable cause [to file suit] as a matter of law") (citing *Crescent City Live-Stock Landing & Slaughter Co. v. Butchers' Union Slaughter-House & Live Stock Landing Co.*, 120 U.S. 141, 149 (1887)); *Indivior Inc. v. Dr. Reddy's Labs. S.A.*, 2020 WL 4932547, at *8 (D.N.J. Aug. 24, 2020) (McNulty, J.) ("A court may decide the applicability of the *Noerr–Pennington* doctrine on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) if no factual issues are present.") (citing *Trustees of Univ. PA v. St. Jude Children's Research Hosp.*, 940 F. Supp. 2d 233, 242–43 (E.D. Pa. 2013)).

"District courts . . . have recognized this and granted motions to dismiss on *Noerr–Pennington* grounds." *St. Jude Children's Research Hosp.*, 940 F. Supp. 2d at 242–47 (dismissing sham litigation claim after reviewing record of underlying litigation and finding that suit had an objective basis, and collecting cases doing same); *see also United Food & Com. Workers Unions & Emp'rs Midwest Health Benefits Fund v. Novartis Pharm. Corp.*, 902 F.3d 1, 5 (1st Cir. 2018) ("*UFCW*") (affirming district court's dismissal of complaint alleging sham litigation); *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005) (affirming district court's dismissal of complaint alleging sham litigation because "[w]ith the

13

opinions of the patent courts before us, we see no barrier to our determining now whether Bell Atlantic's suit was a sham and hence without *Noerr–Pennington* immunity from antitrust liability."). As the Third Circuit has recognized, where the predicate facts are not in dispute, "the reasonableness of a legal position . . . is itself a question of law." *In re Wellbutrin XL Antitrust Litig*, 868 F.3d at 151 (quoting *Highmark, Inc. v. Allcare Health Mgmt. Sys. Inc.*, 701 F.3d 1351, 1353 (Fed. Cir. 2012)) (modifications in original).

In assessing whether a suit is subject to *Noerr-Pennington* immunity at the motion to dismiss phase, the Court may, and should, consider the record in the challenged, completed litigation. *See, e.g.*, *Trustees of Univ. of Pa.*, 940 F. Supp. 2d at 242–43 ("[A]ll facts relevant to the determination of *Noerr–Pennington* applicability are undisputed and contained within the record we may consider in deciding this motion to dismiss."); *Brown v. TD Bank, N.A.*, 2016 WL 1298973, at *7 n.3, *8 (E.D. Pa. Apr. 4, 2016) (dismissing sham litigation claim after examining complaint in underlying lawsuit and concluding that it was not objectively baseless); *In re Lantus Direct Purchaser Antitrust Litig.*, 2018 WL 6629708, at *10 & n.3 (D. Mass. Oct. 24, 2018), *rev'd on other grounds*, 930 F.3d 1 (1st Cir. 2020) (dismissing sham litigation claim for lack of objective baselessness where "the underlying litigation docket shows a hard fought case in which non-infringement was anything

14

but clear") (citing *AstraZeneca*, 2010 WL 2079722, at *4); *Covad Commc'ns Co.*, 398 F.3d at 677 (similar).

Further, where a claim of "sham" litigation is before the same judge who presided over the challenged lawsuit, this presents a particularly legitimate basis to resolve the question of objective baselessness as a matter of law on a motion to dismiss. *See, e.g.*, *AstraZeneca*, 2010 WL 2079722, at *4 (dismissing antitrust counterclaims under Rule 12(b)(6) following conclusion of patent infringement litigation because the litigation over which the Court had presided "was not objectively baseless" based on the merits and events of the underlying infringement suit); *Asahi Glass*, 289 F. Supp. 2d at 993 (Posner, J.) (dismissing antitrust challenge to alleged sham patent lawsuit as lawsuit was not objectively baseless because "[a]lthough I did rule [in the prior lawsuit] that Apotex had not infringed patent 723, I made clear that the issue was a close one").

The Supreme Court "crafted the *Noerr-Pennington* doctrine—and carved out only a narrow exception for 'sham' litigation—to avoid chilling the exercise of the First Amendment right to petition the government for redress of grievances." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014) (citing *PRE*, 508 U.S. at 56).  This is an important reason why sham litigation claims should be resolved on the pleadings, as a matter of law, where there is no dispute over the underlying record.  *See Twin City Bakery Workers*, 207 F. Supp. at 223

15

("Where possible . . . [sham litigation] analysis should be addressed to the face of the complaint, in order to avoid chilling a litigant's exercise of the right to petition.") (citation omitted).

## ARGUMENT

I.     **The IPPs' Sherman Act Claim Is Barred by the *Noerr-Pennington* Doctrine.**

A.     **The Claim of "Sham" Litigation Requires a Showing of "Objective Baselessness."**

As the Supreme Court has made clear, an antitrust claim of "sham" litigation must be dismissed unless the litigation was "objectively baseless in the sense that *no reasonable litigant could realistically expect success on the merits*." *PRE*, 508 U.S. at 60 (emphasis added). This "requires no more than a 'reasonabl[e] belie[f]' that there is a *chance* that [a] claim may be held valid upon adjudication.'" *Id*. at 62–63 (quoting *Hubbard*, 343 Mass. at 262) (modifications in original) (emphasis added). In other words, the relevant question is "whether [defendants] *could have perceived* 'some likelihood of success' in their case at the time of filing." *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d at 150 (quoting *PRE*, 508 U.S. at 65) (emphasis added).[4]

---

[4] *See also Cheminor Drugs, Ltd. v. Ethyl Corp.*, 993 F. Supp. 271, 281 (D.N.J. 1998), *aff'd*, 168 F.3d 119 (3d Cir. 1999) (a claim of "sham" litigation requires a showing that the patent case had "no objective merit"); *Braintree Labs., Inc. v. Schwarz Pharma, Inc.*, 568 F. Supp. 2d 487, 499 (D. Del. 2008) (rejecting sham litigation claim because plaintiff's argument was "colorable" and not "frivolous").

Here, the IPPs allege that it was a "sham" for Janssen and BTG to contend that the '438 patent was valid.[5]  That theory of "objective baselessness" faces a particularly high hurdle because, "[g]iven the presumption of patent validity . . . it will be a *rare case* in which a patentee's assertion of its patent in the face of a claim of invalidity will be so unreasonable as to support a claim that the patentee has engaged in sham litigation." *Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, 762 F.3d 1338, 1345 (Fed. Cir. 2014) (emphasis added); *see also C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998) ("Neither the bringing of an unsuccessful suit to enforce patent rights, nor the effort to enforce a patent that falls to invalidity, subjects the suitor to antitrust liability.").  As a result, the IPPs must plead facts to overcome the *Noerr-Pennington* immunity that attaches to Defendants' assertion of a presumptively valid patent.  "A firm that has received a patent from the patent office . . . enjoys the presumption of validity that attaches to an issued patent, 35 U.S.C. § 282, [and] is entitled to defend the patent's validity in court [and] to sue alleged infringers, . . . whatever its private doubts, unless a neutral observer would reasonably think either that the patent was almost certain to be declared invalid, or the defendants were almost certain to be found not to have infringed it, if the suit went to judgment." *Asahi Glass*, 289 F. Supp. at 992–93; *see also Duke Univ. v.*

---

[5] Although the IPPs assert a federal claim against only Janssen (Count 58), BTG is also discussed in this section for efficiency because the IPPs' state law claims against Janssen and BTG turn on the same analysis.  *See* Section III, *infra*.

*Akorn, Inc.*, 2019 WL 4410284, at *7–10 (D.N.J. Sept. 16, 2019) (dismissing sham litigation counterclaim where "[i]t is unquestionable that the [challenged lawsuits] had objective merit, as each sought to enforce patents whose validity had not yet been adjudicated by a court").[6]

In addition, "[t]he already high hurdle for stating an antitrust claim for anticompetitive litigation . . . is higher still in the context of an ANDA case because . . . an infringement suit filed in response to an ANDA with a paragraph IV certification could only be objectively baseless if no reasonable person could disagree with the assertions of noninfringement or invalidity in the certification." *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d at 149 (citation omitted); *see also In re Lantus*, 2018 WL 6629708, at *9 ("factor[] support[ing] the conclusion that the underlying lawsuit was not objectively baseless includ[ed] the fact that [the antitrust defendant] was enforcing valid patents in the face of a paragraph IV certification").

## B.   The Court's Statements Preclude a Showing of "Objective Baselessness."

The IPPs' allegations here fall woefully short of the high bar they must clear to establish that the underlying patent litigation was objectively baseless.  The IPPs allege that the Hatch-Waxman litigation was a sham because Defendants allegedly

---

[6] *See also UFCW*, 902 F.3d at 15 ("[T]he plaintiffs have not identified a single precedent that permitted an antitrust 'sham' litigation claim to go forward based on an allegation that the infringement litigation was objectively baseless because the underlying patent was alleged to be invalid due to anticipation or obviousness.").

"could never ultimately win" the infringement litigation.  (SCCAC ¶ 10.)  But that conclusory allegation is directly contradicted by this Court's statements on the record of the patent litigation.  The Court specifically stated that although it had "stated [the Court's] view of the merits," the Federal Circuit "could see it differently. The issues are appealable, and [Janssen and BTG's] contentions are *far from frivolous*."  (Dkt. 581 at 64:14–17) (emphasis added).)  The Court also specifically recognized that its validity determinations were "a judgment call for sure, and one that could be made differently by another jurist."  (Dkt. 581 at 60:13–14; *see also id.* at 60:20–24 ("[E]ven where I determined that [certain] factors were in plaintiffs' favor, I did not find they did so heavily enough to overcome the showing of obviousness from the prior art. *Once again, a judgment call, one someone else could have made differently*.") (emphasis added).)

The Court need look no further than its own statements in the record of the patent litigation to reject the IPPs' argument that Janssen and BTG "could never ultimately win" on patent validity.  Aside from the fact that the '438 patent is presumed valid as a matter of law, the Court's statements establish that the question of patent validity was "a judgment call" that "could be made differently by another jurist," that the Federal Circuit "could see it differently," and that the positions on validity were "far from frivolous."  The Court's own statements thus reflect that this was a close case, a "judgment call" on which different judges could differ, and that

19

the Federal Circuit "could see it differently." Given those statements in the record, there is no basis on which the IPPs can establish that the patent litigation was objectively baseless. Under the test of *PRE*, this defeats the IPPs' claim of "sham" litigation as a matter of law.

### C.    The Patent Litigation Record Further Precludes a Showing of "Objective Baselessness."

The record of the underlying patent litigation reflects a hard-fought case. This further forecloses the IPPs' allegation of "sham" litigation because the record demonstrates that Janssen and BTG had, at the very least, "a chance" that the '438 patent would be held valid. *PRE*, 508 U.S. at 62 (citation omitted). The extensive record reflects that Janssen and BTG "*could have perceived* 'some likelihood of success' in their case," *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d at 150 (quoting *PRE*, 508 U.S. at 65) (emphasis added), and nothing more is required to defeat the IPPs' antitrust claim.

Many courts have recognized that where the record evinces a "hard-fought and close" case, that is sufficient to conclude, at the motion to dismiss stage, that the litigation had an objective basis. *See AstraZeneca*, 2010 WL 2079722, at *4 ("Astra's infringement action against Mylan was hard-fought and close. In its lengthy . . . decision—issued after a 42–day bench trial—the Court ruled that Astra had proven that two of three contested limitations of its claims . . . were found in Mylan's product. . . . This outcome hardly bespeaks baseless litigation.") (citation

omitted); *see also In re Lantus*, 2018 WL 6629708, at *9 (dismissing sham litigation claim where "the underlying litigation docket shows a hard fought case in which non-infringement was anything but clear") (citing *AstraZeneca*, 2010 WL 2079722, at *4); *Twin City Bakery Workers*, 207 F. Supp. 2d at 224 (dismissing allegations of sham litigation where "claims of infringement of four of the six asserted patents . . . proceed[ed] beyond summary judgment, and two of the four . . . proceed[ed] through trial") (citation omitted).

This Court's 70-page final written opinion reflects that Janssen and BTG's arguments for patent validity were substantially grounded in the evidentiary record and the case law, and warranted serious consideration.  The Court gave extended attention to both parties' arguments regarding the state of the prior art at the time of the '438 patent application, noting the merits of several of the arguments made by Janssen and BTG on this point.  (Dkt. 571 at 34–51; *id.* at 43 ("Plaintiffs may be correct that Sartor 1998 was flawed, in that it was not a prospective study but a retrospective analysis of data, and that it carried a risk of sample bias."); *id.* at 44–45 ("Plaintiffs' reservations about the Synacthen test for adrenal insufficiency are, I believe, well-taken."); *id.* at 45 ("Plaintiffs further suggest that there were other options and theories on how to treat mCRPC, and that there were other anti-cancer agents, perhaps even more promising ones.").)  Janssen and BTG also made several arguments regarding objective considerations that supported a finding of non-

obviousness, several of which the Court credited.  (*See id.* at 48 ("I must recognize that this abiraterone product has enjoyed commercial success."); *id.* at 50 ("there is evidence supporting the unmet-need or failure-of-others factors"); *id.* at 51 (professional-approval factor "weighs somewhat in plaintiffs' favor").)  Although the Court ultimately found, on balance, that the generics' arguments outweighed those made by Janssen and BTG, its reasoning reflects that this was a balancing of legitimate positions on both sides:

> All in all, however, I conclude that the patented combination here was well foreshadowed in peer-reviewed articles.  That factor outweighs the others.  Balancing all of the prior art and the other indicia, I find that the evidence favors a conclusion of obviousness.

*Id.* at 51 (citation omitted).

There is no suggestion in the Court's opinion that Janssen and BTG's arguments were frivolous or unfounded.  To the contrary, this Court simply found for the generics after carefully weighing both sides' arguments.  *See Covad Commc'ns Co.*, 398 F.3d at 677 (affirming dismissal of "sham" litigation claim because the patent plaintiff "advanced reasonable arguments that each court went to some lengths to reject.  Nothing in [the patent courts'] opinions suggests that no reasonable litigant could [have] realistically expect[ed] success on the merits.") (citing *PRE*, 508 U.S. at 60) (modifications in original); *PRE*, 508 U.S. at 60 n.5 ("when the antitrust defendant has lost the underlying litigation, a court must resist the . . . temptation to engage in *post hoc* reasoning by concluding that an ultimately

22

unsuccessful action must have been unreasonable or without foundation") (citations and internal quotation marks omitted).

The conclusion that Janssen and BTG had an objectively reasonable basis for the patent litigation is further supported by the fact that the generic defendants never filed a motion for attorney's fees on the ground that Janssen and BTG's claims were frivolous. *See Octane Fitness, LLC*, 572 U.S. at 556–57 (establishing that parties may recover attorneys' fees under 35 U.S.C. § 285 in "exceptional" cases, a "far less onerous" standard than establishing objective baselessness for purposes of sham litigation). The fact that the generic manufacturers never claimed an entitlement to recover attorneys' fees (despite obvious incentives to do so) reflects their recognition that they had no basis for meeting even this "far less onerous" standard of 35 U.S.C. § 285.

With its final written opinion, this Court issued a *sua sponte* stay of any generic launch. The Court noted that "I find preliminarily that the merits of this case present a potentially appealable issue" (Dkt. 561 at 2 n.2), even though neither party had yet moved for a temporary injunction or notified the Court of its intention to appeal the case. That the Court itself recognized the possibility that the case could have come out the other way, unprompted by the parties, illustrates that Janssen and BTG's obviousness arguments had a legitimate basis. *See Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 948 F. Supp. 2d 538, 557 (D. Md. 2013)

(determining, on a motion to dismiss, that the underlying suit "cannot be deemed 'objectively baseless'" where the plaintiff had been "granted . . . a preliminary injunction").

This Court then granted the motion of Janssen and BTG for a temporary injunction barring any generic launch until the Federal Circuit had decided their motion for a stay pending appeal.  (Dkt. 568.)  One of the factors a court must consider in determining whether to grant a temporary injunction is whether the stay applicant has "establish[ed] that he is likely to succeed on the merits."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  This Court found that this factor weighed in favor of granting the temporary injunction.  (*See* Dkt. 568 at 1 ("Plaintiffs' showing as to the likelihood of success on appeal, the balance of hardships, and the public interest are sufficient to merit temporary equitable relief.").)  A case that has *any* likelihood of success on appeal is not objectively baseless.  *See PRE*, 508 U.S. at 62 ("sham litigation must constitute the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief") (citation omitted).

The Federal Circuit's final opinion likewise gives no indication that the court viewed the arguments advanced by Janssen and BTG as baseless.  Moreover, appellate courts may forgo oral argument or impose sanctions when an appeal is frivolous, *see* Fed. R. App. P. 34(a)(2)(A), Fed. R. App. P. 38, but the Federal Circuit

24

did neither.  To the contrary, the Federal Circuit invited the Director of the Patent Office to submit an amicus brief on several novel procedural issues that the case presented (SCCAC ¶ 240; *BTG Int'l Ltd. v. Amneal Pharm. LLC* (Fed. Cir.), No. 19-1147, ECF No. 68 (Nov. 20, 2018)), and ultimately resolved the appeal in a detailed, precedential opinion, *see generally BTG Int'l Ltd. v. Amneal Pharm. LLC*, 923 F.3d 1063 (Fed. Cir. 2019).  The Federal Circuit issues precedential opinions only in "cases which merit the effort," Fed. Cir. Internal Operating Procedure No. 10, and a frivolous case that "no reasonable litigant could realistically expect" to win would not meet that standard, *PRE*, 508 U.S. at 60.

In short, this undisputed litigation history forecloses any conclusion that the Hatch-Waxman lawsuit lacked any objective merit.

### D.   The Extensive Evidence in the Patent Record Supported the Validity of the '438 Patent.

The conclusion that Janssen and BTG had an objectively legitimate basis for the patent litigation is further supported by the extensive evidence they presented at trial in support of the validity of the '438 patent.  This included evidence that a person of ordinary skill in the art would not have been motivated to develop abiraterone or other secondary-hormonal therapies, given the many other promising research avenues for mCRPC therapies.  (Dkt. 552 at 18–21.)  As this Court concluded in its findings of fact, before the '438 patent's 2006 priority date, "the prevailing belief was that, once [prostate] cancer resumed growing after ADT, the

25

cancer became androgen independent" (Dkt. 571 at 16), suggesting that androgen-inhibiting therapies such as abiraterone were unlikely to succeed.

Janssen and BTG also presented evidence that abiraterone had not shown promise in treating mCRPC (Dkt. 552 at 21–22) until it was used in combination with prednisone.  This Court recognized the potential weight of that argument, noting that a 2006 article had concluded that "no study" of therapies involving secondary hormonal manipulations had "demonstrated a survival advantage," and as a result, such therapies' "potential role is not agreed upon by all."  (Dkt. 571 at 40.)

Moreover, Janssen and BTG presented evidence that major pharmaceutical companies had demonstrated little to no interest in developing abiraterone.  (Dkt. 552 at 20, 36–37, 39–40; *see also* SCCAC ¶¶ 113–14.)  The Court recognized the significance of this argument as well, noting that BTG had been unsuccessful in licensing abiraterone for development for years before it licensed to Cougar Biotechnology in 2004.  (Dkt. 571 at 41, 48.)  These serious non-obviousness arguments cannot be squared with the IPPs' allegations that Defendants' infringement suit lacked any objective basis.

### E.   The IPPs' Allegations Are Not Sufficient to Allege "Objective Baselessness."

In contrast to the Court's statements on the record that its invalidity determination was "a judgment call . . . that could be made differently by another jurist" (Dkt. 581 at 60:13–14), and that the Federal Circuit "could see . . . differently"

26

(Dkt. 581 at 64:14–15), and the extensive record evidence supporting the position of Janssen and BTG on the non-obviousness and commercial success of the '438 patent, the IPPs offer only a single, conclusory theory to support their claim that the patent litigation was a "sham." They assert that, in making its arguments on non-obviousness to the PTO, Janssen should have disclosed to the patent examiner that the '213 patent was a "blocking patent," and that this supposedly was the reason for the commercial success of the '438 patent. (SCCAC ¶¶ 8, 155.)

But the legal question in a "sham" litigation case is whether Janssen and BTG had an objective basis for enforcing the '438 patent after it issued. The question of whether Janssen should have said something more or different to the patent examiner in prosecuting the '438 patent is not the legal issue presented here. The IPPs do not allege that Janssen fraudulently obtained the '438 patent, nor could they possibly meet the standards for alleging fraud on the PTO.[7] The only question before the Court is thus whether Janssen and BTG had an objective basis for their lawsuit *after*

---

[7] The IPPs do not even attempt to meet the heightened pleading standard that applies to a claim of fraud on the Patent Office, and there would be no basis for any such claim because Janssen disclosed the '213 patent to the PTO, which is referred to on the face of the '438 patent. (Dkt. 366-3 ('438 Patent) at 5:23–29, 7:26–33.) *See Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1327 (Fed. Cir. 2000) (finding that patent holder's "citation as prior art defeats [the] charge that the [prior art] was withheld with deceptive intent"). The IPPs merely assert that Janssen should have presented its commercial success arguments to the PTO in a different way. (*See* SCCAC ¶ 151.) That cannot support an allegation of fraud. *See Rothman v. Target Corp.*, 556 F.3d 1310, 1328–29 (Fed. Cir. 2009) ("a prosecuting attorney is free to present argument in favor of patentability") (citation omitted).

*the patent had issued*.  The legal question, therefore, is whether Janssen and BTG "*could have perceived* 'some likelihood of success' in their case at the time of filing," *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d at 150 (emphasis added) (quoting *PRE*, 508 U.S. at 65)—taking full account of the prosecution of the patent (including the statements that Janssen made to the patent examiner) and all other facts bearing on validity, enforceability and infringement.  The IPPs have alleged no basis to find that Defendants could not have perceived some likelihood of success when they filed the patent infringement lawsuit.

Indeed, this Court considered and rejected the factual point that the IPPs now claim Janssen should have made to the patent examiner.  In the patent litigation, the generics made the same argument that the IPPs now advance—namely, that the commercial success of Zytiga was due to the effect of the earlier '213 "blocking patent" rather than to non-obviousness.  (Dkt. No. 571 at 48.)  The Court found in favor of Janssen and BTG on that point, concluding that the '438 patent was a commercial success notwithstanding that the '213 patent was a blocking patent.  (*See id.* at 49 ("All in all, however, I must recognize that this abiraterone product has enjoyed commercial success.").)

In any event, the question on this motion is not over that detail of the prosecution history (particularly where the IPPs are not alleging that the patent was fraudulently procured).  The issue instead is whether, given the issuance of the '438

28

patent, including its prosecution history, Janssen and BTG had an objectively reasonable basis to assert the '438 patent even accepting the IPPs' point that the '213 patent was a blocking patent. The fact that the Court accepted the position of Janssen and BTG on this issue necessarily reflects that they had an objectively legitimate basis for that position. Moreover, it was a position defendants supported with Federal Circuit case law. *See, e.g.*, *Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310, 1338–39 (Fed. Cir. 2018) (a "blocking patent may or may not deter innovation in the blocked space," and the extent of a blocking patent's impact is a "'fact-specific inquiry'") (quoting *Merck Sharpe & Dohme Corp. v. Hospira, Inc.*, 874 F.3d 724, 731 (Fed. Cir. 2017).[8]

In sum, and as a matter of law, the IPPs' allegations come nowhere close to meeting the *Noerr-Pennington* requirements that Janssen and BTG's patent claims before this Court lacked any objective basis.

## II. The IPPs' Federal Antitrust Claims Are Barred by *Illinois Brick*'s Indirect Purchaser Rule.

The IPPs' federal antitrust claim also fails for the separate and independent reason that the claim is barred by the indirect purchaser rule, first stated in *Illinois*

---

[8] Indeed, as the *Acorda* decision reflects, the Federal Circuit has grappled with the role of "blocking patents" in the commercial success analysis. *See e.g.*, *Acorda Therapeutics, Inc.*, 903 F.3d at 1354 (Newman, J., dissenting) ("The district court and my colleagues also misapply the concept of 'blocking patent' . . . '[A] prior patent would not have categorically precluded others from further developing the technology.'") (citations omitted).

*Brick Co. v. Illinois*, 431 U.S. 720 (1977).  The IPPs do not allege that they purchased Zytiga directly from Janssen.  To the contrary, the IPPs allege that Janssen causes Zytiga to be distributed through a network of "specialty pharmacies"—such as CVS/Caremark and Alliance/Walgreens—which in turn sell Zytiga to the IPPs or to beneficiaries that the IPPs reimburse.  (SCCAC ¶¶ 813–815.)  The IPPs are therefore *indirect* purchasers of Zytiga from Janssen.  Indeed, the IPPs expressly allege that they only indirectly provided reimbursement for Zytiga.  (*Id.* ¶¶ 20–24, 268, 283.)

As a result, the IPPs lack standing to bring federal antitrust claims for damages under *Illinois Brick*.  "*Illinois Brick* established a bright-line rule that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers."  *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019) (citing *Illinois Brick*, 431 U.S. at 746) (emphasis in original); *see also Spinner Consulting LLC v. Bankr. Mgmt. Sols. Inc.*, 604 B.R. 660, 679 (D.N.J. 2019) (McNulty, J.) (dismissing federal antitrust claims brought by indirect purchaser for lack of standing).  Accordingly, Count 58, the IPPs' only federal antitrust claim, should be dismissed for this separate and independent reason, entirely apart from the bar imposed under *Noerr-Pennington* as discussed in Part I.

The IPPs attempt to circumvent this "bright-line rule" by alleging that they have standing to assert a Sherman Act violation because "Janssen functionally controls the resale price of Zytiga."  (SCCAC ¶¶ 817–18.)  But the Supreme Court recently firmly rejected an "effort to transform *Illinois Brick* from a direct-purchaser

30

rule to a 'who sets the price' rule." *Apple*, 139 S. Ct. at 1522 ("*Illinois Brick* . . . was not based on an economic theory about who set the price.").  Moreover, even before *Apple*, the Third Circuit has made clear that a purchaser lacks standing to sue a manufacturer for alleged monopolistic overcharges when it purchased the product from a wholesaler, even where the purchaser contracted with the manufacturer to set the price charged to the purchaser.  *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 87–88, 92 (3d Cir. 2011); *In re Hypodermic Prods. Antitrust Litig.*, 484 F. App'x 669, 674–75 (3d Cir. 2012).  In short, under *Illinois Brick*, and as *Apple* and Third Circuit law make clear, the IPPs' federal antitrust claim is barred regardless of who "controls the resale price."

The IPPs also attempt to evade the indirect purchaser rule by alleging that the specialty pharmacies function as "agents" of Janssen.  (SCCAC ¶¶ 815–22.)  The IPPs claim that, "[a]s a result, it is the Zytiga purchasers from Janssen's distributor agents, and not the distributor agents themselves, that are the direct purchasers for purposes of an antitrust case such as this. . . ."  (*Id.* ¶ 821.)

The IPPs' argument is contrary to Third Circuit law.[9]  Although the Third Circuit has recognized an exception to *Illinois Brick* where indirect purchasers purchased from an entity controlled by the alleged antitrust violator, it has applied

---

[9] The allegation is also implausible, given that one of Janssen's purported "agents"—KPH—has sued Janssen challenging alleged supracompetitive prices for Zytiga.

this "control exception only when the initial seller owned the direct purchaser." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 371–72 (3d Cir. 2005) ("*Hess I*"), *cert. denied*, 547 U.S. 1163 (2006) ("Courts that have extended the control exception beyond a parent-subsidiary relationship still require relationships involving such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser that there effectively has been only one sale.") (citations omitted).  Moreover, other courts have rejected similar attempts to bypass *Illinois Brick* by characterizing distributors as co-conspirators. *See e.g., In re Zetia (Ezetimibe) Antitrust Litig.*, 2019 WL 6977405, at *6 (E.D. Va. Dec. 20, 2019) (dismissing indirect purchasers' claims against pharmaceutical manufacturer under *Illinois Brick* where plaintiffs alleged that the exclusive distributor of the product was a co-conspirator who passed on some overcharges) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 215 (4th Cir. 2002)).

In addition, the Third Circuit has stated that a "co-conspirator exception" to *Illinois Brick* would apply only where the indirect purchaser "(1) [alleges] collusion between defendants and intermediaries immediately upstream, and (2) join[s] the intermediaries as defendants. . . ."  *Animal Science Prods., Inc. v. China Minmetals Corp.*, 34 F. Supp. 3d 465, 505 (D.N.J. 2014) (McNulty, J.) (citing *Hess I*, 424 F.3d 363, and *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237 (3d Cir. 2010) ("*Hess II*")).  This co-conspirator "exception would only exist where the

32

middlemen would be barred from bringing a claim against their former co-conspirator . . . because their involvement in the conspiracy was 'truly complete' (*i.e.*, if the middlemen would be barred from suing by the 'complete involvement defense' of a manufacturer)." *Hess I*, 424 F.3d at 378–39 (citation omitted).  In light of its extremely narrow reading of these two *Illinois Brick* exceptions, there is no basis under Third Circuit law for an entirely new "agency exception" of the type the IPPs allege.

The IPPs also fail to plead facts that could enable them to invoke either of the Third Circuit's recognized exceptions to the indirect purchaser rule.  *See Hess II*, 602 F.3d at 259 (co-conspirator exception did not apply where amended complaint "does not give rise to a plausible inference" that the exception applied) (citation omitted).  Here, the IPPs make no attempt to allege that the specialty pharmacies were co-conspirators with Janssen, and the IPPs have not joined the specialty pharmacies as defendants.  Nor do the IPPs plausibly plead that the specialty pharmacies were subsidiaries of Janssen or that they enjoyed "functional economic or other unity" with Janssen.  (*See* SCCAC ¶¶ 805–23.)  Moreover, even if there were an "agency exception" to *Illinois Brick*—which there is not—the IPPs do not plead facts sufficient to allege that an agency relationship exists between Janssen and more than 16 specialty pharmacies that they allege distribute Zytiga.  (*Id.* ¶ 814; *see also id.* ¶¶ 811–13.)

In short, the IPPs' attempt to circumvent *Illinois Brick*'s bright-line rule thus fails as a matter of law, and Count 58 should be dismissed on this basis as well as on the basis of *Noerr-Pennington* immunity.

This conclusion is supported by the fact that the IPPs' theory makes no sense from a factual perspective.  The IPPs fail to make any allegation as to how specialty pharmacies acquire Zytiga.  Their theory assumes that specialty pharmacies acquire Zytiga directly from Janssen—but the IPP complaint does not allege this, and indeed the KPH complaint directly contradicts this theory.  In that complaint, KPH Healthcare (a specialty pharmacy) has sued as the assignee of McKesson Corporation (a wholesaler of pharmaceuticals).  KPH alleges that McKesson—not KPH—directly purchased Zytiga from Janssen.  As is evident from KPH's allegations, the IPPs' theory ignores the role of wholesalers in the distribution chain.  Thus, even if the IPPs' theory for bypassing *Illinois Brick* were not precluded as a matter of law, the IPPs also have not pleaded facts that render the theory plausible.

## III.   The *Noerr-Pennington* Doctrine Also Bars the IPPs' State Law Claims.

Part I addresses why *Noerr-Pennington* immunity bars the IPPs' federal antitrust claim of "sham" litigation.  For the same reasons, the Court should likewise dismiss the IPPs' state law antitrust claims.  It is settled law that state antitrust claims "cannot rest upon allegations of conduct immunized from the federal antitrust laws." *Bristol-Myers Squibb Co. v. IVAX Corp.*, 77 F. Supp. 2d 606, 615 (D.N.J. 2000)

(applying *Noerr-Pennington* to dismiss state unfair competition claims); *see also, e.g.*, *Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 900 (10th Cir. 2011) (dismissing state antitrust claims based on *Noerr-Pennington*); *Davric Me. Corp. v. Rancourt*, 216 F.3d 143, 147 (1st Cir. 2000) (applying *Noerr-Pennington* doctrine to both state and federal antitrust claims); *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1059 (9th Cir. 1998) ("the *Noerr-Pennington* doctrine . . . is a direct application of the Petition Clause, and we have used it to set aside antitrust actions premised on state law"); *In re Humira Antitrust Litig.*, 465 F. Supp. 3d 811, 819 (N.D. Ill. 2020) ("Because the federal antitrust claims fail, the state antitrust claims fail, too.").

In addition, although *Noerr-Pennington* originated in the context of antitrust claims, the Supreme Court has recognized that it may be "invok[ed] . . . in other contexts" as well. *PRE*, 508 U.S. at 59. In particular, the Third Circuit has held that there is "no persuasive reason why . . . state tort claims, based on the same petitioning activity as the federal claims, would not be barred by the *Noerr-Pennington* doctrine." *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. 1999). Thus, because the IPPs' antitrust  allegations of "sham" litigation are barred by *Noerr-Pennington*, the state consumer protection law claims and unjust enrichment claims, which are based on the same factual allegations of "sham" litigation, are similarly barred by *Noerr-Pennington* immunity. *See, e.g.*, *Green Mountain Realty Corp. v. Fifth Estate Tower, LLC*, 161 N.H. 78, 87 (2010) (dismissing state law

consumer protection claim under *Noerr–Pennington* and collecting similar cases from other jurisdictions); *Bristol-Myers Squibb Co.*, 77 F. Supp. 2d at 615 (barring state law tort claims because they were based on "allegations of conduct immunized from the federal antitrust laws"); *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 312–13 (4th Cir. 2003) (holding that "the *Noerr-Pennington* doctrine immunizes [the defendant] from collateral tort liability); *Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. 2000) (unpublished table disposition) ("*Noerr Pennington* immunity is applicable . . . to state-law claims such as fraud and tortious interference.").

Every state law claim in the IPPs' complaint is based on the same underlying factual conduct:  Defendants' conduct in suing to enforce '438 patent.  As the case law establishes, it would entirely undermine the core purpose of *Noerr-Pennington* to permit state law claims to proceed based on conduct that is immunized from the federal antitrust laws.  Accordingly, because the *Noerr-Pennington* doctrine bars the IPPs' federal antitrust claim of "sham" litigation, it also bars state antitrust and tort claims alleging that the '438 patent litigation was a "sham."

## IV.    The IPPs' State Law Conspiracy Claims Fail as a Matter of Law Under *Copperweld*.

Many of the IPPs' state law claims are based on their allegation that the litigation by Janssen and BTG to enforce the '438 patent reflected an illegal conspiracy in violation of various state antitrust laws.  (SCCAC ¶ 280 (asserting

"defendants entered into continuing agreement(s), understanding(s), and conspiracy(ies) in restraint of trade artificially to fix, raise, stabilize, and peg prices for abiraterone acetate in the United States").)  But, as co-owners of the '438 patent, Janssen and BTG lack independent economic interests and thus cannot form a conspiracy as a matter of law under *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984), and its progeny.[10]  The Court must dismiss any claims based on allegations of an illegal conspiracy on this basis alone.[11]

In *Copperweld*, the Supreme Court held that a parent and its wholly owned subsidiary were incapable of conspiring under the Sherman Act because they "always have a unity of purpose or a common design."  467 U.S. 752, 771 (internal quotation marks omitted).  The Court reasoned that antitrust laws aim to restrict concerted behavior where "two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit," because such action "not only reduces the diverse directions in which economic power is

---

[10] Similarly, the Janssen Defendants are all directly or indirectly wholly-owned by Johnson & Johnson.  *See* Financial Interest Disclosure Statement of Janssen Biotech, Inc., Janssen Oncology, Inc., and Janssen Research & Development, LLC, ECF No. 14 (May 14, 2019).  Thus, no conspiracy claim can be maintained among the Janssen Defendants either.

[11] Although the *Copperweld* doctrine was developed by federal courts interpreting federal antitrust laws, "state antitrust laws . . . continue to be consistently interpreted in parallel, if not identically, with the Sherman Act," *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2017 WL 4642285, at *11 (E.D. Pa. Oct. 17, 2017) (collecting cases), including on issues such as the *Copperweld* doctrine.  *See, e.g., Par. Disposal Indus., LLC v. BFI Waste Servs., LLC*, 2014 WL 6886007, at *2 (W.D. La. Dec. 5, 2014); *Hood v. Tenneco Texas Life Ins. Co.*, 739 F.2d 1012, 1016 (5th Cir. 1984).

aimed but suddenly increases the economic power moving in one particular direction." *Id.* at 768–69.

The courts have extended *Copperweld* beyond the parent-subsidiary context to similar relationships, including patent owner and licensee, because "[t]he relevant inquiry . . . is whether there is a contract, combination . . . , or conspiracy *amongst separate economic actors pursuing separate economic interests*, such that the agreement deprives the marketplace of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition[.]" *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (emphasis added) (internal quotations and citations omitted); *see also Sheet Metal Duct, Inc. v. Lindab, Inc.*, 2000 WL 987865, at *6 (E.D. Pa. July 18, 2000) (granting motion to dismiss where the alleged anticompetitive behavior "is purely derivative of the legal patent monopoly and legal exclusive distributorship").

Particularly instructive is *Shionogi Pharma, Inc. v. Mylan, Inc*., 2011 WL 2550835 (D. Del. June 10, 2011), where the court dismissed Mylan's counterclaim that Shionogi and its exclusive licensee CIMA had conspired to monopolize in violation of Section 1 of the Sherman Act by "fil[ing] a baseless suit to exclude Mylan from entering the market." *Id.* at *2.  Applying *Copperweld*, the court reasoned that "parties with unified interests, such as a patent holder and licensee, are incapable of conspiring." *Id.* at *5.  Under these settled principles, as a matter of

38

law BTG and Janssen were incapable of conspiring when they sued to enforce a

patent in which they both hold rights and in which they have a unity of economic

interest.  For this reason alone, all claims of an unlawful conspiracy between Janssen

and BTG must be dismissed.[12]

## V.   The Majority of the IPPs' State Law Claims Also Fail For a Variety of State-Specific Reasons.

### A.   The IPPs Fail to Adequately Allege Standing in 24 States, the District of Columbia and Puerto Rico.

The IPPs allege state law claims under the laws of 39 different states, the

District of Columbia, and Puerto Rico.  Even if *Noerr-Pennington* immunity did not

bar these claims, the IPPs lack standing to bring those claims under the laws of 24

states:  Alabama, Alaska, Arkansas, California, Hawaii, Idaho, Iowa, Kansas, Maine,

Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North

Dakota, Oregon, South Carolina, South Dakota, Utah, Vermont, West Virginia,

Wisconsin and Wyoming, as well as the District of Columbia and Puerto Rico.

To establish standing, the named IPPs "must allege and show that they

personally have been injured, not that injury has been suffered by other, unidentified

---

[12] The IPPs' federal Sherman Act claim, Count 58, is not a conspiracy claim.  Thus, the IPPs only purported conspiracy claims are under the state law causes of action (although the Complaint's allegations do not specify the state law claims that allege a conspiracy versus unilateral conduct).  Any state law conspiracy claims should be dismissed under *Copperweld* for the reasons stated in text.  Further, any claims of unilateral acts of monopolization must be dismissed as to BTG because BTG did not participate in the market.  *See* Defendants' Brief in Support of Their Joint Motion to Dismiss the Direct Purchaser Plaintiffs' Complaint at 8–9.

members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975). "It is well-settled that a named plaintiff in a class action lawsuit is required to establish Article III standing." *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *7 (D.N.J. Oct. 20, 2011).

Further, "[p]laintiffs have the burden to establish standing." *Winer Family Trust v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007). And "a plaintiff who raises multiple causes of action 'must demonstrate standing for each claim he seeks to press.'" *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 245 (3d Cir. 2012) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)); *see also Zimmerman v. HBO Affiliate Grp.*, 834 F.2d 1163, 1169 (3d Cir. 1987) ("to be a class representative on a particular claim, the plaintiff must himself have a cause of action on that claim"). This means that a named plaintiff cannot simply assert that "'injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Klein v. General Nutrition Cos., Inc.*, 186 F.3d 338, 345 (3d Cir. 1999) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

As this Court has observed, "[i]t is axiomatic . . . that to represent the absent class members, the named plaintiffs must—among them—possess statutory claims in their own right" rather than merely rely "on the theory there is someone in the putative class who possesses statutory standing to assert" the claim. *De Vito v.*

40

*Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *14 (D.N.J. Dec. 31, 2018) (McNulty, J.).

When these requirements are applied to the state law claims at issue here, there must be a named plaintiff who either resides in that state or was injured in that state because it paid an overcharge there (*e.g.*, by reimbursing a resident). *See, e.g.*, *In re Insulin Pricing Litig.*, 2019 WL 643709, at *17 (D.N.J. Feb. 15, 2019) ("Consistent with *Neale*, district courts within the Third Circuit and throughout the nation have held that named plaintiffs in a class action lack standing to bring claims on behalf of putative classes under the laws of states where no named plaintiff is located and where no named plaintiff purchased the product at issue.") (internal citation omitted); *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, 2013 WL 5503308, at *11 (D.N.J. Oct. 2, 2013) ("[T]his Court agrees that named plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury.").[13]

---

[13] *See also In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 390–91 (D.N.J. 2018) ("[T]he Court is unpersuaded by EPPs' proposition that because they have Article III standing in some states, they can assert claims in any state; since this would effectively render the Article III inquiry obsolete."); *McGuire v. BMW of N. Am., LLC*, 2014 WL 2566132, at *6 (D.N.J. June 6, 2014) ("[T]his Court agrees that the Plaintiff here lacks standing to assert claims under the laws of the states in which he does not reside, or in which he suffered no injury."); *Plumbers' Local Union No. 690 Health Plan v. Apotex Corp.*, 2017 WL 4235773, at *13 (E.D. Pa. Sept. 25, 2017) ("Courts in this district have repeatedly held, in cases in which named plaintiffs are benefit plans who bring suit regarding their reimbursement of members' purchase of drugs, that plaintiffs lack standing, because they suffered no injury, to raise state law claims for states where they are not located and where they

The IPPs' complaint alleges that the named IPPs either reside or do business in Arizona, Colorado, Florida, Georgia, Illinois, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New Jersey, North Carolina, Ohio, Pennsylvania, Rhode Island, Tennessee, Texas and Virginia. (SCCAC ¶¶ 20–24.)  The complaint asserts violations of the laws of only 15 of those states—Arizona, Florida, Georgia, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, North Carolina, Pennsylvania, Rhode Island, Tennessee and Virginia.

The IPPs' complaint also alleges violations of the antitrust, consumer protection, and/or unjust enrichment laws of 24 additional states, as well as the District of Columbia and Puerto Rico—jurisdictions where no named IPP resides or does business.[14]  Because the named IPPs fail to allege facts demonstrating that any

---

did not purchase any drugs or reimburse their members for the purchase of any drugs."); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 758 (E.D. Pa. 2014) ("[N]amed plaintiffs may bring suit only under the laws of states in which they reside or in which they either purchased or made reimbursements for Niaspan."); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 691–94 (E.D. Pa. 2014) (benefit funds could assert claims only under the laws of states where they were incorporated or where their members had purchased Suboxone); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 533 (E.D. Pa. 2010) ("Case law supports the position that Plaintiffs suffered injury and have standing in states where they purchased a drug or reimbursed their members for purchases of a drug."); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 156–58 (E.D. Pa. 2009) (benefit funds could assert claims only under the laws of states where they were located or where their members had purchased Wellbutrin).

[14] These states are Alabama, Alaska, Arkansas, California, Hawaii, Idaho, Iowa, Kansas, Maine, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Dakota, Oregon, South Carolina, South Dakota, Utah, Vermont, West

of them has standing to assert claims based on the laws of those 24 states, the District of Columbia or Puerto Rico, those claims must be dismissed.

The IPPs' complaint includes the allegation that one named plaintiff, Louisiana BCBS, has "participants, members, and beneficiaries primarily in the state of Louisiana, *as well as throughout the U.S.*" (SCCAC ¶ 20 (emphasis added).) But this vague, generalized statement is too amorphous to establish that this named Plaintiff in fact has members in each (or any) of the 24 states, the District of Columbia and Puerto Rico. When considering a motion to dismiss, a court is not required to credit "unsupported conclusions and unwarranted inferences." *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997). By resting on the vague allegation that their members reside in unnamed states "throughout the U.S." the IPPs fail to "nudge[] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 658–59 (E.D. Mich. 2011).

The Court should decide the standing question now, rather than waiting for class certification. "The threshold standing determination may not be postponed to class certification, rather, 'class representatives must meet Article III standing requirements the moment a complaint is filed.'" *In re Insulin Pricing Litig.*, 2019

---

Virginia, Wisconsin and Wyoming, as well as the District of Columbia and Puerto Rico.

WL 643709, at *16 (quoting *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 367 (3d Cir. 2015)).  As the cases cited above reflect, the weight of authority in this Circuit is that standing is a threshold inquiry that should be decided at the motion to dismiss stage.  The alternative approach "would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union." *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. at 155; *see also In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d at 692–94 (similar).

### B.   The IPPs' State Statutory Claims Have a Myriad of Other Deficiencies.

In addition to being barred by the *Noerr-Pennington* doctrine and by the lack of Article III standing for certain states, the IPPs' state law claims fail to meet the differing requirements of different states in relation to state law antitrust, consumer protection and unjust enrichment claims.  The IPPs' complaint lists a collection of state laws but provides no particularized allegations about how the conduct at issue violates those laws.  As a result, the IPPs' state law claims are supported entirely by "threadbare recitals" that should be given no weight, even at the pleading stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In particular, the IPPs' state law claims should be dismissed for a number of specific reasons, which are addressed further in the sections below:

- Certain states' antitrust laws require that the challenged conduct have a significant nexus to the state: District of Columbia (Count 3), Mississippi (Count 13), South Dakota (Count 25), Tennessee (Count 26) and West Virginia (Count 28). *See* Section V.B.2.a, *infra*.

- Certain states' antitrust laws are limited to concerted activity: California (Count 2), Kansas (Count 8), New York (Count 19) and Tennessee (Count 26). *See* Section V.B.2.b, *infra*.

- Certain states' antitrust laws do not allow indirect purchaser claims: Illinois (Count 6), Massachusetts (Count 10), New Hampshire (Count 17) and Puerto Rico (Count 23). *See* Section V.B.2.c, *infra*.

- Certain states' consumer protection laws can only be asserted by end consumers: District of Columbia (Count 32), Hawaii (Count 34), Massachusetts (Count 37), Minnesota (Count 39), Missouri (Count 14), Montana (Count 40), Nevada (Count 42), Oregon (Count 40), Rhode Island (Count 49) and Vermont (Count 54). *See* Section V.B.3.a, *infra*.

- Certain states' consumer protection laws require that the Defendants' conduct have a substantial nexus to the state: California (Count 31), New Hampshire (Count 43), New York (Count 45) and North Carolina (Count 46). *See* Section V.B.3.b, *infra*.

- Certain states' consumer protection laws require an unconscionable, unfair or deceptive act, and consumer reliance on such an act: Arizona (Count 30), Idaho (Count 35), Illinois (Count 36), Michigan (Count 38), Minnesota (Count 39), Nevada (Count 42), New Mexico (Count 44), New York (Count 45), Oregon (Count 48), Rhode Island (Count 49), South Dakota (Count 51), Utah (Count 52), Virginia (Count 55), and West Virginia (Count 56). *See* Section V.B.3.c, *infra*.

- Certain states do not permit antitrust suits by indirect purchasers, which precludes unjust enrichment claims in those states: Alaska (SCCAC ¶ 762), Georgia (*id.* ¶ 768), Idaho (*id.* ¶ 770), Illinois (*id.* ¶ 771), Maryland (*id.* ¶ 775), Massachusetts (*id.* ¶ 776), Montana (*id.* ¶ 781), New Hampshire (*id.* ¶ 784), Pennsylvania (*id.* ¶ 790), Puerto Rico (*id.* ¶ 791), South Carolina (*id.* ¶ 793), Virginia (*id.* ¶ 798), and Wyoming (*id.* ¶ 801). *See* Section V.C.1, *infra*.

- Certain states' unjust enrichment laws do not expressly permit stand-alone unjust enrichment claims: Alabama (SCCAC ¶ 761), Alaska (*id.* ¶ 762),

Arkansas (*id.* ¶ 764), Georgia (*id.* ¶ 768), Maryland (*id.* ¶ 775), Pennsylvania (*id.* ¶ 790), and Wyoming  (*id.* ¶ 801).  *See* Section V.C.2, *infra*.

- Certain states' unjust enrichment laws require that the plaintiff confer a direct benefit on the defendant: Florida (*id.* ¶ 767), Georgia (*id.* ¶ 768), Idaho (*id.* ¶ 770), Maine (*id.* ¶ 774), Michigan (*id.* ¶ 777), and New York (*id.* ¶ 786).  *See* Section V.C.3, *infra*.

### 1.    The IPPs' Cursory and Threadbare Allegations Are Insufficient to Support Their State Statutory Claims.

Plaintiffs are required to plead facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  The IPPs' state law claims fall well short of this standard.  Specifically, the IPPs' state law claims consist of threadbare recitals of the elements of each claim, with no supporting facts or explanation as to how those elements have been violated here.  Consistent with Supreme Court precedent, the Third Circuit has consistently affirmed that "'threadbare recitals of the elements of a cause of action, supported by conclusory statements' are insufficient" to state a claim.  *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 604 (3d Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678).  This rule applies with particular force here, where the IPPs purport to bring claims under myriad state antitrust, consumer protection and unjust enrichment laws, each with different requirements and parameters.

Particularly for the IPPs' consumer protection claims, allegations that merely recite the elements of a cause of action but do not explain how Defendants' alleged conduct satisfies those elements are insufficient to state a claim and so should be

dismissed. *See Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions or formulaic recitation of the elements of a cause of action will not do.") (internal citation omitted); *see also In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016) (affirming dismissal of all state consumer protection and unfair trade law claims where plaintiffs "fail[ed] to explain adequately how the defendants' conduct violated any of the state consumer protection and unfair trade statutes"); *In re Humira Antitrust Litig.*, 465 F. Supp. 3d at 848 (dismissing all state consumer protection law claims because plaintiffs failed to explain "what was unfair or unconscionable about AbbVie's conduct beyond its potential to restrain competition or effect an unlawful monopoly"); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 726 (N.D. Ill. 2016) (dismissing all state consumer protection and unjust enrichment claims where plaintiffs "have pleaded antitrust claims and the factual foundation for them, and have merely alleged that those claims are also actionable under state consumer protection laws and as unjust enrichment"); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 255 (D. Conn. 2015) ("The indirect purchasers and Humana have *listed* claims under very many state laws, but they have not truly *pleaded* claims under those laws sufficient to show their entitlement to recovery under them, as required by Rule 8.") (emphasis in original).

2.      **The IPPs Fail to Plead the Required Elements of Their State Antitrust Claims.**

a)      **State antitrust statutes requiring that Defendants' conduct have a significant nexus with those states**

The IPPs cannot claim relief under the antitrust statutes of the District of Columbia, Mississippi, South Dakota, Tennessee and West Virginia because these states' statutes require plaintiffs to demonstrate that the purported anticompetitive conduct has a significant nexus to those states.  The IPPs' claims under the antitrust statutes of these states must therefore be dismissed:

**District of Columbia (Count 3)**: *See* D.C. Code § 28-4501(b) ("The purpose of this chapter is to promote the unhampered freedom of commerce and industry *throughout the District of Columbia*") (emphasis added); *In re Cast Iron Soil Pipe and Fittings Antitrust Litig.*, 2015 WL 5166014, at *26 (E.D. Tenn. June 24, 2015) (dismissing claim under the D.C. antitrust statute because plaintiffs neither "identif[ied] a connection between the District of Columbia and the wrongful conduct," nor "made any attempt to meaningfully address intrastate commerce," even though complaint alleged that class members purchased a product in the District of Columbia).

**Mississippi (Count 13)**: *See* Miss. Code Ann. § 75-21-3; *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 266–67 (S.D.N.Y. 2019) (dismissing antitrust claim because "the antitrust law of Mississippi focuses on the location where the anticompetitive conduct occurred rather than the effects of such anticompetitive conduct or the broader nexus between the conduct and the state in question") (citations omitted); *In re Microsoft Corp. Antitrust Litig.*, 2003 WL 22070561 at *2  (D. Md. Aug. 22, 2003) (dismissing Mississippi state antitrust claims for failure to allege "at least *some* conduct by [defendant] which was performed wholly intrastate") (emphasis in original) (relying on *Standard Oil Co. of Ky. v. State ex rel. Attorney Gen.*, 65 So. 468, 471 (Miss. 1914)).

**South Dakota (Count 25)**: *See* S.D. Codified Laws § 37–1–3.1 ("A contract, combination, or conspiracy between two or more persons in restraint of trade or commerce *any part of which is within this state* is unlawful") (emphasis added); *In*

*re Automotive Parts Antitrust Litig.*, 2018 WL 1135504 at *3–4 (E.D. Mich. Jan. 16, 2018) (dismissing claim under the South Dakota antitrust statute for failing to plead "that the conspiracy had an effect on trade or commerce in South Dakota," despite the complaint's assertion that class members had paid supra-competitive prices within the state).

**Tennessee (Count 26)**: *See* Tenn. Code Ann. § 47-25-101; *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 523–24 (Tenn. 2005) (holding that "the proper standard for determining whether a case falls within the scope of the [statute] is a 'substantial effects' standard" and dismissing claim because plaintiff "fail[ed] to establish how the . . . anticompetitive conduct affected Tennessee commerce to a substantial degree even though the conduct resulted in [plaintiff] paying higher prices"); *In re Vitamins Antitrust Litig.*, 2001 WL 849928, at *6 (D.D.C. Apr. 11, 2001) (dismissing Tennessee antitrust claim due to a "notable lack of allegations regarding any part of the conspiracy that took place in Tennessee, other than the purchase of vitamin supplements by indirect purchasers").

**West Virginia (Count 28)**: *See* W. Va. Code § 47-18-3(a) (prohibiting "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce *in this State*") (emphasis added); *In re Cast Iron Soil Pipe and Fittings Antitrust Litig.*, 2015 WL 5166014 at *25–26 (explaining that the West Virginia antitrust statute is "directed towards intrastate commerce" and dismissing claim under the statute for failing to address "any connection between [West Virginia] and the wrongful conduct").

### b) State antitrust statutes requiring allegations of concerted activity

As explained in Section IV, Defendants are considered a single economic actor under the antitrust laws, incapable of conspiring or acting in concert with each other. *See Copperweld*, 467 U.S. at 769–72. As a result, dismissal of the IPPs' monopolization claims under the antitrust laws of California, Kansas, New York and Tennessee is required because the laws of those states do not apply to unilateral conduct:

49

**California (Count 2**): *See* Cal. Bus. & Prof. Code § 16720 ("A trust is a combination of capital, skill, or acts by *two or more persons*") (emphasis added); *Asahi Kasei Pharma Corp. v. CoTherix, Inc.*, 138 Cal. Rptr. 3d 620, 626 (Cal. Ct. App. 2012) (California's "Cartwright Act bans combinations, but single firm monopolization is not cognizable under the Cartwright Act"); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986) (the Cartwright Act "does not address unilateral conduct").

**Kansas (Count 8):** Kan. Stat. Ann. § 50-101 ("a trust is a combination of capital, skill, or acts, *by two or more persons*") (emphasis added); *Staley v. Gilead Sciences, Inc.*, 446 F. Supp. 3d 578, 642 (N.D. Cal. 2020) (dismissing plaintiffs' Kansas antitrust claim to the extent that claim was based on unilateral action).

**New York (Count 19):** *See* N.Y. Gen. Bus. Law § 340(1) (declaring certain "contract[s], agreement[s], arrangement[s], or combination[s]" to be illegal); *Glob. Reinsurance Corp. U.S. Branch v. Equitas Ltd.*, 969 N.E.2d 187, 192 (N.Y. 2012) (noting that an antitrust claim under New York law "must allege . . . concerted action by two or more entities and a consequent restraint of trade"); *Commonwealth Elec. Inspection Servs. v. Town of Clarence*, 776 N.Y.S.2d 687, 688–89 (N.Y. App. Div. 2004) (New York state antitrust law does not apply to unilateral action) (relying on *State of New York v. Mobil Oil Corp.*, 38 N.Y.2d 460, 464 (1976)).

**Tennessee (Count 26):** *See* Tenn. Code Ann. § 47-25-101 (outlawing "arrangements, contracts, agreements, trusts, or combinations" in restraint of trade); *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1109 (N.D. Cal. 2007) (dismissing plaintiff's claims under the Tennessee antitrust law because plaintiff had alleged only unilateral conduct).

### c)    State antitrust statutes that do not permit indirect purchaser claims

The IPP's claims under Illinois, Massachusetts, New Hampshire and Puerto

Rico law also fail because antitrust claims by indirect purchasers are barred in each

of those jurisdictions:

**Illinois (Count 6):** *See* 740 Ill. Comp. Stat. § 10/7(2) ("no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General"); *In*

re Humira Antitrust Litig.*, 465 F. Supp. 3d at 850 (noting that Illinois law "prohibits class action antitrust claims brought by indirect purchasers"); *In re Opana*, 162 F. Supp. 3d at 723 (concluding that "the Court must apply the Illinois Antitrust Act and dismiss with prejudice [the] indirect purchaser antitrust claim brought under Illinois law").

**Massachusetts (Count 10):** Plaintiffs have pled their Massachusetts antitrust claim under the wrong statute; the Massachusetts Antitrust Act is codified at Mass. Gen. Laws Ch. 93, §1, *et seq*.  Regardless, even if Plaintiffs had identified the correct statute, their claim under the Massachusetts Antitrust Act would be barred.  *See Ciardi v. F. Hoffman-La Roche, Ltd.*, 762 N.E.2d 303, 308 (Mass. 2002) (indirect purchasers are "foreclosed from pursuing [a] cause of action under [Massachusetts'] Antitrust Act").

**New Hampshire (Count 17):** *See* N.H. Rev. Stat. Ann. § 356; *Minuteman, LLC v. Microsoft Corp.*, 795 A.2d 833, 838 (N.H. 2002) (holding that "it is sound to limit antitrust lawsuits to direct purchasers" and "as a result, the trial court did not err in following the *Illinois Brick* rule when interpreting [the New Hampshire antitrust statute]"); *see also In re Keurig*, 383 F. Supp. 3d at 263–64 (dismissing New Hampshire antitrust claim because indirect purchasers lack standing to sue).

**Puerto Rico (Count 23):** *See* P.R. Laws Tit. 10, § 260; *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 373 (D.R.I. 2019) ("join[ing] the majority of courts in concluding that [indirect purchasers] do not have standing to bring antitrust claims under Puerto Rico law"); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d at 723 (N.D. Ill. 2016) ("Absent an interpretation by the courts of Puerto Rico allowing antitrust recovery by indirect purchasers or an express *Illinois Brick* repealer statute enacted by the legislature, the Court concludes that EPP's indirect purchaser antitrust claim is barred in Puerto Rico and must be dismissed with prejudice.").

### 3.   The IPPs Fail to Plead the Required Elements of Their State Consumer Protection Claims.

#### a)   State consumer protection statutes that permit only consumers to bring suit

In addition to asserting federal and state antitrust claims, the IPPs have also

alleged claims under a number of state consumer protection statutes based on the

same factual allegations of alleged "sham" litigation. But several of these consumer-oriented statutes do not create causes of actions for entities like the IPPs, who are pharmaceutical end-payor entities such as insurers, health plans and municipalities.

For this reason, the IPPs' claims under the consumer protection laws of the District of Columbia, Hawaii, Massachusetts, Minnesota, Missouri, Montana, Nevada, Oregon, Rhode Island and Vermont fail because these state statutes provide a cause of action only for individual consumers:

**District of Columbia (Count 32)**: *See* D.C. Code § 28-3901; *In re Humira Antitrust Litig.*, 465 F. Supp. 3d at 849–50 (finding that "indirect purchasers that reimburse their members" have no remedy under the D.C. Consumer Protection Act, which "covers only the ultimate retail transaction between the final distributor and the individual member of the consuming public") (internal citations omitted); *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1165 (N.D. Cal. 2015) ("*Lidoderm*") (plaintiff health plan "is not a consumer under the District of Columbia's statute," requiring dismissal of plan's claims under that statute); *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1044 (D.C. Cir. 2010) ("[T]he CPPA does not protect businesses engaged in commercial activity.").

**Hawaii (Count 34)**: *See* Haw. Rev. Stat. § 480-1 (defining "consumer" as "a natural person" who makes purchases "primarily for personal, family, or household purposes"); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC* ("*Namenda*"), 2018 WL 7197233, at *40 (S.D.N.Y. Dec. 26, 2018) (indirect purchaser welfare fund could not sue under Hawaii consumer protection statute because it did not purchase Namenda "primarily for personal, family, or household purposes").

**Massachusetts (Count 37):** *See* Mass. Gen. L. ch. 93A, § 1; *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *13 (D. Mass. July 20, 2016) (dismissing claims based on Massachusetts consumer protection law because the "health fund plaintiffs" were not consumers); *Lidoderm*, 103 F. Supp. 3d at 1163–64 (dismissing Massachusetts Consumer Protection Act claim because plaintiff Government Employees Health Organization was acting "in its business interests of providing health care coverage for its members" and was thus an indirect purchaser that could not bring a claim

under Massachusetts law); *In re Auto. Parts Antitrust Litig.*, 2013 WL 2456612, at *29 (E.D. Mich. June 6, 2013) (an indirect purchaser business plaintiff lacks standing under Mass. Gen. L. ch. 93A).

**Minnesota (Count 39):** *See* Minn. Stat. § 325F.68; *Marvin Lumber & Cedar Co. v. Sapa Extrusions, Inc*., 964 F. Supp. 2d 993, 1009 (D. Minn. 2013) (Minnesota consumer protection law is "aimed at protecting consumers" and therefore "merchants cannot assert claims under" the statute); *Solvay Pharms., Inc. v. Global Pharms.*, 298 F. Supp. 2d 880, 886 (D. Minn. 2004) (dismissing Minnesota Consumer Fraud Act claim "because [the statute] is intended to protect the consumers of goods, but not the merchants who are the recipients of Defendants' product").

**Missouri (Count 14)**:   Mo. Rev. Stat. § 407.025(1) (limiting standing to "consumers" who made purchases "primarily for personal, family, or household purposes"); *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1080 (S.D. Cal. 2017) (granting dismissal because indirect purchasers "have not pled the requisite household, personal, or family purposes" under Missouri law).

**Montana (Count 40):** *See* Mont. Code Ann. § 30-14-102(1) (authorizing a private cause of action for a "consumer," which the statute defines as "a person who purchases or leases goods, services, real property, or information primarily for personal, family, or household purposes"); *Namenda*, 2018 WL 7197233, at *46 (indirect purchaser welfare fund had no standing under Montana law because it "did not purchase Namenda 'primarily for personal, family, or household purposes'"); *Lidoderm*, 103 F. Supp. 3d at 1165 (dismissing Montana consumer protection claim brought by health plan because "[t]he statute excludes persons who buy goods for resale").

**Nevada (Count 42):**   *See* Nev. Rev. Stat. § 598.0977 (permitting suits only by "an elderly person or a person with a disability"); *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 234 (M.D. Pa. 2010) (dismissing claim under Nevada statute because "[a] private civil action may be commenced under the NDTPA only by 'an elderly person or a person with a disability'"); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. at 163–64 ("The defendants argue that the Nevada Deceptive Trade Practices Act grants a cause of action only to elderly or disabled persons.  The defendants are correct. . . .  The plaintiffs assert that certain members of their proposed class may fit this description, but this possibility is irrelevant given the named plaintiffs' own lack of standing to assert this claim.").

**Oregon (Count 48):** *See* Or. Rev. Stat. § 646.605, *et seq.*; *Benson Tower Condo. Owners Ass'n v. Victaulic Co.*, 22 F. Supp. 3d 1126, 1135–37 (D. Or. 2014) (Oregon UTPA only provides a cause of action to consumers); *Or. Laborers-Emp'rs Health & Welfare Tr. Fund v. Philip Morris, Inc.*, 17 F. Supp. 2d 1170, 1180 (D. Or. 1998) (plaintiff health and welfare benefit plans "have not alleged that they are consumers of defendants' products and thus . . . they lack standing to maintain claims under the Oregon UTPA."), *aff'd*, 185 F.3d 957 (9th Cir. 1999).

**Rhode Island (Count 49):** R.I. Gen. Laws § 6-13.1-5.2(a) (creating a cause of action for "[a]ny person who purchases or leases goods or services primarily for personal, family, or household purposes"); *Namenda*, 2018 WL 7197233, at *49 (indirect purchaser welfare fund "fails to state a claim under the RIDTPA because it did not purchase Namenda 'primarily for personal, family, or household purposes'"); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKine, PLC*, 737 F. Supp. 2d 380, 423 (E.D. Pa. 2010) (dismissing RIDTPA claim because "[t]hough the plaintiff welfare plans are not corporations, neither are they individuals who purchased Wellbutrin SR for 'personal, family, or household purposes'"); *Whouley v. Shoreham, Inc.*, 2009 WL 762315, at *3 (D.R.I. Mar. 23, 2009) ("The Act applies to 'persons,' and although persons is defined broadly in the Act (R.I. Gen. Laws § 6–13.1–1(3)) [to include corporations], only those 'persons' who purchase or lease goods or services primarily for personal, family, or household purposes may sue under the Act so the coverage of the Act is actually much narrower.").

**Vermont (Count 54):** *See* Vt. Stat. Ann. Tit. 9, § 2451, *et seq.*; *Staley*, 446 F. Supp. at 641–42 (dismissing consumer protection claim because plaintiff union insurers were third-party payors and not "consumers" for purposes of the Vermont Consumer Fraud Act).

### b) State consumer protection statutes requiring that the conduct have a significant nexus with the state

Several states' consumer protection statutes provide a cause of action only for harm that has a close connection to the state. The IPPs' claims under the consumer protection statutes of California, New Hampshire, New York and North Carolina thus fail because those state statutes require that the alleged deceptive conduct occur, at least in part, within the state, and/or substantially affect the state's residents:

54

**California (Count 31):** *See Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*, 404 F. Supp. 2d 1214, 1225–26 (E.D. Cal. 2005) (dismissing California consumer protection claim because "no specific intrastate misconduct" was alleged; "the specific misconduct identified by [plaintiff] occurred in Chicago, Illinois—clearly outside the purview of the [California Unfair Competition Law]").

**New Hampshire (Count 43):** *See Wilcox Indus. Corp. v. Hansen*, 870 F. Supp. 2d 296, 305 (D.N.H. 2012) ("The [New Hampshire Consumer Protection Act] permits relief only for unfair competition that occurs 'within this state.' . . . Although Wilcox alleges that the harm from defendants' conduct occurred in New Hampshire, . . . that fact alone is insufficient to bring the offending conduct within the fold of the NHCPA."); *Mueller Co. v. U.S. Pipe & Foundry Co.*, 2003 WL 22272135, at *6 (D.N.H. Oct. 2, 2003) (because "commercial conduct which affects the people of New Hampshire is actionable under [the New Hampshire Consumer Protection Act] only if it occurs within New Hampshire," plaintiff did not have a cognizable claim under New Hampshire consumer protection law).

**New York (Count 45):** *See Goshen v. Mut. Life Ins. Co.*, 774 N.E.2d 1190, 1195 (N.Y. 2002) (New York General Business Law § 349 "unambiguously evinces a legislative intent to address commercial misconduct occurring within New York," and thus "to qualify as a prohibited act under the statute, the deception of a consumer must occur in New York"); *Sheet Metal Workers Local 441 Health & Welfare Plan*, 263 F.R.D. 205, 214 (E.D. Pa. 2009) (dismissing claim under § 349 because the alleged deceptive conduct in the case—fraud on the PTO and sham litigation— "neither occurred in New York nor was directed at consumers").

**North Carolina (Count 46):** *See Merck & Co. Inc. v. Lyon*, 941 F. Supp. 1443, 1463 (M.D.N.C. 1996) (dismissing North Carolina consumer protection claim where "plaintiffs . . . failed to allege a substantial effect on any in-state business operations," and "[a]ny injury plaintiffs may suffer in North Carolina will be incidental"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 549 (N.D. Ill. 2019) ("North Carolina's Unfair Trade Practices Act reaches only conduct causing a 'substantial' in-state injury, not merely an 'incidental' one. When plaintiffs do not allege that any wrongful conduct occurred in North Carolina, allegations that indirect purchasers payed inflated prices are not sufficient to establish a substantial, in-state injury.") (internal citations omitted).

c)      **State consumer protection statutes that require an unconscionable, unfair, or deceptive act, and consumer reliance on such an act**

The consumer protection claims asserted by the IPPs under the laws of Arizona, Idaho, Illinois, Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Rhode Island, South Dakota, Utah, Virginia and West Virginia are foreclosed because those states' consumer protection statutes do not provide a remedy for antitrust claims absent an unconscionable, unfair or deceptive act.  To the extent the IPPs rely on their allegations of "sham" litigation to satisfy these state law requirements, those assertions fail to allege the requisite deceptive conduct that is required to plead consumer protection claims under the laws of these states:

**Arizona (Count 30):** *See Kuehn v. Stanley*, 91 P.3d 346, 351 (Ariz. Ct. App. 2004) (noting that to state a claim under the Arizona Consumer Fraud Act, plaintiff must show "a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and consequent and proximate injury resulting from the promise"); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 536–37 (E.D. Pa. 2010) (dismissing claims under the Act because, although "Plaintiffs allege that Defendant made arguments that had little basis" in an allegedly sham patent suit, those allegations did not constitute alleged deception of consumers as required to state a claim); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline*, 737 F. Supp. 2d at 403–04 (similar).

**Idaho (Count 35):** *State v. Daicel Chem. Indus., Ltd.*, 106 P.3d 428, 435 (Idaho 2005) (anticompetitive conduct is not cognizable under Idaho's Consumer Protection Act because it is not "'sales conduct' that is directed at the consumer"); *Lidoderm*, 103 F. Supp. 3d at 1168 (dismissing Idaho Consumer Protection Act claim relating to a pharmaceutical company's alleged fraudulent conduct before the USPTO because the conduct was not directed at consumers); *Sheet Metal Workers*, 737 F. Supp. 2d at 411 (similar).

**Illinois (Count 36):** *In re Humira Antitrust Litig.*, 465 F. Supp. 3d at 851 (dismissing claim under the Illinois Consumer Fraud and Deceptive Business Practices Act because "Plaintiffs cannot assert what are essentially antitrust claims in the guise of a claim under the Illinois consumer protection statute, especially when doing so allows them to avoid a provision of Illinois law that would otherwise bar" indirect purchaser suits for alleged antitrust injuries); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 372–73 (D.R.I. 2019) ("[T]his Court joins the majority of other courts in concluding that the EPPs do not have standing to maintain what is in essence an antitrust claim by another name under the Illinois Consumer Fraud and Deceptive Business Practices Act.") (collecting cases).

**Michigan (Count 38):** *See* Mich. Comp. Laws. Ann. § 445.903 (prohibiting specifically enumerated "[u]nfair, unconscionable, or deceptive methods, acts or practices"); *Lidoderm*, 103 F. Supp. 3d at 1169 (dismissing Michigan consumer protection claim because plaintiffs had alleged only "conduct in prosecuting [a] Patent," rather than "wide-spread dissemination of false information to the *public*") (emphasis in original); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 189 (D. Me. 2004) (dismissing consumer protection claim based on antitrust allegations because "the proscribed practices are limited to those itemized in the statute"); *Sheet Metal Workers*, 737 F. Supp. 2d at 413 (dismissing Michigan consumer protection claim because "plaintiffs have failed to claim that GSK made misrepresentations *directed* at them or upon which they, as consumers of Wellbutrin SR, relied" and "failed to allege that GSK had the intent to deceive consumers rather than the PTO or generic manufacturers") (emphasis in original).

**Minnesota (Count 39):** *See* Minn. Stat. § 325F.69 (prohibiting "fraud . . ., misrepresentation, [and] deceptive practice[s], with the intent that others rely thereon in connection with the sale of any merchandise"); *Lidoderm*, 103 F. Supp. 3d at 1170 (dismissing claim under the Minnesota Prevention of Consumer Fraud Act because "the alleged fraudulent and deceptive conduct at issue"—which included alleged deception of the USPTO—"is not the type of fraud, misrepresentation or deceptive practices covered by" the Act).

**Nevada (Count 42):** *See* Nev. Rev. Stat. § 598.0915 (enumerating specific conduct prohibited under the statute, which does not include antitrust violations); *Sheet Metal Workers*, 737 F. Supp. 2d at 417 ("[e]ven if plaintiffs' allegation that GSK made legally baseless allegations to the PTO and in the context of litigation against generic manufacturers proves true, this does not fall" within the purview of the Nevada consumer protection statute).

**New Mexico (Count 44):** *See* N.M. Stat. Ann. § 57-12-2(E) (unconscionable trade practices means acts or practices that "take[] advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree" or "result[] in a gross disparity between the value received by a person and the price paid"); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029–30 (N.D. Cal. 2007) ("*In re GPUs*") (dismissing price-fixing claims under New Mexico consumer protection statute because unconscionability under New Mexico law "requires something more than merely alleging that the price of a product was unfairly high").

**New York (Count 45):** *See* N.Y. Gen. Bus. Law § 349(a), (h) (conferring a private right of action only on a "person who has been injured by reason of" a deceptive act or practice); *In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 589 (E.D. Pa. 2018) (dismissing New York consumer protection claim "because New York's law requires a plaintiff to allege . . . a deceptive act or practice directed toward consumers") (citations omitted).

**Oregon (Count 48):** *See* Or. Rev. Stat. § 646.608(1) (enumerating specific conduct prohibited under the statute, which does not include antitrust violations); *In re GPUs*, 527 F. Supp. 2d at 1030 (holding that price fixing is not one of the "number of practices proscribed by the statute"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1115–16 (N.D. Cal. 2007) (dismissing indirect purchaser's claim under Oregon statute because antitrust allegations did not fall within catch-all provision for "any other unfair or deceptive conduct in trade or commerce").

**Rhode Island (Count 49):** *See* R.I. Gen. Laws § 6-13.1-1(6) (enumerating specific conduct prohibited under the statute, which does not include antitrust violations); *In re GPUs*, 527 F. Supp. 2d at 1030–31 (dismissing Rhode Island consumer protection claim because "Rhode Island's unfair-competition statute has been interpreted to foreclose claims based on antitrust violations," and "Rhode Island does not permit state-law antitrust claims by indirect purchasers"); *In re DRAM Antitrust Litig.*, 516 F. Supp. 2d at 1116 (dismissing claim because the alleged antitrust conduct does not "fall within the enumerated list of conduct and activity that the [Rhode Island statute] defines").

**South Dakota (Count 51):** *See* S.D. Codified Laws § 37-24-6(1) (defining an actionable deceptive practice as to "[k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or

advertisement of any merchandise"); *New Motor Vehicles*, 350 F. Supp. 2d at 202–03 (dismissing claim based on antitrust allegations because "only those acts or practices specifically designated as unlawful" are prohibited); *Lidoderm*, 103 F. Supp. 3d at 1171–72 (dismissing claim under South Dakota consumer protection law because "there are no allegations that defendants made affirmative misrepresentations that were passed along to the purchasers of Lidoderm").

**Utah (Count 52):** *See In re Humira Antitrust Litig.*, 465 F. Supp. 3d at 853 (dismissing claim under the Utah Consumer Sales Practices Act because defendants' alleged patent misuse was not unconscionable since it "did not involve either gross bargaining power or oppression" as those terms have been interpreted by Utah courts); *In re DRAM Antitrust Litig.*, 516 F. Supp. 2d at 1117 (dismissing antitrust claim brought under Utah CSPA because the act "prohibits only 'deceptive' and 'unconscionable' acts, which are expressly enumerated in the statute, and none of which include antitrust violations").

**Virginia (Count 55):** *See* Va. Code Ann. § 59.1-200(A) (prohibiting specified acts "committed by a supplier in connection with a consumer transaction"); *Adams v. Children's Hosp. of the King's Daughters*, 2018 WL 9392997, at *8 (Va. Cir. Ct. 2018) (granting dismissal of claim against intermediary based on plaintiffs' failure to plead "that there was a misrepresentation made to her upon which she relied or that the alleged misrepresentation was in connection with a consumer transaction").

**West Virginia (Count 56):** *See* W. Va. Code § 46A-6-102(7) (enumerating specific prohibited conduct, which does not include antitrust violations); *In re DRAM Antitrust Litig.*, 516 F. Supp. 2d at 1118 (the West Virginia statute "specifically enumerates the practices and conduct that constitute unfair competition or deceptive and unfair practices, and antitrust violations are not included in that enumerated list"); *In re GPUs Antitrust Litig.*, 527 F. Supp. 2d at 1030 ("West Virginia's statute lists a number of unfair and deceptive practices in trade or commerce; price fixing is not among them.").

### C. The IPPs' Unjust Enrichment Claims Similarly Warrant Dismissal.

All of the IPPs' unjust enrichment claims should be rejected for the same

reasons that their underlying antitrust claims fail. Because—as discussed above in

Part I—there is no basis for the IPPs' claim that the '438 patent litigation was a

"sham" or was objectively baseless, this likewise defeats any claim of unjust enrichment derived from that same factual allegation of "sham" litigation. *See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 936–37 (3d Cir. 1999) (finding "no justification for permitting plaintiffs to proceed on their unjust enrichment claim once we have determined that the District Court properly dismissed the traditional tort claims"); *Allegheny General Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir. 2000) (describing the dismissal of unjust enrichment claims where "the traditional tort claims [are] properly dismissed" as the "proper reading of *Steamfitters*"); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d at 542 n.13 (concluding that allowing unjust enrichment claims where plaintiffs failed to state antitrust or consumer protection claims "would undermine state legislative policies and an entire body of substantive law"); *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995) (because plaintiff's unjust enrichment claim hinged on practices plaintiff claimed to be illegal under the Sherman Act and the Donnelly Act and "because the allegations of illegality in the complaint fail, the unjust enrichment claim must be dismissed"); *In re Actos End Payor Antitrust Litig.*, 2015 WL 5610752, at *28 (S.D.N.Y. 2015) ("because no antitrust claim survives, the parasitic unjust enrichment claims must be dismissed as well"); *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4743425, at *4 (S.D.N.Y. 2014) , *aff'd*, 833 F.3d 151 (2d Cir. 2016) (dismissing unjust enrichment claim because it was

"predicated on defendants' alleged violations of antitrust or consumer protection laws . . ., which the Court has dismissed").

The IPPs' unjust enrichment claims also suffer from additional defects.

> **1.      Unjust Enrichment Claims Brought Under the Laws of States That Have Not Repealed *Illinois Brick* Should Be Dismissed.**

Almost half of the states' antitrust laws follow *Illinois Brick* and bar claims brought by indirect purchasers.  The IPPs here should not be permitted to circumvent those state legislative determinations by repackaging their antitrust claims as claims for unjust enrichment.  *See, e.g.*, *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 763 (E.D. Pa. 2014) ("the Court dismisses the end-payor plaintiffs' unjust-enrichment claims brought under the laws of any state in which indirect purchasers may not bring an antitrust or consumer-protection claim"); *Sheet Metal Workers*, 737 F. Supp. 2d at 426 (dismissing "plaintiffs' unjust enrichment claims in those states where indirect purchasers do not have a remedy under the relevant state antitrust or consumer protection laws, because allowing indirect purchasers to pursue an equitable remedy in states where they have no antitrust or consumer protection remedy at law would subvert state legislative attempts to limit antitrust liability for defendants"); *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d at 239 (explaining that "it would improperly displace the legislative prerogative to allow indirect purchasers . . . to vindicate antitrust injury via equitable

61

relief in jurisdictions where the legislative body has not adopted an *Illinois Brick* repealer").

Here, the IPPs bring unjust enrichment claims under the laws of 39 states, the District of Columbia and Puerto Rico.  (Count 57, SCCAC ¶¶ 756–801.)  These claims should be dismissed as to the twelve states—Alaska, Georgia, Idaho, Illinois, Maryland, Massachusetts, Montana, New Hampshire, Pennsylvania, South Carolina, Virginia and Wyoming—as well as Puerto Rico that do not permit indirect purchasers to bring antitrust actions.  *See Lidoderm*, 103 F. Supp. 3d at 1175 (dismissing claims brought under the antitrust laws of the listed states, except New Hampshire); *LaChance v. U.S. Smokeless Tobacco Co.*, 931 A.2d 571, 575–76 (N.H. 2007) (indirect purchasers do not have standing under New Hampshire law).

### 2. "Stand Alone" Unjust Enrichment Claims Brought Under the Laws of States That Do Not Expressly Allow Them Should Be Dismissed.

The IPPs assert unjust enrichment claims in seven states where they have alleged neither an antitrust nor a consumer protection claim—Alabama, Alaska, Arkansas, Georgia, Maryland, Pennsylvania and Wyoming.  (SCCAC ¶¶ 761–762, 764, 768, 775, 790, 801.)  Such "stand-alone" claims, sometimes referred to as autonomous claims, should be dismissed because they are again attempts by the IPPs to circumvent state law and legislative policies.

Courts have repeatedly dismissed stand-alone unjust enrichment claims in states that bar the plaintiff from recovering for a defendant's alleged conduct under antitrust or consumer protection laws, unless the state has explicitly recognized autonomous unjust enrichment claims. *See Lidoderm*, 103 F. Supp. 3d at 1175; *Flonase*, 692 F. Supp. 2d at 542 n.13; *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d at 209–10. That is because such autonomous claims are clear attempts by plaintiffs to seek a restitution remedy when the state legislature has not provided for one. Thus, permitting such stand-alone unjust enrichment claims would "undermin[e] another body of substantive law" by permitting an end-run around the scope of liability established by state law. *New Motor Vehicles*, 350 F. Supp. 2d at 209. This is particularly true where "the scope of antitrust laws and consumer protection statutes is designed to permit unfettered economic activity in matters that are not within their proscription." *Id*.

For this reason, the seven stand-alone unjust enrichment claims must be dismissed with prejudice. *See Namenda*, 2018 WL 7197233, at *57 (dismissing Alaska claims); *Lidoderm*, 103 F. Supp. 3d at 1175 n.18 (dismissing Alabama and Arkansas claims); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d at 763–65 (dismissing Georgia, Maryland and Pennsylvania claims); *Sheet Metal Workers*, 737 F. Supp. 2d at 426 (dismissing Alabama and Georgia claims).

### 3. Unjust Enrichment Claims Should Be Dismissed as to Those States That Require the Plaintiff to Confer a Direct Benefit on the Defendant as an Element of the Claim.

The laws of six states require, as an element of any unjust enrichment claim, that the plaintiff confer a benefit *directly* on the defendant. The IPPs' unjust enrichment claims under Florida, Georgia, Idaho, Maine, Michigan and New York law should thus be dismissed for lack of any such allegation.

**Florida (SCCAC ¶ 767):** *See Flonase*, 692 F. Supp. 2d at 544 (dismissing indirect purchaser's unjust enrichment claim based on same allegations as sham litigation claim because "Florida courts have indicated that in order to state a claim for unjust enrichment, the plaintiff must confer a direct benefit on the defendant"); *Am. Safety Ins. Serv., Inc. v. Griggs*, 959 So. 2d 322, 331 (Fla. Dist. Ct. App. 2007) (concluding unjust enrichment claim could not proceed because plaintiffs did not "show they directly conferred a benefit on the defendants").

**Georgia (SCCAC ¶ 768):** *See Brenner v. Future Graphics, LLC*, 258 F.R.D. 561, 576 (N.D. Ga. 2007) (granting summary judgment because Georgia law did not provide for unjust enrichment claim against defendant who received benefit indirectly from plaintiff); *Scott v. Mamari Corp.*, 530 S.E.2d 208, 212 (Ga. Ct. App. 2000) (unjust enrichment claim failed where defendants did not "receive[] the direct benefit" of plaintiff's action).

**Idaho (SCCAC ¶ 770):** *See In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 234 (S.D.N.Y. 2012) (dismissing unjust enrichment claim based on Idaho law because "direct benefit" was not alleged).

**Maine (SCCAC ¶ 774):** *See In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *25–26 (E.D. Mich. Apr. 9, 2013) (dismissing Maine unjust enrichment claim because Maine requires that plaintiff conferred a direct benefit on defendant to assert valid claim); *In re Aftermarket Filters Antitrust Litig.*, 2010 WL 1416259, at *2–3 (N.D. Ill. Apr. 1, 2010) (same).

**Michigan (SCCAC ¶ 777):** *See Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d 601, 618 (E.D. Mich. 2017) (dismissing claim because "to state a claim for unjust

enrichment, Michigan law requires a direct benefit or some sort of direct interaction" between plaintiff and defendant, and plaintiffs alleged neither).

**New York (SCCAC ¶ 786):** *See Lidoderm*, 103 F. Supp. 3d at 1178 (indirect purchaser's claims were "too attenuated to state an unjust enrichment claim under New York law"); *Sheet Metal Workers*, 737 F. Supp. 2d at 441 ("New York courts have required a direct relationship—short of privity of contract but stronger than that between a manufacturer and a consumer along the chain of commerce—between the plaintiff and the defendant in order to state a claim for unjust enrichment.").[15]

## CONCLUSION

For the foregoing reasons, the IPPs' complaint should be dismissed for failure to state a claim.

Dated:  April 6, 2021

s/ Liza M Walsh
Liza M. Walsh
Katelyn O'Reilly
William T. Walsh, Jr.
**WALSH PIZZI O'REILLY**
**FALANGA LLP**
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
Phone: (973) 757-1100
Facsimile: (973) 757-1090

s/ Jeffrey J. Greenbaum
Jeffrey J. Greenbaum
Gregory E. Reid
**SILLS CUMMIS & GROSS P.C.**
One Riverfront Plaza
Newark, NJ 07102
Phone: (973) 643-7000
Facsimile: (973) 643-6500
jgreenbaum@sillscummis.com
greid@sillscummis.com

---

[15] The IPPs have asserted unjust enrichment claims under the laws of many states that do not permit such equitable claims when plaintiff has an adequate remedy at law.  Defendants have not moved to dismiss those claims at this time because courts in this district have held that plaintiffs are permitted to plead alternative causes of action. *See, e.g.*, *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) ("Plaintiffs . . . are clearly permitted to plead alternative theories of recovery. Consequently, it would be premature at this stage of the proceedings to dismiss the Indirect Purchasers' and the Commonwealth's unjust enrichment claims on th[e] basis" that they had also claimed a remedy at law).  Defendants reserve the right to move to dismiss those claims at the appropriate time.

lwalsh@walsh.law
koreilly@walsh.law
wwalsh@walsh.law

Jack E. Pace III (*pro hac vice*)
jpace@whitecase.com
Alison Hanstead (*pro hac vice*)
ahanstead@whitecase.com
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY 10020

Peter J. Carney (*pro hac vice*)
pcarney@whitecase.com
Adam M. Acosta (*pro hac vice*)
adam.acosta@whitecase.com
**WHITE & CASE LLP**
701 Thirteenth Street, NW
Washington, DC 20005

Kevin M. Bolan (*pro hac vice*)
kevin.bolan@whitecase.com
**WHITE & CASE LLP**
75 State Street
Boston, MA 02109

*Attorneys for BTG International Limited*

Timothy C. Hester (*pro hac vice*)
thester@cov.com
Ashley E. Bass (*pro hac vice*)
abass@cov.com
Carol A. Szurkowski (*pro hac vice*)
cszurkowski@cov.com
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Phone: (202) 662-6000
Facsimile: (202) 662-6291

*Attorneys for Janssen Biotech, Inc., Janssen Oncology, Inc., and Janssen Research & Development, LLC*