# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

LOUISIANA HEALTH SERVICE &
INDEMNITY COMPANY D/B/A BLUE
CROSS AND BLUE
SHIELD OF LOUISIANA, HMO
LOUISIANA, INC., et al.,

        Plaintiffs,

        v.

JANSSEN BIOTECH, INC., JANSSEN
ONCOLOGY, INC., JANSSEN
RESEARCH & DEVELOPMENT, LLC,
and BTG INTERNATIONAL LIMITED,

        Defendants.

Civil Action No.
19-14146 (KM)(JBC)

## END-PAYOR PLAINTIFFS' OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

*Interim Liaison Counsel for the Proposed
End-Payor Class*

(Additional Counsel on Signature Page)

i

## TABLE OF CONTENTS

I.   INTRODUCTION ...........................................................................1

II.  BACKGROUND ............................................................................3

    A.   BTG patents abiraterone in the 1990s; Janssen's initial attempts at extending patent protection fail. ......................................................3

    B.   Zytiga gets approved, but Janssen's patent efforts continue to fail. ...............................................................................................3

    C.   Janssen succeeds with the PTO on the sixth try by deciding not to call attention to the '213 blocking patent. .........................................5

    D.   Would-be competitors chomped at the bit to sell a generic version of Zytiga as soon as the '213 blocking patent expired. ............5

III. LEGAL STANDARD .....................................................................6

IV.  ARGUMENT ................................................................................7

    A.   Whether any immunity applies is fact-driven and inappropriate for a motion to dismiss. ........................................................................7

    B.   *Noerr-Pennington*'s limited immunity does not protect Janssen or BTG. ......................................................................................11

        1.   Janssen and BTG pursued objectively baseless litigation. .......13

        2.   Janssen and BTG were motivated to impose delay on generic competition. ...............................................................17

        3.   Defendants paint an inaccurate picture of the Court's findings, betraying the weakness of their motion. ....................18

        4.   The Court's decision to briefly maintain the status quo reflects a procedural quirk, not the merits of the litigation. .................................................................................21

        5.   Defendants misrepresent the Court's comments from the bench. ........................................................................22

    C.   *Illinois Brick* does not bar the EPPs' Sherman Act damages claim. ..............................................................................25

ii

1.    EPPs allege that the specialty pharmacies have functional economic or other unity with Janssen, satisfying *Illinois Brick*'s control exception. ........................................................25

2.    Defendants mistake EPPs' basis for federal antitrust standing. ...............................................................................28

3.    Antitrust standing is a factual inquiry, for which discovery should be permitted. ................................................30

D.    *Noerr-Pennington* does not bar EPPs' state law claims. ..................31

E.    *Copperweld* does not foreclose EPPs' state law conspiracy claims. ................................................................................31

F.    Defendants' attacks on EPPs' state law claims fail. ...........................36

1.    EPPs have Article III standing to pursue their state law claims. ................................................................................36

2.    EPPs adequately plead the state law claims. ..............................41

3.    EPPs adequately allege violations of state antitrust laws. ........43

a)    The complaint sufficiently pleads an intrastate nexus. ...............................................................................43

b)    The complaint alleges concerted activity by Janssen and BTG. ...........................................................45

c)    EPPs may proceed under the antitrust laws of Illinois and Puerto Rico. .................................................46

4.    EPPs adequately plead state consumer protection claims. .......47

a)    Consumer protection laws of the District of Columbia, Hawaii, Massachusetts, Minnesota, Missouri, Montana, Nevada, Oregon, Rhode Island and Vermont are not limited to "individuals." ..............47

b)    EPPs adequately allege in-state effects of defendants' conduct. ......................................................51

c)    EPPs allege the requisite conduct under various states' consumer protection statutes. ..............................54

5.    Plaintiffs' unjust enrichment claims are adequately pled. ........60

a)    Unjust enrichment claims proceed independently from antitrust claims. ....................................................60

iii

       b)      *Illinois Brick* does not bar EPPs' unjust enrichment claims. ............................................................61

       c)      Plaintiffs' unjust enrichment claims should be sustained in those states where they have no other claims. ............................................................63

       d)      Unjust enrichment claims do not require additional allegations of direct benefit. ...........................................64

V.   CONCLUSION ...............................................................67

iv

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Abbott Lab'ys v. Teva Pharms. USA, Inc.*,
432 F. Supp. 2d 408 (D. Del. 2006)....................................................................14

*In re Actiq Sales & Mktg. Pracs. Litig.*,
790 F. Supp. 2d 313 (E.D. Pa. 2011)..................................................................49

*Adam A. Weschler & Son, Inc. v. Klank*,
561 A.2d 1003 (D.C. 1989) .........................................................................46, 47

*In re Aftermarket Filters Antitrust Litig.*,
2010 WL 1416259 (N.D. Ill. Apr. 1, 2010).............................................56, 57, 64

*In re Aggrenox Antitrust Litig.*,
94 F. Supp. 3d 224 (D. Conn. 2015)....................................................................41

*Albers v. Mercedes-Benz USA, LLC*,
2020 WL 1466359 (D.N.J. March 25, 2020).........................................24, 25, 26

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988).............................................................................................7

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016) ...............................................................................41

*Am. Fed'n of State Cnty. Mun. Emp. v. Ortho-McNeill-Janssen Pharms., Inc.*,
2010 WL 891150 (E.D. Pa. Mar. 11, 2010) .......................................................49

*Am. Needle, Inc. v. Nat'l Football League*,
560 U.S. 183 (2010).............................................................................................33

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997).............................................................................................36

*Ames v. Oceanside Welding & Towing Inc.*,
767 A.2d 677 (R.I. 2001).............................................................................56, 57

v

*In re Androgel Antitrust Litig.*,
  687 F. Supp. 2d 1371 (N.D. Ga. 2010) .............................................................15

*Animal Sci. Prods., Inc. v. China Minmetals Corp.*,
  34 F. Supp. 3d 465 (D.N.J. 2014) ....................................................................29

*Apple v. Pepper*,
  139 S. Ct. 1514 (2019) ....................................................................................28

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018) ..............................................................................39

*In re Asacol Antitrust Litig.*,
  2016 WL 4083333 (D. Mass. July 20, 2016) ...................................................47

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...........................................................................................6

*AstraZeneca AB v. Mylan Lab'ys, Inc.*,
  2010 WL 2079722 (S.D.N.Y. May 19, 2010) ..............................................9, 10

*In re Auto. Parts Antitrust Litig.*,
  2013 WL 2456612 (E.D. Mich. June 6, 2013) .................................................52

*In re Auto. Parts Antitrust Litig.*,
  50 F. Supp. 3d 869 (E.D. Mich. 2014) .........................................................62, 5

*In re Auto. Parts Antitrust Litig.*,
  50 F. Supp. 3d 836 (E.D. Mich. 2014) .............................................................51

*In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs.*
  *Litig.*,
  701 F. Supp. 2d 356 (E.D.N.Y. 2010) ..............................................................40

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................................6, 7, 40

*Bergman v. Spruce Peak Realty, LLC*,
  847 F. Supp. 2d 653 (D. Vt. 2012) ...................................................................49

*Brenner v. Future Graphics, LLC*,
  258 F.R.D. 561 (N.D. Ga. 2007) ......................................................................63

vi

*In re Broiler Chicken*,
    290 F. Supp. 3d 772 (N.D. Ill. 2017)...........................................................38, 45

*BTG Int'l Ltd. v. Amneal Pharms. LLC*,
    923 F.3d 1063 (Fed. Cir. 2019) ..................................................................18, 23

*BTG Int'l Ltd. v. Amneal Pharms. LLC*,
    No. 15-cv-05909 (D.N.J.) ...................................................................................2

*C.R. Bard, Inc. v. M3 Systems, Inc.*,
    157 F.3d 1340 (Fed. Cir. 1998) .......................................................................14

*In re Canon Cameras Litig.*,
    2006 WL 1751245 (S.D.N.Y. June 23, 2006) ..................................................65

*In re Cardizem CD Antitrust Litig.*,
    105 F. Supp. 2d 618 (E.D. Mich. 2000) .....................................................58, 62

*Carlsen v. GameStop, Inc.*,
    833 F.3d 903 (8th Cir. 2016) ............................................................................55

*Cave Consulting Grp., Inc. v. OptumInsight, Inc.*,
    2016 WL 4744165 (N.D. Cal. Sept. 12, 2016).................................................11

*In re Chocolate Confectionary Antitrust Litig.*,
    602 F. Supp. 2d 538 (M.D. Pa. 2009)..............................................................38

*In re Chocolate Confectionary Antitrust Litig.*,
    749 F. Supp. 2d 224 (M.D. Pa. 2010)........................................................*passim*

*Clark Off. Bldg., LLC v. MCM Cap. Partners, LLLP*,
    245 A.3d 186 (Md. Ct. Spec. App. 2021).........................................................62

*Clark v. McDonald's Corp.*,
    213 F.R.D. 198 (D.N.J. 2003)..........................................................................38

*Coffee Pot Plaza P'ship v. Arrow Air Conditioning and Refrigeration, Inc.*,
    412 So. 2d 883 (Fla. Dist. Ct. App. 1982)........................................................63

*Conceptual Eng'g Assocs., Inc. v. Aelectronic Bonding, Inc.*,
    714 F. Supp. 1262 (D.R.I. 1989) ......................................................................11

vii

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984).................................................................*passim*

*Cox v. Microsoft Corp.*,
  8 A.D.3d 39, 778 N.Y.S.2d 147 (N.Y. App. Div. 2004) ....................................65

*Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*,
  250 F.3d 570 (7th Cir. 2001) .............................................................54

*D.R. Ward Constr. Co. v. Rohm & Hass Co.*,
  470 F. Supp. 2d 485 (E.D. Pa. 2006)................................................59, 62

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
  2015 WL 3988488 (N.D. Ill. June 29, 2015).......................................59

*Davis v. Four Seasons Hotel Ltd.*,
  228 P.3d 303 (Haw. 2010) ...............................................................47

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
  903 F. Supp. 2d 198 (S.D.N.Y. 2012) ...........................................*passim*

*In re Domestic Drywall Antitrust Litig.*,
  2016 WL 3769680 (E.D. Pa. July 13, 2016) .....................................40

*In re Dynamic Access Memory Antitrust Litig.*,
  536 F. Supp. 2d 1129 (N.D. Cal. 2008).......................................56, 57

*In re Dynamic Access Memory Antitrust Litigation*,
  516 F. Supp. 2d 1072 (N.D. Cal. 2007).................................56, 57, 58

*E.R.R. Pres. Conf. v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961).........................................................................8

*Ellmaker v. Tabor*,
  377 P.3d 390 (Idaho 2015) .............................................................63

*In re EpiPen (Epinephrine Injection, USP) Mktg, Sales Pracs. and
  Antitrust Litig.*,
  336 F. Supp. 3d 1256 (D. Kan. 2018)...............................32, 33, 34, 44

*Fed. Trade Comm'n v. AbbVie Inc.*,
  976 F.3d 327 (3d Cir. 2020) ........................................................*passim*

*In re FieldTurf Artificial Turf Mktg. & Sales Pracs. Litig.*,
    2018 WL 4188459 (D.N.J. Aug. 31, 2018) ........................................................38

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ................................................................................41

*FTC v. Mylan Lab'ys Inc.*,
    99 F. Supp. 2d 1 (D.D.C. 1999).............................................................................58

*In re G–Fees Antitrust Litig.*,
    584 F. Supp. 2d 26 (D.D.C. 2008)..................................................................58, 60

*Gamboa v. Ford Motor Co.*,
    2020 WL 7047612 (E.D. Mich. Nov. 30, 2020)...................................................30

*Gasperoni v. Metabolife, Int'l Inc.*,
    2000 WL 33365948 (E.D. Mich. Sept. 27, 2000) ...............................................55

*Gavilon Grain LLC v. Rice*,
    2017 WL 3508721 (E.D. Ark. Aug. 16, 2017)....................................................61

*In re Generic Pharms. Pricing Antitrust Litig.*,
    368 F. Supp. 3d 814 (E.D. Pa. 2019)...........................................................*passim*

*George v. Custer*,
    862 P.2d 176 (Alaska 1993) ................................................................................61

*Goshen v. Mut. Life Ins. Co.*,
    774 N.E.2d 1190 (N.Y. 2002)..............................................................................51

*Graff v. Subbiah Cardiology Assocs., Ltd.*,
    2008 WL 2312671 (W.D. Pa. June 4, 2008) .......................................................41

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007)...............................................................56

*Handgards, Inc. v. Ethicon, Inc.*,
    601 F.2d 986 (9th Cir. 1979) ..............................................................................11

*Harbour Cap. Corp. v. Allied Cap. Corp.*,
    2009 WL 2185449 (D.N.H. July 22, 2009).........................................................51

*Hausam v. Schnabl*,
    887 P.2d 1076 (Idaho Ct. App. 1994)...................................................................63

*Hoffman–LaRoche, Inc. v. Genpharm, Inc.*,
    50 F. Supp. 2d 367 (D.N.J. 1999) ......................................................................9

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*,
    424 F.3d 363 (3d Cir. 2005) ........................................................................25, 27

*In re Humira (Adalimumab) Antitrust Litigation*,
    465 F. Supp. 3d 811(N.D. Ill. 2020), *appeal filed sub nom. UFCW*
    *Loc. 1500 Welfare Fund v. AbbVie Inc.*, No. 20-2402 (7th Cir.
    2020) .................................................................................41, 47, 57

*In Re Hypodermic Prods. Antitrust Litig.*,
    2007 WL 1959225 (D.N.J. June 29, 2007).........................................................38

*In re Hypodermic Prods. Antitrust Litig.*,
    484 Fed. App'x 669 (3d Cir. 2012) .................................................................28

*Ill. Brick Co. v. Illinois*,
    431 U.S. 720 (1977)...........................................................................*passim*

*Indivior Inc. v. Dr. Reddy's Lab'ys S.A.*,
    2020 WL 4932547 (D.N.J. Aug. 24, 2020) (McNulty, J.) ..............................7, 9

*In re Insulin Pricing Litig.*,
    2019 WL 643709 (D.N.J. Feb. 15, 2019) ....................................................38, 39

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    496 F. Supp. 2d 404 (D. Del. 2007)............................................................54, 57

*Jewett v. Boihem*,
    23 So. 3d 658 (Ala. 2009)...............................................................................61

*Jewish Hosp. Ass'n of Louisville, Ky. v. Stewart Mech. Enters.*,
    628 F.2d 971 (6th Cir. 1980) .............................................................................25

*In re K-Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004)............................................................62, 63

*Kammer Asphalt Paving Co., v. E. China Twp. Schs.*,
   504 N.W.2d 635 (Mich. 1993)................................................................64

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) ...................................................64

*Khawaja v. RE/MAX Cent.*,
   2016 PA Super 261, 151 A.3d 626 (2016) .............................................62

*King Drug Co. v. Cephalon, Inc.*,
   702 F. Supp. 2d 514 (E.D. Pa. 2010)................................................59, 60

*Kramer v. Pollock-Krasner Found.*,
   890 F. Supp. 250 (S.D.N.Y. 1995) ........................................................59

*Kuehn v. Stanley*,
   91 P.3d 346 (Ariz. Ct. App. 2004)..........................................................54

*Langan v. Johnson & Johnson Consumer Cos.*,
   897 F.3d 88 (2d Cir. 2018) .....................................................................39

*In re Lantus Direct Purchaser Antitrust Litig.*,
   284 F. Supp. 3d 91 (D. Mass. 2018)..................................................14, 15

*In re Lidoderm Antitrust Litig.*,
   103 F. Supp. 3d 1155 (N.D. Cal. 2015)..............................................47, 48

*In re Lipitor Antitrust Litig.*,
   336 F. Supp. 3d 395 (D.N.J. 2018)....................................................55, 56

*In re Liquid Aluminum Sulfate Antitrust Litig.*,
   2017 WL 3131977 (D.N.J. July 20, 2017) .....................................*passim*

*In re Loestrin 24 Fe Antitrust Litig.*,
   410 F. Supp. 3d 352 (D.R.I. 2019) ............................................51, 54, 55

*In re Loestrin 24FE Antitrust Litig.*,
   261 F. Supp. 3d 307 (D.R.I. 2017) ....................................................16, 55

*In re Lorazepam & Clorazepate Antitrust Litig.*,
   295 F. Supp. 2d 30 (D.D.C 2003)...........................................................47

*LaChance v. U.S. Smokeless Tobacco Co.*,

931 A.2d 571, 578 (N.H. 2007) ........................................................................51

*Macquarie Grp. Ltd. v. Pac. Corporate Grp., LLC*,
2009 WL 539928 (S.D. Cal. Mar. 2, 2009) .....................................................56

*Mann v. Bahi*,
251 F. Supp. 3d 112 (D.D.C. 2017) ................................................................47

*MarcTec, LLC v. Johnson & Johnson*,
No. 07-cv-825, (S.D. Ill. June 15, 2009) ........................................................16

*MarcTec, LLC v. Johnson & Johnson*,
664 F.3d 907 (Fed. Cir. 2012) ........................................................................16

*Mayor of Baltimore v. Actelion Pharms. Ltd.*,
2021 WL 1376980 (4th Cir. Apr. 13, 2021) ..............................................39, 70

*McCarthy v. Recordex Serv., Inc.*,
80 F.3d 842 (3d Cir. 1996) .............................................................................25

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ......................................................................19

*Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*,
404 F. Supp. 2d 1214 (E.D. Cal. 2005) ..........................................................50

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
948 F. Supp. 2d 538 (D. Md. 2013) ................................................................21

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
No. 12-cv-00954 (Sept. 15, 2014) ..................................................................22

*Metz Beverage Co. v. Wyo. Beverages, Inc.*,
2000 WY 21, 39 P.3d 1051 (Wyo. 2002) ........................................................62

*Miller v. Samsung Elecs. Am., Inc.*,
2015 WL 3965608 (D.N.J. June 29, 2015).......................................................38

*Minnesota ex rel. Humphrey v. Alpine Air Prods. Inc.*,
490 N.W.2d 888 (Minn. Ct. App. 1992)....................................................48, 55

*Morris Pumps v. Centerline Piping, Inc.*,
729 N.W.2d 898 (Mich. Ct. App. 2006)..........................................................64

*Morrison v. YTB Int'l, Inc.*,
  649 F.3d 533 (7th Cir. 2011) ...............................................................39

*MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*,
  2019 WL 1418129 (D.N.J. Mar. 29, 2019) ........................................40

*Neale v. Volvo Cars of North America, LLC*,
  794 F.3d 353 (3d Cir. 2015) .................................................37, 38, 39

*In re Neurontin Antitrust Litig.*,
  2009 WL 2751029 (D.N.J. Aug. 28, 2009) .....................................9, 15

*In re New Motor Vehicles Canadian Expert Antitrust Litig.*,
  350 F. Supp. 2d 160 (D. Me. 2004) .......................................48, 51, 55

*New York v. Feldman*,
  210 F. Supp. 2d 294 (S.D.N.Y. 2002) ........................................51, 56

*In re Niaspan Antitrust Litig.*,
  42 F. Supp. 3d 735 (E.D. Pa. 2014) ...................................................51

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  572 U.S. 545 (2014) ........................................................................8, 16

*In re Opana ER Antitrust Litig.*,
  162 F. Supp. 3d 704 (N.D. Ill. 2016) .................................................41

*In re Opana ER Antitrust Litig.*,
  2016 WL 4245516 (N.D. Ill. Aug. 11, 2016) ....................................64

*Oregon ex rel. Rosenblum v. Johnson & Johnson*,
  362 P.3d 1197 (Or. Ct. App. 2015)....................................................56

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999).............................................................................38

*In re Packaged Seafood Prods. Antitrust Litig.*,
  242 F. Supp. 3d 1033 (S.D. Cal. 2017) ...........................48, 56, 57, 58

*Persky v. Turley*,
  1991 WL 327434 (D. Ariz. 1991) ......................................................54

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  491 F. Supp. 2d 20 (D. Mass. 2007) ......................................................47, 54, 58

*Phillips v. Cnty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ................................................................................6

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
  946 F. Supp. 2d 554 (E.D. La. 2013).................................................................48

*In re Pork Antitrust Litig.*,
  2020 WL 6149666 (D. Minn. Oct. 20, 2020) ....................................................64

*In re Processed Egg Prods. Antitrust Litig.*,
  851 F. Supp. 2d 867 (E.D. Pa. 2012)..............................................38, 60, 61, 63

*Prof'l Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.* (*PRE*),
  508 U.S. 49 (1993).........................................................................................8, 16

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998) .................................................................35, 37, 39

*Rathe Salvage, Inc. v. R. Brown & Sons, Inc.*,
  2008 VT 99, 184 Vt. 355, 965 A.2d 460 (2008) ...............................................49

*In re Refrigerant Compressors Antitrust Litig.*,
  2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) ..................................................64

*In re Relafen Antitrust Litig.*,
  221 F.R.D. 260 (D. Mass. 2004).........................................................................36

*In re Relafen Antitrust Litig.*,
  346 F. Supp. 2d 349 (D. Mass. 2004).................................................................16

*In re Remicade Antitrust Litig.*,
  345 F. Supp. 3d 566 (E.D. Pa. 2018)............................................................38, 50

*Rickman v. BMW of North America*
  2020 WL 3468250 (D.N.J. June 25, 2020).................................................37, 38

*Rivera-Muniz v. Horizon Lines, Inc.*,
  737 F. Supp. 2d 57 (D.P.R. 2010) ......................................................................45

xiv

*Rivers v. Amato,*
　　2001 WL 1736498 (Me. Super. June 22, 2001) ..........................................63, 64

*Rochester Drug Co-op., Inc. v. Braintree Lab'ys,*
　　712 F. Supp. 2d 308 (D. Del. 2010)..........................................................9, 16, 22

*Schechner v. Whirlpool Corp.,*
　　237 F. Supp. 3d 601, 617 (E.D. Mich. 2017) ....................................................64

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action,*
　　678 F.3d 235 (3d Cir. 2012) ...............................................................................36

*Scheuer v. Rhodes,*
　　416 U.S. 232 (1974).............................................................................................7

*Scott v. Mamari Corp.,*
　　530 S.E.2d 208 (Ga. Ct. App. 2000).................................................................63

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis PLC,*
　　2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) ........................................40, 47, 54

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis PLC,*
　　2012 WL 4336218 (E.D.N.Y. Sept. 17, 2012) ...................................................59

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
　　559 U.S. 393 (2010)...........................................................................................44

*Shaw v. Marriott Int'l, Inc.,*
　　605 F.3d 1039 (D.C. Cir. 2010) ....................................................................46,47

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v.*
　　*GlaxoSmithKline, PLC,*
　　737 F. Supp. 2d 380 (E.D. Pa. 2010)..................................................50, 51, 52, 62

*Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS*
　　*Health Corp.,*
　　221 F. Supp. 3d 227 (D.R.I. 2016) ....................................................................38

*Sheet Metal Workers Nat'l Health Fund v. Amgen Inc.,*
　　2008 WL 3833577 (D.N.J. Aug. 13, 2008) .......................................................38

*Shionogi Pharma, Inc. v. Mylan, Inc.*,
2011 WL 2174499 (D. Del. May 26, 2011) ................................................33, 34

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
2013 WL 2181185 (E.D. Tenn. May 20, 2013) ...................................................8

*Smith v. Glenmark Generics, Inc., USA*,
2014 WL 4087968 (Mich. Ct. App. Aug. 19, 2014) .........................................64

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
2015 WL 5458570 (D. Mass. Sept. 16, 2015)............................................53, 55

*Sperry v. Crompton Corp.*,
863 N.E.2d 1012 (N.Y. 2007)...............................................................................65

*Staley v. Gilead Scis., Inc.*,
446 F. Supp. 3d 578 (N.D. Cal. 2020)...............................................46, 47, 48, 49

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
2010 WL 5094289 (N.D. Cal. Dec. 8, 2010)......................................................64

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
64 F. Supp. 3d 665 (E.D. Pa. 2014).............................................................*passim*

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
2017 WL 3967911 (E.D. Pa. Sept. 8, 2017)........................................................9

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
2017 WL 4910673 (E.D. Pa. Oct. 30, 2017) .....................................................32

*In re Takata Airbag Prods. Liab. Litig.*,
462 F. Supp. 3d 1304 (S.D. Fla. 2020)...............................................................63

*Takeda Pharm. Co. Ltd. v. Zydus Pharm. (USA) Inc.*,
358 F. Supp. 3d 389 (D.N.J. 2018) (Wolfson, J.).................................................7

*Terrill v. Electrolux Home Prods., Inc.*,
753 F. Supp. 2d 1272 (S.D. Ga. 2010) ...............................................................63

*Teva Pharm. Indus., Ltd. v. Apotex, Inc.*,
2008 WL 3413862 (D.N.J. Aug. 8. 2008) ..........................................................12

*In re Thalomid and Revlimid Antitrust Litig.*,
  2015 WL 9589217 (D.N.J. Oct. 29, 2015) .........................................9, 14, 15, 38

*Townshend v. Rockwell Int'l Corp.*,
  2000 WL 433505 (N.D. Cal. Mar. 28, 2000) ....................................................34

*Trickett v. Spann*,
  2020 Ark. App. 552, 613 S.W.3d 773 (2020) ...................................................61

*Trs. of Univ. of Pa. v. St. Jude Children's Rsch. Hosp.*,
  940 F. Supp. 2d 233 (E.D. Pa. 2013)................................................................8

*Tuvim v. United Jewish Cmtys., Inc.*,
  680 S.E.2d 827 (Ga. 2009) ......................................................................61, 62

*Tyman v. Pfizer, Inc.*,
  2017 WL 6988936 (S.D.N.Y. Dec. 27, 2017)...................................................65

*Universal Elec., Inc. v. Universal Remote Control, Inc.*,
  2014 WL 12586122 (C.D. Cal. Mar. 24, 2014).................................................11

*In re Volkswagen "Clean Diesel" Mktg, Sales Pracs., & Prod.*
  *Liability Litig.*,
  349 F. Supp. 3d 881 (N.D. Cal. 2018)..............................................................25

*Waldman v. New Chapter Inc.*,
  714 F. Supp. 2d 398 (E.D.N.Y. 2010) ..............................................................65

*Warma Witter Kreisler, Inc. v. Samsung Elecs. Am., Inc.*,
  2009 WL 4730187 (D.N.J. Dec. 3, 2009)..........................................................38

*Warner Lambert Co. v. Purepac Pharm. Co.*,
  2000 WL 34213890 (D.N.J. Dec. 22, 2000).......................................................9

*Warren Gen. Hosp. v. Amgen Inc.*,
  643 F.3d 77 (3d Cir. 2011) ....................................................................6, 28

*Warth v. Seldin*,
  422 U.S. 490 (1975)........................................................................................36

*In re Wellbutrin SR Antitrust Litig.*,
  749 F. Supp. 2d 260 (E.D. Pa. 2010)..................................................................9

xvii

*In re Wellbutrin XL Antitrust Litigation*,
   260 F.R.D. 143 (E.D. Pa. 2009) ............................................................49

*WesternGeco LLC v. ION Geophysical Corp.*,
   889 F.3d 1308 (Fed. Cir. 2018) ............................................................20

*Wright v. Genesee Cnty.*,
   934 N.W.2d 805 (Mich. 2019) ..............................................................64

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   2019 WL 1397228 (E.D. Va. Feb. 6, 2019) ............................42, 43, 45

## CODES, LAWS, AND STATUTES

35 U.S.C. § 285 .......................................................................................16

2013 Ariz. Legis. Serv. Ch. 143 (H.B. 2396) .........................................54

Ariz. Rev. Stat. Ann.§ 44-1522(A) .........................................................54

Cal. Bus. & Prof. Code § 17200, *et seq.* ................................................50

D.C. Code §§ 28-3901(a) ...................................................................46, 47

Haw. Rev. Stat. § 480-1 ..........................................................................47

Haw. Rev. Stat. § 480-2 ..........................................................................47

Idaho Code §§ 48-601 *et seq.* .................................................................54

Ill. Comp. Stat. Ann. 10/3(1) *et seq.* ......................................................54

Ill. Comp. Stat. Ann. 505/1 *et seq.* ........................................................54

Ill. Comp. Stat. Ann. 505/10a *et seq.* ....................................................54

Mass. Gen. Laws ch. 93A, § 9 ................................................................47

Mass. Gen. Laws ch. 93A, § 11 ..............................................................47

Mich. Comp. Laws Ann. § 445.903(1)(a) and (z) ...................................54

Minn. Stat. § 325F.68, *et seq.* ................................................................48

Mo. Rev. Stat. § 407.010(5) .......................................................................48

Mo. Rev. Stat. § 407.025(1) .......................................................................48

Mont. Code Ann. § 34-14-102(1) ...............................................................48

Mont. Code Ann. § 34-14-102(6) ...............................................................48

Mont. Code Ann. § 30-14-133(1) ...............................................................48

N.C. Gen. Stat. §§ 75-1.1, *et seq.* ...........................................................52

N.M. Stat. Ann. §§ 57-12-1 *et seq.* .........................................................55

Nev. Rev. Stat. § 41.600 .......................................................................48, 49

Nev. Rev. Stat. § 598.0923(3) ....................................................................55

Nev. Rev. Stat. § 598.0977 .........................................................................48

Nevada statute, § 598.0903, *et seq.* ..........................................................48

N.Y. Gen. Bus. Law §§ 349 *et seq.* ..........................................................56

Or. Rev. Stat. Ann. § 646.607 ....................................................................56

Or. Rev. Stat. Ann. § 646.780 ....................................................................49

R.I. Gen. Laws § 6-13.1-1(3) ......................................................................49

R.I. Gen. Laws §§ 6-13.1-2 .........................................................................56

R.I. Gen. Laws §§ 6-13.1-3 .........................................................................56

S.D. Codified Laws § 37-24-6(1) ................................................................57

Utah Code Ann. §§ 13-11-1 *et seq.* (West) ...............................................57

Va. Code Ann. § 59.1-200(14) .....................................................................57

Vt. Stat. Ann. tit. 9 § 2451a(a) ...................................................................49

2015 W. Va. Acts Ch. 64 (S.B. 315) ...........................................................58

W. Va. Code § 46A-6-101 ...........................................................................57

W. Va. Code § 46A-6-104 ................................................................57

**RULES**

Fed. R. Civ. P. 12(b)(6) ...........................................................6, 29

Fed. R. Civ. P. 12(d) ..................................................................30

Fed. R. Civ. P. 23 ....................................................35, 37, 39, 44

Fed. R. Civ. P. 56 ......................................................................30

**OTHER AUTHORITIES**

1 Dan B. Dobbs, Law of Remedies § 4.1(2), at 557 (2d ed. 1993) ........................61

George P. Roach, *How Restitution and Unjust Enrichment Can Improve Your Corporate Claim*, 26 Rev. Litig. 265, 275 (2007)......................61

John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 Tex. L. Rev. 1769, 1787 (2014)................................................12

Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a (Am. L. Inst. 2011) ................................................61

# I.    INTRODUCTION

Litigation is a "sham" if its true purpose is to interfere with competition. The test is whether the suit was "objectively baseless" (*i.e.*, no reasonable litigant could realistically expect to prevail) and "subjectively baseless" (*i.e.*, the lawsuit was an attempt to interfere with a competitor through governmental process). The complaint[1] pleads both prongs, although defendants only challenge the first.

Defendants' argument for dismissal comes down to this: because (a) the patent infringement case was allegedly "hard fought" and (b) this Court said from the bench that their position was "far from frivolous," the litigation cannot possibly have been objectively baseless and is therefore immune from the antitrust laws under *Noerr-Pennington*.[2] Defendants completely ignore that the sham test focuses on the perspective of the reasonable *litigant*, not jurist. Instead, they hang their hats on a few words pulled from fewer than 10 lines of a single hearing transcript that they misinterpret. For example, defendants contend that the Court ruled in their favor on the ultimate issue of why Zytiga enjoyed commercial success. It did not. The Court determined that Zytiga's success was due to the blocking patent's effect on Zytiga's

---

[1] Second Consolidated Class Action Compl., *Louisiana Health Service & Indemnity Company d/b/a/ Blue Cross and Blue Shield of Louisiana v. Janssen Biotech, Inc.*, No. 19-cv-14146 (D.N.J. Feb. 22, 2021), ECF No. 147 (Comp.).

[2] Defs.' Br. in Supp. of their Joint Mot. to Dismiss at 1-6, *Louisiana Health Service & Indemnity Company d/b/a/ Blue Cross and Blue Shield of Louisiana v. Janssen Biotech, Inc.*, No. 19-cv-14146 (D.N.J. Apr. 6, 2021), ECF No. 155-1 (MTD).

competitors, so it did not render the '438 patent non-obvious.

Defendants' motion skirts the key questions: Was the invention claimed in the '438 patent obvious? And if so, could that obviousness be overcome by Zytiga's commercial success?

On the first question, defendants went 0-for-10: the Patent and Trademark Office (PTO) (five times), the Patent and Trademark Appeal Board (PTAB) (three times), this Court, and the Federal Circuit all found the '438 patent invalid because the invention it claimed was obvious.

On the second question, they went 1-for-7, succeeding only when they shielded the existence of the blocking patent from the PTO examiner. And the complaint alleges that Janssen and BTG knew that Zytiga's commercial success was the *only* basis on which the patent had issued, and that they could not have reasonably believed they had any chance of success in litigation once the full record was in plain view. At best, defendants have pointed to a factual question—whether a reasonably litigant could have believed they had any chance of success in the litigation—that is not suitable for resolution now.[3]

---

[3] This is especially true where relevant briefing remains under seal and unavailable to the End-Payor Plaintiffs (EPPs), including Janssen and BTG's (1) post-trial brief, (2) proposed findings of fact, (3) brief in support of a preliminary injunction pending appeal, and (4) various filings on the appellate docket. *See*, *e.g.*, *BTG Int'l Ltd. v. Amneal Pharms. LLC*, No. 15-cv-05909 (D.N.J.), ECF Nos. 535, 536, 549, and 564.

Defendants' arguments challenging plaintiffs' Article III and statutory standing under federal and state law are similarly infirm, having been rejected by multiple courts in this Circuit and otherwise. The motion to dismiss should be rejected in its entirety.

## II.   BACKGROUND

### A.   BTG patents abiraterone in the 1990s; Janssen's initial attempts at extending patent protection fail.

BTG obtained U.S. Patent No. 5,604,213 (the '213 blocking patent) on abiraterone, the active pharmaceutical ingredient in Zytiga, in 1997. Comp. ¶¶110-13. In 2004, a company later acquired by Janssen obtained an exclusive license to the '213 blocking patent. Comp. ¶114. In 2007. Janssen filed patent application 11/844,440 which, as subsequently narrowed, asserted method-of-use claims relating to the treatment of prostate cancer. Comp. ¶¶115-17. In 2010, after the PTO issued its first rejection finding the proposed claims unpatentable over two pieces of prior art, Janssen argued (1) the prior art did not teach what the examiner believed; and (2) a recent article discussing the use of abiraterone with prednisone showed "unexpected results." Comp. ¶118-120. The PTO again rejected the claims and Janssen abandoned the application. Comp. ¶¶121-25.

### B.   Zytiga gets approved, but Janssen's patent efforts continue to fail.

---

Unless otherwise specified, all ECF references in this brief reference docket entries in the underlying patent litigation.

Following the PTO's first two rejections, Janssen sought, and on April 28, 2011 received, FDA approval to sell Zytiga. Comp. ¶¶126-130. Sales of Zytiga would soon reach over $1 billion a year. Comp. ¶130.

Janssen filed a new patent application (the '340 application) in 2011, again asserting method-of-use claims relating to the treatment of prostate cancer. Comp. ¶¶131-33. Again, the PTO rejected every claim as obvious. Comp. ¶¶134-38. Janssen challenged the examiner's conclusions in July 2012, renewing its 'unexpected results" argument and arguing that Zytiga's commercial success disproved the obviousness finding; two months later, the PTO again rejected all claims. Comp. ¶¶139-145.

In January 2013, Janssen asked the PTO to reconsider only the "unexpected results" rejection; again, the PTO rejected all claims. Comp. ¶¶146-48.

By this time, Janssen faced another problem: the '213 blocking patent would expire on February 18, 2014. Comp. ¶149. Because it claimed the active ingredient in Zytiga, Janssen obtained, by quirk of regulation, an extension of the '213 blocking patent, giving it a lawful monopoly on Zytiga until December 13, 2016. Comp. ¶¶149-151.

**C.   Janssen succeeds with the PTO on the sixth try by deciding not to call attention to the '213 blocking patent.**

After its fifth rejection by the PTO, Janssen threw a Hail Mary, submitting to the PTO the Zytiga label and a December 2012 FDA News Release—but *not* the '213 blocking patent—to argue that Zytiga's commercial success overcame the '340 application's clear obviousness. Comp. ¶¶152-56. Janssen chose not to mention the '213 blocking patent to the examiner, *despite acknowledging, when seeking the patent term extension, that the '213 blocking patent prevented any other entity from competing with Zytiga*. Comp. ¶¶149-156.[4]

Janssen's ruse worked: the PTO examiner found that the "unexpected commercial success of the launch of [Zytiga]" overcame the invention's obviousness and, *on that sole basis*, issued the '438 patent. Comp. ¶¶156-57. Janssen later added over 50 references to the file but *never* the '213 blocking patent. Comp. ¶¶158-166.

**D.   Would-be competitors chomped at the bit to sell a generic version of Zytiga as soon as the '213 blocking patent expired.**

On the very first day they could challenge the '438 patent, almost a dozen generic companies filed Paragraph IV ANDAs for approval to sell generic Zytiga;

---

[4] The '213 patent is referenced in the "description of invention" section of the '438 patent as an example of where CYP17 inhibitors had been shown to be useful in treating cancer and among the references showing how such inhibitors could be synthesized. *See* '438 Patent, 5:21-28, 7:26-33. But Janssen did not disclose it as a patent covering the drug product abiraterone when presenting its commercial success argument. Comp. ¶155.

defendants responded by filing lawsuits against all eleven would-be competitors, asserting infringement of the '438 patent. Comp. ¶¶168-173.

Janssen and BTG knew they could not win on the merits and could only "win" by getting the benefit of the automatic stay of FDA approval of the generics, delaying generic competition for Zytiga; the longer the case lasted, the greater their "win." Comp. ¶¶10, 228. Indeed, every review of the '438 patent—three times by the PTAB, one by this Court, once by the Federal Circuit—led to the same conclusion: patent invalidation.

In December 2015, would-be competitors petitioned the PTAB to invalidate the '438 patent; the PTAB concluded both that the invention claimed in the '438 patent was obvious and, after examining the complete record (including the existence of the '213 blocking patent), that Janssen failed to demonstrate a nexus between Zytiga's commercial success and the claimed invention. Comp. ¶¶174-186, 193-95, 203-227. In the fall of 2018, this Court reached the same conclusion. Comp. ¶¶228-235. The Federal Circuit agreed. Comp. ¶¶236-250. Shortly thereafter, belated generic competition began. Comp. ¶¶250-53.

### III.   LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss "may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims lack facial

plausibility."[5] This inquiry "does not impose a probability requirement at the pleading stage."[6] The question is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."[7] Defendants bear the burden of showing that the plaintiff has failed to state a claim upon which relief can be granted.[8]

## IV.   ARGUMENT

### A.   Whether any immunity applies is fact-driven and inappropriate for a motion to dismiss.

Petitioning, including litigation, is protected—but that protection "is not absolute."[9] The scope of any immunity depends "on the source, context, and nature

---

[5] *Warren Gen. Hosp. v. Amgen Inc.,* 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).

[6] *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that the "plausibility standard is not akin to a 'probability requirement'").

[7] *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds*, *Davis v. Scherer*, 468 U.S. 183 (1984). *See also Twombly*, 550 U.S. at 563 n.8 (citing *Scheuer*, noting "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder").

[8] *Indivior Inc. v. Dr. Reddy's Lab'ys S.A.*, 2020 WL 4932547, at *5 (D.N.J. Aug. 24, 2020) (McNulty, J.) (citation omitted).

[9] *Fed. Trade Comm'n v. AbbVie Inc.*, 976 F.3d 327, 360 (3d Cir. 2020) ("*AbbVie*"); *Indivior*, 2020 WL 4932547, at *7 ("*Noerr-Pennington* is not an absolute shield.").

of the anticompetitive restraint at issue."[10] Whether immunity applies "is a fact-intensive [question], generally not suitable for resolution at the pleading stage."[11]

Nearly thirty years ago, the Supreme Court articulated a two-pronged test for determining when activity that petitions the government, including the filing of lawsuits, loses immunity under *Noerr-Pennington* and the First Amendment.[12] The Third Circuit recently reaffirmed the test in *Fed. Trade Commission v. AbbVie Inc*, explaining that "[u]nder the [first,] objective baselessness prong," a plaintiff pursuing a sham theory must allege a lack of probable cause: that the original litigant did not have a "reasonable belief" that its "claim would be held valid upon adjudication."[13] Under the second, "subjective motivation" prong, "a plaintiff must show the [original litigant] 'brought baseless claims in an attempt to thwart

---

[10] *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988).

[11] *Indivior*, 2020 WL 4932547, at *8 (citing *Takeda Pharm. Co. Ltd. v. Zydus Pharm. (USA) Inc.*, 358 F. Supp. 3d 389, 394-95 (D.N.J. 2018) (Wolfson, J.) (collecting cases, and observing that "district courts within this Circuit have routinely prohibited parties from invoking the protections of *Noerr-Pennington* at the dismissal stage of a case . . . at which time the factual record remains undeveloped and insufficient for the purpose of determining whether a 'sham litigation' has been filed")).

[12] *AbbVie*, 976 F.3d at 360 (citing *Prof'l Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.* (*PRE*), 508 U.S. 49, 60-61 (1993)).

[13] *AbbVie*, 976 F.3d at 360 (citation omitted). Stated differently, a lawsuit is "objectively baseless" if the litigant did not have probable cause to initiate the legal proceedings. *Trs. of Univ. of Pa. v. St. Jude Children's Rsch. Hosp.*, 940 F. Supp. 2d 233, 245 (E.D. Pa. 2013).

8

competition (*i.e.*, in bad faith).'"[14] In short, a lawsuit does not warrant protection if it is "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor."[15] This rule applies both to initiating litigation and continuing it.[16]

Where pleadings allege facts suggesting that the filing was a sham, courts in this circuit consistently refuse to dismiss them.[17] This is true even where the

---

[14] *AbbVie*, 976 F.3d at 360 (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014)). Factors include whether the litigant was "indifferent to the outcome on the merits" or "had decided to sue primarily for the benefit of collateral injuries inflicted through the use of legal process." *Id.* at 360-61.

[15] *E.R.R. Pres. Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961).

[16] *See, e.g.*, *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2013 WL 2181185, at *1 (E.D. Tenn. May 20, 2013) (actions taken in litigation support sham allegations).

[17] *See, e.g.*, *Indivior*, 2020 WL 4932547, at *10 (refusing to dismiss sham litigation counterclaims because they turned upon "issues of reasonableness and intent-issues which are premature" for a motion to dismiss); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2017 WL 3967911, at *18 n.19 (E.D. Pa. Sept. 8, 2017) (denying motion to dismiss sham citizen petition claims); *In re Thalomid and Revlimid Antitrust Litig.*, 2015 WL 9589217, at *13 (D.N.J. Oct. 29, 2015) ("the Court is reluctant to dismiss claims of sham litigation when plaintiffs' theory is clearly enunciated in the complaints and the facts in support connect the litigation to delay to the injury complained of."); *In re Wellbutrin SR Antitrust Litig.*, 749 F. Supp. 2d 260, 265-66 (E.D. Pa. 2010) (denying dismissal of sham litigation allegations, even though manufacturer prevailed on a patent infringement claim); *Rochester Drug Co-op., Inc. v. Braintree Lab'ys*, 712 F. Supp. 2d 308, 321 (D. Del. 2010) (*Noerr-Pennington* issues are "better addressed at the summary judgment stage upon a developed record"); *In re Neurontin Antitrust Litig.*, 2009 WL 2751029, at *22-23 (D.N.J. Aug. 28, 2009) (denying motion to dismiss sham litigation allegations, even though decisions in the underlying infringement case favored antitrust defendant); *Warner Lambert Co. v. Purepac Pharm. Co.*, 2000 WL

underlying plaintiff was partially successful in its infringement case.[18]

Here, there is no dispute that Janssen and BTG went 0-for-10 on "obviousness" and 1-for-7 on "commercial success" (with the only 'win' in an *ex parte* proceeding where they withheld material information). Those facts, coupled with Janssen and BTG's pre-litigation knowledge that the "commercial success" argument could not withstand scrutiny in an adversarial setting, are sufficient to establish the sham nature of the litigation. In arguing to the contrary, Janssen and BTG quibble over subsidiary facts, disputing whether this Court found the existence of the '213 blocking patent to be relevant in the invalidity analysis[19] and what aspect

---

34213890, at *5 (D.N.J. Dec. 22, 2000) (denying summary judgment on sham allegations despite favorable patent infringement rulings for antitrust defendant); *Hoffman–LaRoche, Inc. v. Genpharm, Inc.*, 50 F. Supp. 2d 367, 380 (D.N.J. 1999) (whether a reasonable litigant would have realistically expected success on the merits of a patent infringement suit is a question of fact, not properly resolved on motion to dismiss).

[18] *See, e.g.*, *Wellbutrin SR*, 749 F. Supp. 2d at 263-67; *Warner Lambert Co. v. Purepac Pharm. Co.*, 2000 WL 34213890, at *5; *In re Neurontin*, 2009 WL 2751029, at *21-23. Defendants' proposition that if the judge assessing the sham claims is the same judge who presided below it "presents a particularly legitimate basis to resolve the question of objective baselessness as a matter of law" (MTD 15) finds no support in the cases they cite. Those cases stand for the unremarkable proposition that where the underlying plaintiff prevails in substantive part, it will be difficult to later prove a sham. *See, e.g.*, *AstraZeneca AB v. Mylan Lab'ys, Inc.*, 2010 WL 2079722, at *4 (S.D.N.Y. May 19, 2010) (noting that plaintiff had proven two of three contested limitations and overcome invalidity challenge).

[19] *Compare* MTD 5, 28 (defendants contending the Court found that the '213 patent was *not* a blocking patent sufficient to defeat a "commercial success" argument) *with*

of the case (substantive or procedural) supported the Court's decision to order a short pause for a quick appeal.[20] That defendants ground their motion in a factual dispute underscores why the sham issue should not be decided at this early stage.

**B.**    ***Noerr-Pennington*'s limited immunity does not protect Janssen or BTG.**

The Third Circuit has cautioned that when engaging in the "delicate task" of applying the two-prong test, courts "must not immunize a brand-name manufacturer who uses the Hatch-Waxman Act's automatic, 30-month stay to thwart competition. Doing so would excuse conduct that Congress proscribed in the antitrust laws."[21] Plaintiffs allege that Janssen and BTG did just that—used the automatic stay to "win" by delaying competition—and are liable under the antitrust laws.

Sham litigation does not depend on establishing inequitable conduct or fraud on the PTO.[22] For example, the Ninth Circuit endorsed an antitrust claim for bad faith litigation to enforce patents "with knowledge that the patents, though lawfully

---

ECF No. 581 at 48 and Comp. ¶¶8-9, 152-156 (Court's holding on invalidity in light of '213 patent); *see also* Section IV.B.3.

[20] *See, e.g.*, Section IV.B.5.

[21] *AbbVie*, 976 F.3d at 361.

[22] To be clear, the complaint alleges that Janssen deliberately chose not to call the '213 blocking patent to the examiner's attention in presenting the "commercial success" argument. *See, e.g.*, Comp. ¶¶154, 161, 162, 164 & 166. That was wrongful.

11

obtained, were invalid."[23] Other courts recognize that a claim "can be based on bad faith litigation to enforce a patent known to be invalid for reasons other than fraud on the USPTO."[24]

A decision made in a non-adversarial PTO proceeding does not substitute for the fact-specific inquiry necessary to determine whether a reasonable party in the position of the patentee would have a realistic likelihood of succeeding on the merits in a contested patent infringement suit.[25] Indeed, courts regularly find issued patents invalid or unenforceable, particularly in the pharmaceutical context, where studies show patent challengers that litigate to decision winning about 74% of the time.[26]

---

[23] *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 994 (9th Cir. 1979). A *Walker Process* theory had been dismissed from the case years before. *Id.* at 989-991.

[24] *Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, 2016 WL 4744165, at *9 (N.D. Cal. Sept. 12, 2016); *see also Universal Elec., Inc. v. Universal Remote Control, Inc.*, 2014 WL 12586122, at *2 (C.D. Cal. Mar. 24, 2014) (pursuing action in bad faith to enforce a patent can lead to antitrust liability "irrespective of fraud" in obtaining the patent); *Conceptual Eng'g Assocs., Inc. v. Aelectronic Bonding, Inc.*, 714 F. Supp. 1262, 1267 (D.R.I. 1989) (patent holder who knew that the patent would be held invalid due to his failure to disclose certain information when obtaining the patent had acted in bad faith).

[25] *See, e.g., Teva Pharm. Indus., Ltd. v. Apotex, Inc.*, 2008 WL 3413862, at *6 (D.N.J. Aug. 8. 2008) (presumption of patent validity does not save drug manufacturer "at the motion to dismiss stage [as] it is not controlling as to the objective prong of the *PRE* test"); *see also* Comp. ¶¶40-43.

[26] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 Tex. L. Rev. 1769, 1787 (2014).

### 1.    Janssen and BTG pursued objectively baseless litigation.

The EPPs allege that Janssen and BTG knew the '438 patent would, upon full judicial review, be invalidated, and yet filed and pursued the litigation anyway. Comp. ¶¶8-9, 172. The invalidity analysis asks: (1) was the invention obvious; and if so, (2) was Zytiga's "commercial success" so closely related to the invention of the '438 patent that it overcame such obviousness? The well-pleaded allegations show that defendants had no reasonable expectation of prevailing on either question.

There can be no serious doubt that the inventions claimed in the '438 patent were obvious: the PTO reached this conclusion five times, the PTAB three times, and this Court and the Federal Circuit once each.[27] Defendants went 0-for-10.

The complaint alleges Janssen and BTG also knew that issuance of the '438 patent hinged *solely* on Janssen's "commercial success" argument to overcome the obviousness finding. Comp. ¶156. And they knew that Janssen failed to present to the PTO critical—indeed, determinative—evidence bearing on the commercial success argument: the '213 blocking patent. Janssen did not mention the '213 blocking patent in the application and the PTO did not analyze the '213 blocking patent when considering Janssen's commercial success argument. Comp. ¶¶8, 155.

---

[27] Comp. ¶¶115-125, 131-148 (PTO), 203-226 (PTAB), 229-235 (Court), 239-241 (Fed. Cir.).

In *ex parte* proceedings, such tactics may work. But in the light of a contested federal court case, revelation of the blocking patent's existence and effect was inevitable. No reasonable litigant in Janssen's or BTG's position would believe it had a chance of winning on these arguments.

The "presumption of patent validity" does not get defendants anywhere. MTD 17-18. The Third Circuit recently upheld sham claims despite the presumption.[28] Here, the patent Court found the would-be competitors met their burden "to rebut the presumption of validity by clear and convincing evidence." ECF No. 571 at 51. So any presumption, weakened here by the failure to call attention to the '213 blocking patent, does not prove that Janssen and BTG could reasonably have believed they would win. Indeed, courts have recognized the unremarkable proposition that a reasonable litigant would know that bringing suit to enforce an invalid patent is baseless.[29]

---

[28] *AbbVie*, 976 F.3d at 370-71.

[29] *See, e.g.*, *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1368 (Fed. Cir. 1998) ("Conduct prohibited under antitrust laws includes bringing suit to enforce a patent with knowledge that the patent is invalid or not infringed, and the litigation is conducted for anticompetitive purposes."); *In re Thalomid and Revlimid*, 2015 WL 9589217, at *12 ("[A] reasonable litigant would know that a lawsuit to enforce invalid patents is without probable cause"); *Abbott Lab'ys v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 428 (D. Del. 2006) (allegations of pursuing litigation on patents known to be unenforceable upheld); *see also supra* notes 23 & 24.

14

The fact that a patent infringement case naming eleven defendants took three years to resolve does not mean that the case was "hard fought." And while the parties (and by necessity, the Court) may have expended resources during that time, that indicates little about the substantive merits of the parties' positions, or their *bona fides* in espousing them. A litigant's right to discovery and the reality that expert testimony is necessary to resolve the highly technical disputes (real or imagined) that patent litigation often engenders, means that a final resolution often takes time.[30]

Review of the record demonstrates the arc of the underlying case was unremarkable. The parties filed a complaint, amended complaints, and answers.[31] They engaged in discovery disputes, motion practice, and *Markman* briefing and a hearing, followed by summary judgment and *Daubert* motions and a trial.[32]

That a plaintiff can file a complaint based on complex facts that require expert analysis and court evaluation does not insulate that complaint from being determined

---

[30] Even in *Lantus*, cited by the defendants, the district court noted that litigation being heavily contested and hard fought is "not conclusive" of whether it was a sham. *In re Lantus Direct Purchaser Antitrust Litig.*, 284 F. Supp. 3d 91, 109 (D. Mass. 2018), *reversed on other grounds*, 950 F.2d 1 (1st Cir. 2020).

[31] *See, e.g.*, ECF Nos. 1, 47, 76, 77, 85, 87, 89, 91, 93, 156, 288, 289, 297-303. One defendant moved to dismiss for lack of venue. *See, e.g.*, ECF Nos. 98, 99, 140, 144, 146, 153, 189, 90 & 191.

[32] *See, e.g.*, ECF Nos. 167, 174, 176, 185, 187, 209, 210, 220, 221, 270, 364, 365, 369, & 372. No summary judgment ruling issued because of the trial schedule. *See, e.g.*, ECF No. 483.

a sham.[33] Likewise, that litigation progressed beyond the pleading stage is also not determinative. Courts have allowed sham claims to go forward relating to patent suits that lasted for years,[34] reached claim construction, summary judgment,[35] and the eve of trial.[36] The Federal Circuit even upheld a fee award against a patentee for pursuing baseless litigation despite the district court's having issued a 56-page summary judgment opinion.[37]

---

[33] Defendants' citation to cases discussing the peculiar jurisdictional setting of ANDA litigation (MTD 18) misses the mark. While some cases note that pursuing infringement allegations of a *valid* patent may not be a sham given the 'technical' act of infringement by filing the ANDA, such cases have no application where the plaintiff knows the patent will not withstand scrutiny. *See, e.g.*, *supra* note 29.

[34] *In re Thalomid & Revlamid*, 2015 WL 9589217, at *7, *12-13 (underlying lawsuit filed in 2007 settled "not long after the [30-month] stay expired" in 2010); *In re Androgel Antitrust Litig.*, 687 F. Supp. 2d 1371, 1375 (N.D. Ga. 2010) (noting litigation went on for almost three years).

[35] *See, e.g., In re Neurontin*, 2009 WL 2751029, at *22 ("Surviving summary judgment does not, alone, establish that a lawsuit is not sham for the purposes of an antitrust claim."); *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 362-64 (D. Mass. 2004) (holding that a plaintiff's surviving summary judgment does not prove as a matter of law that his case was not objectively baseless).

[36] *See, e.g., In re Loestrin 24FE Antitrust Litig.*, 261 F. Supp. 3d 307, 323, 348-49 (D.R.I. 2017) (denying motion to dismiss sham litigation allegations where one of underlying suits was settled "just weeks before it was scheduled for trial"); *Rochester Drug*, 712 F. Supp.2d at 315 (bench trial found 'at least a colorable argument for validity' and subsequent antitrust court *still* let sham claim proceed).

[37] *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 917-19 (Fed. Cir. 2012) (upholding trial court's finding of objective baselessness and awarding fees as an "exceptional case" under 35 U.S.C. § 285 on that ground); *see also, MarcTec, LLC v. Johnson & Johnson*, No. 07-cv-825 (S.D. Ill. June 15, 2009), ECF No. 178.

## 2.   Janssen and BTG were motivated to impose delay on generic competition.

A court also must examine the litigant's subjective motivation, focusing on whether the litigant "brought baseless claims in an attempt to thwart competition (*i.e.,* in bad faith)."[38] "The ultimate inquiry under sham litigation's subjective prong is a defendant's subjective motivation, not its subjective belief about the merits of its claims."[39]

Put another way, improper motivation exists where the litigant is "ambivalent about the merits while filing litigation for an improper purpose."[40] EPPs allege that here. Janssen and BTG were ambivalent about the merits; they "won" simply by keeping the lawsuit alive long enough to enjoy the automatic 30-month stay, "a collateral injury the defendant's mere use of legal process invariably inflicts."[41] Defendants knew that by filing their lawsuit they would inflict this harm and reap the resulting benefit, regardless of the litigation's outcome. Comp. ¶¶10, 228. Tellingly, defendants do not even contest the subjective prong.

---

[38] *Octane Fitness*, 572 U.S. at 556.

[39] *AbbVie*, 976 F.3d at 369 (citing *PRE*, 508 U.S. at 60-61, and *Octane Fitness*, 572 U.S. at 556). Purchasers bringing an antitrust case "may be able to show [the patentee] was indifferent to the outcome of its infringement suit, and the automatic, 30-month stay was an anticompetitive weapon." *Id.* at 361.

[40] *AbbVie*, 976 F.3d at 370.

[41] *Id.* at 361.

17

### 3. Defendants paint an inaccurate picture of the Court's findings, betraying the weakness of their motion.

Ignoring the reasonable litigant test, defendants point to irrelevant transcript snippets in their attempt to dismiss EPPs' claims. Even if those excerpts were relevant, read in context, defendants' citations to snippets of the record below fail them. While the Court noted defendants' arguments, it consistently rejected them.

| Defendants cite | Court concluded |
| --- | --- |
| Sartor was flawed (MTD 21) | Janssen/BTG "may be correct" that Sartor had flaws, but a reference is prior art regardless of whether its methods were scientifically tested. ECF No. 571 at 43. |
| Synthacen test subject to question (MTD 21) | Janssen/BTG "reservations about the Synthacen test … do not, however, outweigh the clear import of O'Donnell 2004 [which] falls far short … of concluding" that such reservations are valid. ECF No. 571 at 45. |
| Other options on how to treat mCRPC existed (MTD 21) | "Nevertheless, the prior art clearly pointed to coadministration of abiraterone with a glucocorticoid." ECF No. 571 at 45. |
| There was evidence of unmet need or failure-of-other factors (MTD 22) | "So, although there is evidence supporting the unmet-need or failure-of-others factors, I do not find it to be powerful." ECF No. 571 at 50. |
| Professional-approval factor weighed in favor (MTD 22) | "This factor weighs somewhat in [Janssen/BTG's] favor. All in all, however, I conclude that the patented combination here was well-foreshadowed in peer-reviewed articles. That factor outweighs the others." ECF No. 571 at 51. |
| Zytiga enjoyed commercial success (MTD 22) | "The existence of a blocking patent…would have discouraged [competition]. And the sales of Zytiga may not be wholly attributable to the [invention in the '438 patent]. These are powerful offsetting factors." ECF No. 571 at 48. |

| Defendants cite | Court concluded |
|---|---|
| Cougar's failed licensing efforts were significant factor in assessing commercial success (MTD 26) | "The existence of a blocking patent [from] 1997 through 2006 (indeed, through 2016), despite desultory licensing efforts, would have discouraged entry at the very time when the obviousness of combination therapy was manifesting itself." ECF No. 571 at 48.[42] |
| --- | Generics' "burden of proof to rebut the presumption of validity by clear and convincing evidence is met. The '438 patent is declared invalid for obviousness." ECF No. 571 at 51. |

Defendants suggest the Court ruled in *their* favor on the ultimate issue of whether Zytiga's commercial success was due to the blocking patent, writing:

> The Court found in favor of Janssen and BTG on [the issue of whether Zytiga's commercial success was attributable to the'213 blocking patent rather than to non-obviousness], concluding that the '438 patent was a commercial success notwithstanding that the '213 patent was a blocking patent…. The fact that the Court accepted the position of Janssen and BTG on this issue necessarily reflects that they had an objectively legitimate basis for that position.

MTD 28-29; *see also id.* at 5. The Court's acknowledgement of the uncontroversial fact that Zytiga was commercially successful means little given the "powerful offsetting factors," most notably the '213 blocking patent, the Court cited.[43]

Everyone agrees that Zytiga sales were in the billions of dollars. But the Court held,

---

[42] The Federal Circuit, discussing the PTAB's assessment of the blocking patent, noted that "substantial evidence supports" the conclusion that any licensing efforts did not "remove the deterrent effect of the blocking patent." *BTG Int'l Ltd. v. Amneal Pharms. LLC.*, 923 F.3d 1063, 1076 (Fed. Cir. 2019).

[43] ECF No. 571 at 48.

19

unmistakably, that Zytiga's success resulted from the '213 blocking patent keeping competition at bay. Under well-settled legal principals, the Court found the invention claimed in the '438 patent unpatentable as obvious, a finding the proffered "commercial success" considerations could not overcome.

This "nexus" test that defendants needed to pass has been in place for more than 15 years.[44] It asks, simply, whether any claimed commercial success enjoyed was *because of* the invention claimed in the patent. The Federal Circuit recently reaffirmed the test: any claimed commercial success enjoyed by the product at issue "is only significant if there is a nexus between the claimed invention and the commercial success."[45] Janssen and BTG established no such nexus in the underlying trial, or at the PTAB. ECF No. 571 at 48; Comp. ¶¶203-223, 228-235. That is why they lost. That is why the Federal Circuit affirmed. Their mischaracterization of this finding betrays the weakness of their motion.[46]

---

[44] *See, e.g., Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1376 (Fed. Cir. 2005) ("[T]he law deems evidence of (1) commercial success, and (2) some causal relation or 'nexus' between an invention and commercial success of a product embodying that invention, probative of whether an invention was non-obvious." (citation omitted)).

[45] *WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1330-31 (Fed. Cir. 2018) (citation omitted).

[46] Defendants make no argument that the law in this area was "unsettled" or that they sought a reasonable modification of existing law.

#### 4. The Court's decision to briefly maintain the status quo reflects a procedural quirk, not the merits of the litigation.

Avoiding, again, the reasonable litigant test, Janssen and BTG make much of the Court referencing a "potentially appealable issue" post-trial. MTD 23, citing ECF No. 561 at 2, n.2. However, a review of the record reveals that this reference had little if anything to do with the merits of Janssen and BTG's invalidity defenses, but instead related to their argument that the generics (who had won the case before the PTAB) were estopped from challenging validity before the Court. Discussing the "likelihood of success" prong, the Court noted "[t]he first [basis], perhaps the primary one that [Janssen and BTG] offer is the 315 issue, the estoppel issue."[47] While recognizing that the procedural argument may present an appealable issue, the Court made clear where it stood:

> I think that that is an absurd result at least under the circumstances. An element of a cause of action for patent infringement is that there be a valid patent. [Janssen and BTG's] interpretation could result in this Court entering a mandatory injunction based on infringement even though the [alleged infringers] have already

---

[47] ECF No. 581, 51:11-13; *see also id.* at 31(Court noting that Janssen/BTG were "leading" their argument for a stay on the Section 315 procedural issue), 46-49 (Janssen/BTG counsel focusing on Section 315 argument in discussing likelihood of success prong); ECF No. 571 at 27-27a, n.13 (discussing estoppel argument). The transcript that defendants so heavily rely upon is also redacted (six pages that seem to reflect defendants' statements on their likelihood of success are not available to the EPPs) as are the post-trial and appellate briefing filed by Janssen and BTG. *See supra* note 3. Those materials are not part of the record on this motion.

21

> successfully challenged the validity of the patent in an administrative proceeding.
>
> I think that perverts the aims of the estoppel provision. I think it would defeat the legislative aim of preventing multiple processes and inconsistent results between two forums.[48]

Defendants' reliance (MTD 23) upon the Court's alleged "*sua sponte*" inclusion of a short stay in its opinion should also be disregarded as the Court itself noted that the brief stay was, at least in part, due to its expectation that an appeal would be filed.[49] It was simply providing short, temporary relief so that the parties could "get on [their] horse[s] and get to the Federal Circuit in short order." ECF No. 581 at 51.[50]

### 5. Defendants misrepresent the Court's comments from the bench.

Defendants' motion largely rests on repeating a few selective quotations lifted from two pages of the October 30, 2018 hearing transcript. MTD 3. But the test articulated by the Supreme Court and reiterated by the Third Circuit focuses on a

---

[48] ECF No. 581, 56:6-16.

[49] ECF No. 581, 52:2-4 ("Now, the motion [for a stay], as anticipated, was brought…"); ECF No. 581 at 27a, n.13 (PTAB district court cases likely to converge "when my decision is appealed"). Janssen and BTG were also arguing that if they lost on the procedural issue at the Federal Circuit, they might further appeal to the Supreme Court, delaying generic entry for even more years.

[50] Defendants' attempt to equate this case with *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 948 F. Supp. 2d 538, 557 (D. Md. 2013) fails. There, the preliminary injunction was eventually converted into a final injunction. *See* Permanent Injunction and Final Order, *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, No. 12-cv-00954 (D. Md. Sept. 15, 2014), ECF No. 420.

reasonable litigant (*i.e.*, whether there was a reasonable belief of a chance of ultimately prevailing on the claim). Here, defendants knew full well that they had not presented the '213 blocking patent when pressing the "commercial success" argument to convince the examiner to issue the patent. And they knew that this was the sole reason that the PTO finally issued '438 patent after five prior rejections. The Court's *post hoc*, "half on the fly" (ECF No. 581, 51:19) comment that its ruling included a "judgment call" with which others might disagree matters little in this context. No reasonable litigant could have believed the Court would rule other than as it did.[51]

Even if these statements were somehow relevant to assessing the sham claim, defendants' suggestion that these quotes support their validity position is wrong. The "merits" the Court was referring to when noting that the "Court of Appeals could see it differently" seem, again, to refer to the procedural estoppel issue. ECF No. 581 at 59-64. And the Court's comments that the obviousness question was a "judgment call … that could be made differently by another jurist" (ECF No. 581,

---

[51] Defendants' attempt to draw inferences from the generic challengers' failure to pursue antitrust counterclaims should not be credited. EPPs here are entitled to their day in court and should not be precluded based on a prior litigant's strategy decisions. *See Rochester Drug*, 712 F. Supp. 2d at 320 (allowing purchasers to pursue sham claim despite prior finding of no sham).

60:13-14) must be viewed in light of the reality that *nobody*—not the PTO, not the PTAB, not the Court, and not the Federal Circuit—did so.

Likewise, the Court noting that "someone else could have" viewed the secondary consideration questions differently (ECF No. 581, 60:20-24) must be assessed in light of the reality that the only party that did view it differently—the PTO examiner—was the only one that did not account for the effects of the '213 blocking patent.

Whatever optimism about the patent's validity defendants glean from the trial court's statements do not appear to have been shared by the Federal Circuit. Indeed, notably absent from defendants' briefing is *any* citation to the Federal Circuit's decision that found "substantial evidence" to uphold the finding of invalidity and finding Janssen and BTG's "counterarguments [to be] unavailing" and "lack[ing] merit."[52] In short, after a full assessment, everyone reached the conclusion that defendants were uniquely positioned to know before *ever* filing their case:[53] the patent would be found invalid.

---

[52] *BTG Int'l*, 923 F.3d at 1074-76.

[53] This is precisely why the test is based on the perspective of a reasonable litigant.

C.   *Illinois Brick* **does not bar the EPPs' Sherman Act damages claim.**

Where direct purchasers are controlled by the manufacturer, *Illinois Brick Co.*

*v. Illinois*[54] does not bar EPP claims. The complaint adequately pleads that EPPs

purchased Zytiga from specialty pharmacies acting as agents of Janssen. Comp.

¶822. *Illinois Brick* is no hindrance, particularly at the pleading stage.

1.   **EPPs allege that the specialty pharmacies have functional economic or other unity with Janssen, satisfying *Illinois Brick*'s control exception.**

The "judge-made direct seller rule" of *Illinois Brick* "provides that only those

direct purchasers harmed by an antitrust violation will be permitted to assert a claim

for antitrust injury."[55] But the Third Circuit is clear that *Illinois Brick*'s "control

exception" may apply where the manufacturer and the direct purchaser have

"functional economic or other unity";[56] what matters is "the economic substance of

the transaction."[57]

---

[54] 431 U.S. 720 (1977).

[55] *Albers v. Mercedes-Benz USA, LLC*, 2020 WL 1466359, at *7 (D.N.J. Mar. 25, 2020).

[56] *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 372 (3d Cir. 2005) (quoting *Jewish Hosp. Ass'n of Louisville, Ky. v. Stewart Mech. Enters.*, 628 F.2d 971, 975 (6th Cir. 1980)).

[57] *Hess*, 424 F.3d at 372-73.

In *Albers*, this Court denied dismissal of a RICO class action complaint[58] alleging that car makers colluded to market cars as "clean diesel" despite knowing that the cars discharged emissions at impermissible levels. Rejecting an *Illinois Brick* defense, the Court found sufficient the plaintiffs' allegations that the engine control units at issue "run on complex, highly proprietary engine management software over which [defendant] Bosch GmbH exerts *near-total control*. . . . [T]he software is *typically locked to prevent customers, like Mercedes, from making significant changes on their own.* Accordingly, both the design and implementation are interactive processes, requiring Bosch's close collaboration with the automaker from beginning to end."[59]

Plaintiffs' allegations here mirror those in *Albers*, asserting Janssen has effectively "locked" access to Zytiga except through its "specialty pharmacy" network, exercising "near-total control" over access to Zytiga. Janssen distributes Zytiga in the U.S. through a small group of limited distribution "specialty pharmacies" controlled and paid by Janssen. Comp. ¶¶812-14. Janssen also pays

---

[58] "[A]ntitrust standing principles apply equally to allegations of RICO violations." *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996).

[59] *Albers*, 2020 WL 1466359 at *7 (emphasis added) (citing *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Product Liability Litig.*, 349 F. Supp. 3d 881, 905-09 (N.D. Cal. 2018), which rejected the argument that the car maker's actions break the causal chain and render the relationship between Bosch and the plaintiffs' RICO injury not sufficiently direct).

these specialty pharmacies to provide other services, including patient counseling and monitoring. *Id*. ¶813. The select specialty pharmacies are Janssen's agents, and "there is neither a likelihood nor ability for [its] distribution agents to enforce antitrust laws" Janssen violates. *Id*. ¶815. The complaint alleges at least three ways in which Janssen controls the specialty pharmacies.

*First*, the specialty pharmacies do not profit from buying Zytiga from Janssen and selling it at a higher price to downstream purchasers; rather, Janssen *pays* them to distribute the drug. *Id*. ¶816. This makes it doubtful that the pharmacies have suffered overcharge damages at all.[60] Like Janssen, the longer Zytiga maintains market exclusivity, the more money they make. *Id*. Rather than being injured by Janssen's anticompetitive behavior, the specialty pharmacies share Janssen's goal of maintaining the monopoly and blocking competition for as long as possible.

*Second,* Janssen sets *both* the prices at which it sells Zytiga to the specialty pharmacies and the prices charged to downstream purchasers. Comp. ¶¶817-18. This functional control of the sale price eliminates competition between the specialty pharmacies, such that the amounts charged by the various specialty pharmacies for Zytiga are, "to the penny, exactly the same (*e.g.* $10,221.93)." *Id*. ¶818.

---

[60] The details of the financial transactions between Janssen and the specialty pharmacies are yet-to-be-discovered facts—but given that the specialty pharmacies make their money on Zytiga from fees Janssen pays them, it is difficult to imagine that they are injured by an absence of generic competition. *See* Comp. ¶819.

27

*Third,* membership in Janssen's limited distribution network is highly lucrative and carefully guarded. Since Janssen controls which companies it allows to play this role, the specialty pharmacies are unlikely to upset this source of highly profitable work. *Id*. ¶820. They will not bite the hand that feeds them.

Unlike the *Hess* purchasers, the EPPs allege the specialty pharmacies make no independent decisions about Zytiga, take no mark-up, and could not sue Janssen for antitrust violations. Zero risk exists of exposing Janssen to duplicative liability or inconsistent judgments. Permitting the indirect purchasers to sue for damages is not only an efficient mechanism for enforcing the antitrust laws; it is likely the only such mechanism.

### 2. Defendants mistake EPPs' basis for federal antitrust standing.

EPPs do not assert that Janssen controlled the specialty pharmacies solely because they set the prices at which the specialty pharmacies sold Zytiga. Rather, EPPs claim that the specialty pharmacies had functional economic and other unity with Janssen; price-setting is merely a component of this unity.

Defendants rely on *Apple v. Pepper*[61] and two Third Circuit cases to argue that just because they set the price the specialty pharmacies charged for Zytiga, that does not convert the indirect purchasers into direct ones under *Illinois Brick*. This is a

---

[61] 139 S. Ct. 1514, 1521-22 (2019).

straw man. Plaintiffs claim status as direct purchasers under the control exception. The allegation that Janssen set the price for Zytiga is simply one among several indicators that Janssen controlled the specialty pharmacies—*i.e.*, that they had "functional economic unity" with them.

The Third Circuit cases are likewise inapposite. In *Warren Gen. Hosp. v. Amgen Inc.*, a hospital sued drug manufacturer Amgen, alleging an illegal tying claim under the federal antitrust laws.[62] The *Warren* Court affirmed dismissal after it became clear, through review of the contracts governing the hospital's purchases, that the hospital purchased Amgen's drugs "through an *independent* middleman wholesaler known as AmerisourceBergen."[63] Here, defendants have refused to produce their contracts with the specialty pharmacies, so there is no record on which such a factual finding can be made. Similarly, *In re Hypodermic Products Antitrust Litigation*[64] affirmed a grant of summary judgment based on a full factual record.

Defendants also argue that EPPs' claims under the co-conspirator exception to *Illinois Brick* fail because the specialty pharmacies are not defendants. But EPPs do not assert antitrust standing under the co-conspirator exception.

---

[62] 643 F.3d 77.

[63] *Id.* at 82 (emphasis added).

[64] 484 Fed. App'x 669 (3d Cir. 2012).

### 3.   Antitrust standing is a factual inquiry, for which discovery should be permitted.

Defendants suggest that because plaintiffs have not identified specifically how specialty pharmacies acquire Zytiga or how KPH Healthcare Services, Inc. has also brought federal antitrust claims by assignment from a wholesaler, EPPs' claims must be dismissed. MTD 34. That is not the law.

At the pleading stage, "questions of statutory standing, like other factual issues, are considered under the same pleading requirements" as a motion under Rule 12(b)(6).[65] The complaint alleges that Janssen "functionally controls" every aspect of the purchasers' access to the drug, making "the Zytiga purchasers from Janssen's distributor agents," not the distributor agents themselves, "the direct purchasers for purposes of an antitrust case such as this that alleges delayed generic entry." Comp. ¶821. Plaintiffs adequately plead federal antitrust standing at this stage.

Questions about how Zytiga reaches the market or, for example, whether the specialty pharmacies ever take possession of Zytiga or instead simply function as a mere pass-through do not necessitate dismissal. The Court need not adjudicate here potential contradictions between plausible factual allegations of the EPPs' complaint

---

[65] *Animal Science Products, Inc. v. China Minmetals Corp.*, 34 F. Supp. 3d 465, 485 (D.N.J. 2014).

and factual allegations of KPH's complaint.[66] Rather, "discovery may illuminate more facts … which precludes dismissing Plaintiffs' claims."[67]

### D. *Noerr-Pennington* does not bar EPPs' state law claims.

Defendants argue that the *Noerr-Pennington* doctrine bars EPPs' state law claims "[f]or the same reasons" they contend mandate dismissal of EPPs' federal sham litigation claims. MTD 34. For the same reasons discussed above in Sections IV.A-B, *Noerr-Pennington* does not preclude EPPs' state antitrust law claims.

### E. *Copperweld* does not foreclose EPPs' state law conspiracy claims.

Defendants argue that the Court should dismiss plaintiffs' conspiracy claims because their relationship as co-owners of the patent immunizes them under *Copperweld Corp. v. Independence Tube Corp.*[68] MTD 36-39. Not so. Plaintiffs base their conspiracy claims not on the patent relationship itself, but on conduct that is ancillary to it—the suppression of competition through coordinated abuse of the

---

[66] Indeed, defendants' request for such consideration might improperly convert the present motion to one for summary judgment. *See* Fed. R. Civ. P. 12(d) (if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56").

[67] *Gamboa v. Ford Motor Co.*, 2020 WL 7047612, at *9 (E.D. Mich. Nov. 30, 2020) (denying motion to dismiss consumer RICO claims on *Illinois Brick* grounds even though the "dealerships' roles as potential unnamed coconspirators is currently undetermined").

[68] 467 U.S. 752 (1984).

patent litigation process.[69] This is classic collusion between separate economic actors, and it is open to antitrust scrutiny.

In *Copperweld*, the Supreme Court, which "limit[ed] [its] inquiry to the narrow issue [of] whether a parent and its wholly owned subsidiary are capable of conspiring," deemed defendants' conduct "as that of a single enterprise," and thus immune from antitrust liability as a matter of law, because they "always have a 'unity of purpose or a common design.'"[70] This was because their objectives can only be "common," as "their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one."[71] The Court made no statements, let alone rulings, about antitrust immunity for patent co-owners.

Courts confronted with similar dismissal attempts under *Copperweld* in cases alleging similar misconduct have denied them. These rulings are based on the same fundamental premise: unrelated companies' pre-existing patent relationship cannot shield them from antitrust claims, at least at the pleadings stage, where they jointly engaged in anticompetitive conduct that is ancillary to the relationship and pursuant to their own interests.

---

[69] *See* Comp. ¶¶168-253.

[70] *Copperweld*, 467 U.S. at 767, 771.

[71] *Id.* at 771.

*In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litigation*[72] is one such case. There, the defendants, a patent holder and an exclusive licensee, allegedly conspired to delay generic entry through the filing of sham FDA citizen petitions.[73] The court ruled that the licensing relationship did not immunize them from liability because it was "ancillary to the anticompetitive conduct at the heart of the alleged conspiracy," which included the patent holder's participation in the licensee's "plan to delay generic entry by helping [the licensee] explore what citizen petition opportunities may exist."[74] "The mere fact that this overall scheme included the existence of an exclusive license relationship" did not "bring[] it within the realm of the *Copperweld* doctrine;" rather, the plaintiffs "describe[d] two separate entities that engaged in concerted action to jointly advance their independent economic interests."[75]

And in *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation*, the defendants, a patent holder and an exclusive licensee, allegedly colluded to restrict competition by filing sham patent infringement actions

---

[72] 2017 WL 4910673 (E.D. Pa. Oct. 30, 2017).

[73] *Id.* at *2, *4.

[74] *Id.* at *8-9.

[75] *Id.* at *9.

against generic manufacturers.[76] The court held that *Copperweld* did not apply because the plaintiffs alleged facts to show the defendants were "two separate entities that engaged in concerted action to jointly advance their economic interests," including a "concerted effort" to "initiate patent infringement litigation," that was "'ancillary' to the patentee/licensee relationship."[77]

Similarly, here, plaintiffs allege that defendants conspired to violate antitrust laws by pursuing sham patent infringement actions against generic manufacturers. Defendants' patent relationship does not trigger *Copperweld* because the complaint describes "two separate entities that engaged in concerted action" "ancillary" to the patent relationship that "jointly advance[d] their independent economic interests."[78] Nothing about their patent co-ownership required defendants to pursue sham litigation. As patent co-owners, each defendant could have chosen to compete when faced with generic entry by, for example, selling an authorized generic product. But they chose to collude, and in doing so "deprive[d] the marketplace of independent centers of decision-making."[79]

---

[76] 336 F. Supp. 3d 1256, 1298-99, 1301 (D. Kan. 2018).

[77] *Id.* at 1301-02 (quoting *Suboxone*, 2017 WL 4910673, at *9).

[78] 336 F. Supp. 3d at 1301-02.

[79] *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (quoting *Copperweld*, 467 U.S. at 769).

34

The case upon which defendants rely, *Shionogi Pharma, Inc. v. Mylan, Inc.*,[80] is unpersuasive. There, the alleged infringer countersued the patent holder and its exclusive licensee for violating the antitrust laws by engaging in coordinated activity to delay FDA approval of the would-be competing product.[81] The court dismissed the conspiracy claim, reasoning that the counter defendants had a "complete unity of interest" in the litigation. To the extent defendants contend *Shionogi Pharma* finds that patent holders and licensees can never conspire because they always have completely unified interests, it is wrong. "*Copperweld* does not hold that a patent holder and licensee never can conspire to violate the antitrust laws."[82]

*Shionogi Pharma* is also inapposite, as Janssen and BTG describe themselves as co-owners, not patent holder and licensee. MTD 37. As alleged, they jointly engaged in anticompetitive conduct that was ancillary to the patent relationship in pursuit of their own economic interests. "[S]ubstance, not form, should determine whether a separately incorporated entity is capable of conspiring under [Sherman

---

[80] 2011 WL 2174499 (D. Del. May 26, 2011).

[81] *Id.* at *1-2.

[82] *EpiPen*, 336 F. Supp. 3d at 1301; *see also Townshend v. Rockwell Int'l Corp.*, 2000 WL 433505, at *6 (N.D. Cal. Mar. 28, 2000) (same).

Act] § 1."[83] There is no evidence that Janssen and BTG had a "complete unit of interest" here, and the motion to dismiss on this ground should be rejected.

### F.   Defendants' attacks on EPPs' state law claims fail.

#### 1.   EPPs have Article III standing to pursue their state law claims.

Defendants concede EPPs have Article III standing to pursue claims under the laws of those states where the named plaintiffs reside or made purchases of Zytiga. Nonetheless, defendants erroneously contend EPPs lack "standing" to pursue claims under the laws of those states in which no named plaintiff resides or made purchases. MTD 41. Defendants' argument conflates the requirements of Article III standing and class certification under Rule 23. As this Court recently held, whether named plaintiffs can represent absent class members under the laws of other states should be addressed at the class certification stage. To avoid this outcome, defendants simply ignore every decision that has reached this conclusion, including this Court's opinion and the weight of authority in the Third Circuit.

"Article III [standing] requires that federal courts may only adjudicate an actual 'case or controversy.'"[84] "[W]hether an action presents a 'case or controversy'

---

[83] *Shionogi Pharma*, 2011 WL 2174499, at *5, (quoting *Copperweld*, 467 U.S. at 773 n.21).

[84] *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 306 (3d Cir. 1998).

under Article III is determined vis-à-vis the named parties."[85] Here, there is no

dispute that the named EPPs satisfy the Article III case and controversy requirement:

they each allege purchases of Zytiga at supracompetitive prices resulting from

defendants' anticompetitive conduct and seek damages to redress their injuries under

the laws of the states where they made purchases.[86] Nothing more is required at this

stage.

Nonetheless, defendants wrongly attempt to graft an additional requirement

onto the Article III analysis: that named plaintiffs demonstrate "standing" to pursue

claims on behalf of absent class members under the parallel laws of other states

where the named plaintiffs made no purchases. This is illogical[87] and contrary to

Third Circuit precedent. The named plaintiffs do not seek to recover under the

---

[85] *Id.*

[86] *See* MTD 39. Many of defendants' cited cases stand for the unremarkable proposition that each named plaintiff must establish the three requirements of Article III standing as to claims they are pursuing on their own behalf (*i.e.*, in an individual rather than representative capacity). *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 502 (1975); *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 245 (3d Cir. 2012).

[87] Defendants' approach is also more burdensome. As one court put it, requiring class counsel to "identify representatives from each state involved in a multistate class action, would render class actions considerably more cumbersome to initiate, and in turn, less effective in overcoming a lack of incentives to prosecute individual rights and in 'achiev[ing] economies of time, effort, and expense.'" *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 269 (D. Mass. 2004) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615-17 (1997)).

statutes of those states where they did not make purchases. Rather, they seek to represent absent class members who made purchases in those states under parallel state laws, which resulted in the same injury (overcharges) and emanated from the same conduct, caused by the same defendants. It makes little sense to evaluate whether the named plaintiffs have "standing" under the laws of states where they seek to represent absent class members at this stage.[88] The question of whether they can represent absent class members in other states is not a question of Article III standing but of compliance with Rule 23. This approach aligns with Third Circuit precedent holding that there is no separate "class standing" requirement:

> Once threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court, and there remains no further separate class standing requirement in the constitutional sense. . . . The absentee class members are not required to make a similar showing, because once the named parties have demonstrated they are properly before the court, the issue [becomes] one of compliance with the provisions of Rule 23, not one of Article III standing.[89]

---

[88] Contrary to defendants' contention, plaintiffs do not rely on the fact that Louisiana BCBS has members or beneficiaries throughout the U.S. to satisfy their standing obligations. *See* MTD 43. Rather, the complaint adequately alleges that either the named plaintiffs and/or absent class members made purchases in each state under which laws a claim has been brought—a point defendants do not and cannot dispute. *See, e.g.*, Comp. ¶¶761-801.

[89] *Prudential*, 148 F.3d at 306-07 (internal citations and quotation marks omitted). The Third Circuit recently reiterated this holding, confirming it applies to both settlement and litigation classes in *Neale v. Volvo Cars of North America, LLC*, 794 F.3d 353, 361-62 (3d Cir. 2015).

Consistent with this reasoning, when faced with the identical standing argument, this Court recently held in *Rickman v. BMW of North America*, that "[a] more prudent approach would be to defer consideration of [whether named plaintiffs can represent absent class members under the laws of other states] until the certification stage."[90] In reaching this conclusion, this Court recognized that it was following "the lead of other cases that have declined to address similar issues in advance of class certification."[91] Numerous courts, both within[92] and outside this Circuit[93] have

---

[90] 2020 WL 3468250, at *11 (D.N.J. June 25, 2020).

[91] *Id.* (citing *Sheet Metal Workers Nat'l Health Fund v. Amgen Inc.*, 2008 WL 3833577 at *9 (D.N.J. Aug. 13, 2008); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999); *In Re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959225, at *15 (D.N.J. June 29, 2007); and *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 204 (D.N.J. 2003)).

[92] *See, e.g.*, *In re FieldTurf Artificial Turf Mktg. & Sales Pracs. Litig.*, 2018 WL 4188459, at *8 (D.N.J. Aug. 31, 2018) (whether plaintiffs can assert claims for violation of laws of states where they do not reside is an issue that arises only in the context of class certification); *accord In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 827-31 (E.D. Pa. 2019); *In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 585 (E.D. Pa. 2018); *In re Liquid Aluminum Sulfate Antitrust Litig.*, 2017 WL 3131977, at *19 (D.N.J. July 20, 2017); *Miller v. Samsung Elecs. Am., Inc.*, 2015 WL 3965608, at *3 (D.N.J. June 29, 2015); *In re Thalomid & Revlimid*, 2015 WL 9589217, at *19; *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 886-87 (E.D. Pa. 2012); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 579-80 (M.D. Pa. 2009); *Warma Witter Kreisler, Inc. v. Samsung Elecs. Am., Inc.*, 2009 WL 4730187, at *2 (D.N.J. Dec. 3, 2009).

[93] *See, e.g.*, *In re Broiler Chicken*, 290 F. Supp. 3d 772, 809-10 (N.D. Ill. 2017), *reconsideration denied sub nom. Maplevale Farms, Inc. v. Koch Foods, Inc.*, 2018 WL 10550500 (Jan. 31, 2018); *Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Health Corp.*, 221 F. Supp. 3d 227, 236 (D.R.I. 2016).

reached the same conclusion, shifting the weight of authority in this circuit and others to align with this Court's well-reasoned approach.[94] Indeed, this Court's conclusion is in line with the holding of *every* circuit court to have squarely addressed the issue.[95] The Court should reach the same result here.

---

[94] In deciding *Rickman*, this Court considered and seemingly rejected the line of cases defendants cite from within this Circuit that reach a contrary result. *See* MTD 41, 42 n.13. Only one of those cases, *In re Insulin Pricing Litigation*, 2019 WL 643709, at *17 (D.N.J. Feb. 15, 2019), even cited the Third Circuit's decisions in *Prudential* and *Neale*. The *Insulin* court distinguished *Prudential* on the grounds that it involved "a matter where the *class* included members alleging injury in all fifty states." *Id.* (emphasis added). But that reasoning supports *plaintiffs'* argument here. The proposed EPP class likewise includes members injured in all the asserted states. *See, e.g.*, Comp. ¶¶761-801. While *Prudential* involved two individual class representatives who could not have purchased insurance in all fifty states but were nonetheless pursuing claims in all fifty, *Prudential*, 148 F.3d at 293, the Third Circuit evaluated their ability to represent a nationwide class under Rule 23 and upheld certification of a national class. *Id.* at 290.

[95] *See Mayor of Baltimore v. Actelion Pharms. Ltd.*, 2021 WL 1376980, at *7-9 (4th Cir. Apr. 13, 2021) (holding that "claims that the plaintiffs made on behalf of class members who purchased [the drug] in [other states] need not be" dismissed but instead "considered in determining" commonality, typicality and predominance under Fed. R. Civ. P. 23); *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 95 (2d Cir. 2018) ("[C]onsidering variation[] in state law[] as [a] question[] of predominance under Rule 23(b)(3), rather than standing under Article III, makes sense [because] . . . it acknowledges the obvious truth that class actions necessarily involve plaintiffs litigating injuries that they themselves would not have standing to litigate."); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51 (1st Cir. 2018) ("Our conclusion is in line with our prior precedent . . . requir[ing] only that a plaintiff make a single purchase in order to satisfy standing for a claim brought under multiple state laws."); *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 535-36 (7th Cir. 2011).

## 2.    EPPs adequately plead the state law claims.

Plaintiffs plead, across 83 pages, the elements of each of their state law claims and connect them to factual allegations. Comp., Section IX, Claims for Relief, ¶¶279-801. Defendants ignore this and instead contend that plaintiffs' claims are "threadbare." MTD 46-47. They are wrong.

Within this Circuit, courts have rejected similar challenges to the sufficiency of state law claims. For example, in *Generic Pharmaceuticals Pricing*, the court concluded that the complaint's overall antitrust allegations were sufficient to support the plaintiffs' state law consumer protection claims: "[Plaintiffs'] Complaints contain detailed factual allegations that make plausible their claims that . . . Defendants engaged in unfair competition and they need not reiterate these facts in their consumer protection law counts."[96] Likewise, in *In re Domestic Drywall Antitrust Litigation*, the district court rejected defendants' sufficiency criticisms, stating: "To the extent Defendants' one-paragraph [*Twombly*] argument is an invitation for the Court to comb through all of Plaintiffs' consumer protection claims and determine whether the elements have been adequately pleaded, the Court respectfully declines the invitation." [97]

---

[96] *Generic Pharms. Pricing*, 368 F. Supp. 3d at 839-40 (citing cases).

[97] 2016 WL 3769680, at *11 (E.D. Pa. July 13, 2016). *See also MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, 2019 WL 1418129, at *17 (D.N.J.

Defendants base their argument on facially distinct complaints that only "listed" the state statutes at issue.[98] By contrast, plaintiffs pleaded the elements of each state statute and tied the statutes to the detailed factual allegations of the complaint. Comp., Section IX, Claims for Relief, ¶¶279-801. Plaintiffs' state law claims, in fact, exceed what is required at the pleading stage. As the Third Circuit acknowledged, "[e]ven post-*Twombly*, it has been noted that a plaintiff is not

---

Mar. 29, 2019) (rejecting defendants' insufficiency argument, finding that "Plaintiffs have included sufficient factual allegations in the Amended Complaint establishing their respective state law claims"); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis PLC*, 2018 WL 7197233, at *35 (S.D.N.Y. Dec. 26, 2018) ("the factual allegations that support the IPP's claims are well-pleaded throughout the Complaint, and it is not necessary that the IPP reiterate each of them when listing its causes of action in the final section of the Complaint"); *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig.*, 701 F. Supp. 2d 356, 378-79 (E.D.N.Y. 2010) (holding "Plaintiffs have drawn the connection between the statutes and defendant's offending conduct," which is "sufficient for defendant and the Court to draw inferences that the elements exist").

[98] *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016) (finding the complaint did nothing other "than list a couple dozen state statutes in alphabetical order by state, without pleading any of their elements"); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 726 (N.D. Ill. 2016) (finding plaintiffs only "*listed* claims under various state laws" (emphasis in original)); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 255 (D. Conn. 2015) (dismissing certain consumer protection claims where the claims were only "*listed*") (emphasis in original)). Defendants' reliance on *In re Humira (Adalimumab) Antitrust Litigation*, is unavailing. 465 F. Supp. 3d 811 (N.D. Ill. 2020), *appeal filed sub nom. UFCW Loc. 1500 Welfare Fund v. AbbVie Inc.*, No. 20-2402 (7th Cir. 2020). There, the court acknowledged that plaintiffs could rely on the same facts supporting their antitrust claims to support their state law unfair and unconscionable conduct claims. *Id*. at 848.

42

required to establish the elements of a *prima facie* case but instead need only put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element.'"[99] EPPs more than satisfy this standard.

### 3.   EPPs adequately allege violations of state antitrust laws.

Defendants advance three arguments with respect to certain of EPPs' claims under state antitrust laws. All three should be rejected.

### a)   The complaint sufficiently pleads an intrastate nexus.

First, defendants argue that the alleged anticompetitive conduct does not have a sufficient nexus to the District of Columbia, Mississippi, South Dakota, Tennessee and West Virginia, and must be dismissed. MTD 48-49. Defendants are wrong.

"[C]ourts have held that plaintiffs sufficiently pled state antitrust claims where they alleged a 'nationwide antitrust violation that increased prices paid by the end payors in each state,' rejecting arguments that state law antitrust claims should be dismissed because the relevant state laws 'target only anticompetitive conduct that occurs solely or predominantly within the borders of the state. . . .'"[100] In *Generic Pharmaceuticals Pricing*, the court agreed with this majority view and sustained the

---

[99] *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (quoting *Graff v. Subbiah Cardiology Assocs., Ltd.*, 2008 WL 2312671, at *4 (W.D. Pa. June 4, 2008)).

[100] *Generic Pharms. Pricing*, 368 F. Supp. 3d at 837 (citation omitted).

state antitrust claims under the laws of the District of Columbia, South Dakota, Tennessee, and West Virginia, among others, where the allegations concerned a "broad nationwide-scheme to fix generic drug prices."[101] Likewise, in *In re Zetia (Ezetimibe) Antitrust Litigation*, the court held that allegations that "Defendants engaged in a nationwide pattern of anticompetitive conduct that resulted in the sale of brand and generic Zetia at supracompetitive prices . . . [and] that these sales took place in every state where they have asserted claims" was sufficient to meet the intrastate requirements of the antitrust laws of the District of Columbia, Mississippi, South Dakota, Tennessee and West Virginia.[102]

Here, EPPs allege that defendants engaged in a nationwide antitrust violation by initiating sham patent infringement litigation for the purpose of delaying generic competition, thereby increasing prices paid by EPPs in each state. *See, e.g.*, Comp. ¶¶280-86. The Court should deny defendants' motion as to Counts 3, 13, 25, 26 and 28.

---

[101] *Id.* at 835-37 & n.100 (collecting cases).

[102] *See In re Zetia*, 2019 WL 1397228, at *24 (E.D. Va. Feb. 6, 2019), *report and recommendation adopted as modified*, 400 F. Supp. 3d 418 (E.D. Va. 2019); *see also Liquid Aluminum*, 2017 WL 3131977, at *24 (sustaining District of Columbia, Mississippi, South Dakota, Tennessee and West Virginia state antitrust claims).

## b) The complaint alleges concerted activity by Janssen and BTG.

Defendants argue EPPs' claims under the antitrust laws of California, Kansas, New York, and Tennessee must be dismissed because allegations of "concerted activity" are required. MTD 49-50. Again, defendants are wrong.

As described in Section IV.E, EPPs allege that BTG and Janssen acted in concert, as co-owners of the '438 patent, to delay generic competition for Zytiga and that defendants' concerted action included: (1) the joint filing and prosecution of patent infringement litigation based on the '438 patent; and (2) the appeal of the district court's decision of invalidity as to the '438 patent. *See* Comp. ¶¶115-173, 228-250. These actions, taken by both BTG and Janssen, constitute "concerted activity" designed to delay generic competition for Zytiga and to advance their independent economic interests. As such, the claims under the antitrust laws of California (Count 2), Kansas (Count 8), New York (Count 19) and Tennessee (Count 26) should be sustained.[103]

---

[103] *See Suboxone*, 2017 WL 4910673, at *8-9; *EpiPen*, 336 F. Supp. 3d at 1301.

### c) EPPs may proceed under the antitrust laws of Illinois and Puerto Rico.

Defendants also argue that indirect purchasers are barred from asserting claims under the antitrust statutes of Illinois and Puerto Rico.[104]

With respect to the Illinois Antitrust Act's ("IAA") purported bar of class actions by indirect purchasers, defendants have failed to address *Shady Grove*, which held that a state statutory prohibition on class actions may not apply to federal court and upend Fed. R. Civ. P. 23.[105] Judge Linares, when addressing the same argument, sustained the indirect purchasers' claim under the IAA and unequivocally held that "while the subject statutes may prohibit the Illinois [and other states] statutory claims from proceeding as class actions, such a bar is inapplicable to this action."[106] Recent decisions are in agreement.[107] For the Puerto Rico Antitrust Act ("PRAA"), defendants have ignored a key decision from the U.S. District Court of Puerto Rico that concluded that the indirect purchasers are permitted to bring claims under the

---

[104] MTD 50-51. Plaintiffs hereby withdraw their claims under the New Hampshire Antitrust Statute (Count 17). As explained herein, plaintiffs are pursuing their Massachusetts claims under the Massachusetts Consumer Protection Act (Count 37), which was inadvertently duplicated at Count 10 of the complaint. *See infra* p. 47.

[105] *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010).

[106] *Liquid Aluminum*, 2017 WL 3131977, at *25.

[107] *See, e.g.*, *In re Broiler Chicken*, 290 F. Supp. 3d at 817 (holding IAA's class action bar is procedural, not substantive, and permitting class claim); *In re Zetia*, 2019 WL 1397228, at *26 (same).

PRAA.[108] Accordingly, the EPPs' antitrust claims under the laws of Illinois (Count

6) and Puerto Rico (Count 23) should not be dismissed.

### 4. EPPs adequately plead state consumer protection claims.

#### a) Consumer protection laws of the District of Columbia, Hawaii, Massachusetts, Minnesota, Missouri, Montana, Nevada, Oregon, Rhode Island and Vermont are not limited to "individuals."

Defendants erroneously argue that the consumer protection laws of the

District of Columbia, Hawaii, Massachusetts, Minnesota, Missouri, Montana,

Nevada, Oregon, Rhode Island and Vermont "do not create causes of actions for . .

. insurers, health plans and municipalities."[109] To the contrary, as discussed in detail

below, these laws are to be construed liberally and permit claims involving any

consumer injury or harm to the public interest. Here, the named plaintiffs are Third

Party Payors ("TPPs"). TPPs participate in consumer transactions *not* as

"merchants" or "business plaintiff[s]", MTD 53, but by paying some or all of the

---

[108] *See Rivera-Muniz v. Horizon Lines, Inc.*, 737 F. Supp. 2d 57, 61 (D.P.R. 2010) ("Because Puerto Rico liberally construes its standing requirements in private antitrust cases . . . it is immaterial whether Plaintiffs are direct or indirect purchasers . . . ." (citing *Pressure Vessels of P.R., Inc. v. Empire Gas de P.R.*, 137 D.P.R. 497, 509-19 (1994))), *certification denied*, 2010 WL 3703737 (Sept. 13, 2010); *see also In re Zetia*, 2019 WL 1397228, at *24 (adopting the reasoning of *Rivera-Muniz* and permitting the indirect purchasers' PRAA claim to proceed).

[109] MTD 52. The class definition includes both TPPs and individual purchasers. Comp. ¶268. Individual purchasers are unquestionably consumers under each statute and their claims should not be dismissed.

prices charged for Zytiga on behalf of their members and/or beneficiaries (*i.e.*, individual consumers). They do *not* purchase drugs for resale, distribute products, or act as intermediaries in the distribution chain. As the complaint alleges, (Comp. ¶¶20-24) their purchases are made for the personal use of their members and beneficiaries. These statutes' application, by definition and courts' review, encompass TPPs.

**District of Columbia**: Under D.C. Code §§ 28-3901(a)(1)-(2)(A) ("CCPA"), "consumer," used as a noun, includes entities who purchase "consumer goods or services," as long as the purchase is "other than for purposes of resale." The provisions include TPPs who—as alleged here[110]—"participate in consumer transactions by paying some or all of the prices charged to individual consumers, and, as a result, pay a portion of any overcharges." *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 637 (N.D. Cal. 2020); *see also Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1005 (D.C. 1989) ("If . . . the purchaser is not engaged in the regular business of purchasing this type of goods or service and reselling it, then the transaction will usually fall within the Act."). The court in *Liquid Aluminum*, 2017 WL 3131977, at *26, permitted TPPs' claims and criticized reliance (like that of defendants, here) on *Shaw v. Marriott International, Inc.*, 605 F.3d 1039, 1043 (D.C. Cir. 2010) rather than "tak[ing] into account the D.C. Appellate Court's holding [in *Klank*]."[111] *See also Mann v. Bahi*, 251 F. Supp. 3d 112, 120 (D.D.C. 2017) (CPPA is "broadly remedial" and permits claims by those who "purchase" and consumers that "receive" products. (quoting D.C. Code § 28-3901(a)(2))).

---

[110] Comp. ¶¶20-24.

[111] The court in *Staley*, 446 F. Supp. 3d at 638, rejected *In re Lidoderm Antitrust Litigation*,103 F. Supp. 3d 1155, 1165 (N.D. Cal. 2015), relied on by the defendants, (MTD 52): "Although an insurer who purchases a pharmaceutical product does not make that purchase for its own use, its role is located on the retail side of the transaction given that it is essentially acting as a proxy for its insured." *Staley*, 446 F. Supp. 3d at 638. For the same reason, *In re Humira*, 465 F. Supp. 3d 811, citing *Lidoderm*, should be rejected.

**Hawaii**: Haw. Rev. Stat. § 480-2(e), provides that "[a]ny person may bring an action," and is construed broadly to include entities. *Id.* § 480-1. *See Davis v. Four Seasons Hotel Ltd.*, 228 P.3d 303, 310 (Haw. 2010) ("broad interpretation of 'any person' is consistent with the principle that, as a remedial statute, chapter 480 must be construed liberally" (citation omitted)); *Generic Pharms. Pricing*, 368 F. Supp. 3d at 847-48 (permitting EPP claims under the Hawaii statute at motion to dismiss stage). The definition of "consumer," to which defendants refer only, is used in Haw. Rev. Stat. § 480-2(d) and limited to actions based on "deceptive" claims. *Sergeants Benevolent Association*, 2018 WL 7197233, at *40, was incorrectly decided for the reasons set forth. *See supra* note 111.

**Massachusetts**: Mass. Gen. Laws ch. 93A, § 11 applies to claims brought by businesses ("[a]ny person who engages in the conduct of any trade or commerce"), and *id.* § 9 applies to all other claims ("[a]ny person, other than a person entitled to bring action under section eleven of this chapter"). TPPs, as explained above, do not engage in "trade or commerce," and are thus within Mass. Gen. Laws ch. 93A, § 9. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 81-82 (D. Mass. 2007) (TPPs may bring claims under Mass. Gen. Laws ch. 93A § 9 because they "were not motivated by the desire to make money"), *aff'd*, 582 F.3d 156 (1st Cir. 2009); *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 44 (D.D.C 2003) ("[EPPs] can assert claims for . . . anticompetitive conduct under [Mass. Gen. Laws ch.] 93A § 9."). Defendants' cited cases erroneously equate the not-for-profit provision of health benefits with trade and commerce. And, contrary to the statute's provisions, *In re Asacol*, 2016 WL 4083333, at *13, *40 (D. Mass. July 20, 2016), and *Lidoderm*, 103 F. Supp. 3d at 1163-64, incorrectly imposed a requirement that plaintiff must purchase the product for his or her own personal use. *See supra* note 111.

**Minnesota**: Minn. Stat. § 325F.68, *et seq.*, is "remedial in nature and . . .[] to be liberally construed in favor of protecting consumers." *Minnesota ex rel. Humphrey v. Alpine Air Prods. Inc.*, 490 N.W.2d 888, 892 (Minn. Ct. App. 1992), *aff'd*, 500 N.W.2d 788 (Minn. 1993). Defendants, with their cited cases, erroneously equate the not-for-profit provision of health benefits with "merchants." TPPs are not merchants and may bring claims under the statute. *See, e.g., Suboxone*, 64 F. Supp. 3d 665, 701 (E.D. Pa. 2014) (allowing EPP claims under the Minnesota statute), *reconsideration in part*, 2015 WL 12910728 (E.D. Pa. Apr. 14, 2015).

**Missouri**: Mo. Rev. Stat. § 407.025(1) allows "[a]ny person who purchases or leases merchandise primarily for personal, family or household purposes" to sue for

damages. Mo. Rev. Stat. § 407.010(5) defines "person" to include entities. The personal use limitation applies to the nature and intended use of the merchandise, not the identity of the purchaser. *See In re Packaged Seafood Products Antitrust Litigation*, 242 F. Supp. 3d 1033, 1080 (S.D. Cal. 2017), holding that a plaintiff must purchase the product for his or her own personal use, is contrary to the statutory provisions for the reasons set forth. *See supra* note 111. TPPs fall within the purview of the statute. *See, e.g., In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554, 571 (E.D. La. 2013) ("[T]he Missouri Supreme Court has expressly allowed suit by indirect purchasers under the [Missouri statute]."); *Staley*, 446 F. Supp. 3d at 640 (permitting TPPs' claims under the MMPA and observing the absence of legislative history indicating that a consumer is restricted to one who purchases for their own use).

**Montana**: Mont. Code Ann. § 30-14-133(1) permits claims by any "consumer," defined as a "person," *id.* § 34-14-102(1), and includes entities, *id.* § 34-14-102(6). The statute is "not limited to those who engage directly in consumer transactions." *In re New Motor Vehicles Canadian Expert Antitrust Litig.*, 350 F. Supp. 2d 160, 193 (D. Me. 2004). *See Staley*, 446 F. Supp. 3d at 640 (permitting TPPs' claims under the Montana statute). *Lidoderm*, 103 F. Supp. 3d at 1165, is inapposite. The court held that the Montana statute excludes "persons who buy goods for resale." *Id.* TPPs do not resell. Defendants also point to no legislative history indicating that a consumer is restricted to one who purchases for their own use.

**Nevada**: Nev. Rev. Stat. § 41.600(1) provides: "[a]n action may be brought by any person who is a victim of consumer fraud." *See Suboxone*, 64 F. Supp. 3d at 702 (allowing EPP claims under the Nevada statute, § 598.0903, *et seq.*). Defendants cite Nev. Rev. Stat. § 598.0977, (MTD 53) which creates *additional* remedies for elderly and disabled persons; it does not abrogate the right of action for *all* injured persons by *id.* § 41.600. Defendants cite *In re Wellbutrin XL Antitrust Litigation*, 260 F.R.D. 143, 163-64 (E.D. Pa. 2009) and *Chocolate Confectionary*, 749 F. Supp. 2d 224, 234 (M.D. Pa. 2010), which did *not* consider Nev. Rev. Stat. § 41.600.

**Oregon**: "An action authorized by this paragraph may be brought regardless of whether the plaintiff dealt directly or indirectly with the adverse party." Or. Rev. Stat. Ann. § 646.780 (West).

**Rhode Island**: R.I. Gen. Laws § 6-13.1-1(3) permits suits by persons, defined broadly to include entities.[112] Defendants point to no legislative history indicating that a consumer is restricted to one who purchases for their own use. *Staley*, 446 F. Supp. 3d at 641 (allowing TPPs' claims under the Rhode Island statute and noting the absence of legislative history to support defendants' argument that the statute only applies individual consumers). *See also* supra note 111.

**Vermont**:   "The Vermont Supreme Court has repeatedly held that the [Vermont Consumer Fraud Act] is 'remedial in nature' and must be construed 'liberally . . . .'" *Bergman v. Spruce Peak Realty, LLC*, 847 F. Supp. 2d 653, 671 (D. Vt. 2012) (citation omitted). Vt. Stat. Ann. tit. 9 § 2451a(a) defines "consumer" as "a person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services not for resale in the ordinary course of his or her trade or business but for the use or benefit of his or her business or in connection with the operation of his or her business." This language "signaled the Legislature's intent to provide businesses with the same protections under the Act as individuals have historically received." *See Rathe Salvage, Inc. v. R. Brown & Sons, Inc.*, 2008 VT 99, ¶¶ 19-22, 184 Vt. 355, 364-65, 965 A.2d 460, 466-67 (2008). Defendants ignore the 1997 amendment. Federal courts construing similar provisions of Pennsylvania's consumer law have held that TPPs have standing under the statute.[113]

### b) EPPs adequately allege in-state effects of defendants' conduct.

Defendants' argument that the EPPs' claims under the consumer protection statutes of California, New Hampshire, New York and North Carolina "fail because those state statutes require that the alleged deceptive conduct occur, at least in part, within the state, and/or substantially affect the state's residents," (MTD 54) is

---

[112] The defendants' cited cases disregard the statute's broad definition of "person."

[113] *See, e.g.*, *In re Actiq Sales & Mktg. Pracs. Litig.*, 790 F. Supp. 2d 313, 326-27 (E.D. Pa. 2011), *reconsideration denied*, 2012 WL 2135560 (June 13, 2012); *Am. Fed'n of State Cnty. Mun. Emp. v. Ortho-McNeill-Janssen Pharms., Inc.*, 2010 WL 891150, at *3-4 (E.D. Pa. Mar. 11, 2010).

meritless. Defendants ignore the fact that EPPs allege in detail that defendants' actions artificially inflated prices for Zytiga each and every time a consumer made a purchase and the intended and actual result of defendants' conduct was to overcharge consumers, the very parties whom these states' statutes are intended to protect.[114] Courts have held anticompetitive acts are sufficiently connected to consumers under these four states' consumer protection statutes:

**California**: Overcharges in California are sufficient to establish an intrastate nexus, and courts allow EPP claims under California's statute § 17200, *et seq.* based on purchases at supracompetitive prices in California. *See*, *e.g.*, *Suboxone*, 64 F. Supp. 3d at 699 (holding that EPPs' allegations of overcharges in California were sufficient to establish an intrastate nexus (citing *Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005) (noting that a plaintiff must allege that either misconduct or injuries occurred intrastate))); *In re Remicade*, 345 F. Supp. 3d at 588 (EPPs met "the 'substantial nexus' requirement of California" by alleging defendants' "exclusionary scheme resulted in [the drug] . . . being sold at artificially inflated prices and caused overcharges [in California]."). *Accord Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,* 737 F. Supp. 2d 380, 406 (E.D. Pa. 2010). Defendants misapply *Meridian,* 404 F. Supp. at 1225. In *Meridian*, *none* of the alleged misconduct *or* injuries occurred in California. Here, EPPs allege that defendants' conduct injured purchasers in California.[115]

**New Hampshire**: Overcharges in New Hampshire are sufficient to establish an intrastate nexus. *See In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 760-61 (E.D. Pa. 2014). *Accord Chocolate Confectionary*, 749 F. Supp. 2d at 235; *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 231 (S.D.N.Y. 2012); *New Motor Vehicles*, 350 F. Supp. 2d at 193; *Liquid Aluminum*, 2017 WL 3131977, at

---

[114] Each state count incorporates all of the complaint's detailed allegations.

[115] *See*, *e.g.*, Comp. ¶¶490, 494, 516.

*24-25 & n.25.[116] In *LaChance v. United States Smokeless Tobacco Co.*, the New Hampshire Supreme Court emphasized that a pleading states a claim if the "allegations encompass conduct which was part of trade or commerce that had direct or indirect effects on the people of [New Hampshire]." 931 A.2d 571, 578 (N.H. 2007). *See also Harbour Cap. Corp. v. Allied Cap. Corp.*, 2009 WL 2185449, at *8 (D.N.H. July 22, 2009) ("[The statute] cover[s] a defendant's extra-territorial acts if those acts affect . . . commerce within the state."). EPPs allege, here, that defendants' unlawful conduct substantially affected New Hampshire's trade and commerce, and injured purchasers in New Hampshire.[117]

**New York**: Overcharges in New York are sufficient to establish an intrastate nexus. *See*, *e.g.*, *Suboxone*, 64 F. Supp. 3d at 702 (overcharges in New York sufficient to establish nexus with intrastate commerce). *Accord In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 836, 860 (E.D. Mich. 2014); *Liquid Aluminum*, 2017 WL 3131977, at *24-25 & n.25; *Loestrin*, 410 F. Supp. 3d at 377. Here, EPPs allege purchases in New York.[118] Defendants rely on *Goshen v. Mutual Life Insurance Co.*, 774 N.E.2d 1190, 1195-96 (N.Y. 2002) (holding the offending *transaction*, not the scheme, must occur in New York), and on *Sheet Metal Workers Loc. 441*, 263 F.R.D. 205, 214 (E.D. Pa. 2009) (citing *Goshen*, 774 N.E.2d at 1196). *Goshen allowed* claims by New York plaintiffs to proceed, but dismissed claims by a plaintiff who made his purchase in Florida.

**North Carolina**: EPPs' allegations that defendants' anticompetitive conduct had substantial effects in North Carolina because competition was suppressed, prices were elevated, and class members purchased at supracompetitive prices, (Comp. ¶¶490, 494, 657-660) satisfies the "intrastate" pleading requirements under N.C. Gen. Stat. §§ 75-1.1, *et seq. See*, *e.g.*, *Sheet Metal Workers Loc. 441*, 737 F. Supp. 2d at 420 ("Plaintiffs have alleged a substantial effect in North Carolina in pleading that they and members of their plans paid more for [product] in North Carolina as a result of" defendants' anticompetitive conduct.). *Accord In re Auto. Parts*, 2013 WL

---

[116] *See In re Loestrin 24 Fe Antitrust Litig.*, 410 F. Supp. 3d 352, 377 (D.R.I. 2019) ("EPPs sufficiently pled intrastate activity under the [New Hampshire and New York] consumer protection laws where they allege overcharge damages for purchases at supracompetitive prices, the impact of which was felt within each state." (citations omitted)).

[117] *See*, *e.g.*, Comp. ¶¶490, 494, 627-29.

[118] *See*, *id.* ¶¶490, 494, 649-651.

2456612, at *21 (E.D. Mich. June 6, 2013); *DDAVP*, 903 F. Supp. 2d at 231; *Liquid Aluminum*, 2017 WL 3131977, at *24-25 & n.25.

### c) EPPs allege the requisite conduct under various states' consumer protection statutes.

Defendants argue that EPPs' claims under the consumer protection statutes of various states fail because the consumer protection laws of Arizona, Idaho, Illinois, Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Rhode Island, South Dakota, Utah, Virginia and West Virginia "do not provide a remedy for antitrust claims absent an unconscionable, unfair or deceptive act."[119] However, state consumer protection statutes typically grant broad remedies based upon various types of unlawful conduct, including, *inter alia*, unfair, unconscionable *or* deceptive conduct, in the disjunctive. Thus, even if the Court finds that EPPs did not adequately allege a violation based upon one prong of a statute (*e.g.*, deceptive conduct), it can still find that EPPs stated a claim based upon another prong (*e.g.*, unfair or unconscionable conduct).

To the extent that any statutes do require EPPs to plead deceptive conduct, EPPs have done so. EPPs allege detailed and extensive factual allegations, incorporated into the state consumer protection claims, that defendants engaged in prohibited conduct which caused harm to consumers and TPPs in each state who

---

[119] MTD 56.

paid supracompetitive prices and ties those factual allegations to each state's legal requirements.[120] Specifically, as to each state, EPPs allege:

> The defendants' above-described scheme and conduct constitutes unfair competition, unconscionable conduct, and fraudulent and deceptive acts and practices in violation of the state consumer protection statutes set forth below. As a direct and proximate result of the defendants' anticompetitive, fraudulent, deceptive, unfair, and/or unconscionable acts or practices, the plaintiffs and the class were denied the opportunity to purchase lower-priced generic versions of abiraterone acetate, and in fact paid higher prices for branded abiraterone acetate than they should have.

Comp. ¶490. Defendants' claim that allegations of sham litigation do not satisfy the state requirements rings hollow. It defies logic that this anticompetitive conduct causing injury to consumers in the form of overcharges is not a prime example of conduct the states' consumer protection statutes prohibit and that "process" would trump the illegal outcome of supracompetitive prices and delayed entry.[121]

**Arizona:** Arizona's statute was amended in 2013 to prohibit "unfair" acts or practices. Ariz. Rev. Stat. Ann.§ 44-1522(A); 2013 Ariz. Legis. Serv. Ch. 143 (H.B. 2396). Defendants' three cited cases predate this amendment. *Kuehn v. Stanley*, 91 P.3d 346, 351 (Ariz. Ct. App. 2004), is also inapplicable because the court applied a

---

[120] *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2015 WL 5458570, at *15 (D. Mass. Sept. 16, 2015) (TPPs sufficiently state claims under state statutes where claims "incorporate by reference the entire complaint, which contains many allegations of unfair competition and anticompetitive injury").

[121] *See, e.g., DDAVP*, 903 F. Supp. 2d at 222-23 (holding that EPPs plausibly alleged a cause of action under the Arizona statute based upon allegations that "[i]n paying supra-competitive prices for DDAVP, consumers . . . relied on Defendants' false representations to [agencies including the PTO] regarding the patentability and safety of their product and its generic equivalents").

summary judgment standard. EPPs' allegations *do* fall within the statute's prohibitions. *See Loestrin*, 410 F. Supp. 3d at 379-80 (denying dismissal of EPPs' Arizona consumer protection claim for failure to plead "deceitful conduct," and holding that "[t]he Court joins the majority of courts in concluding that it is sufficient, under the consumer protection laws of [AZ, DC, ID, MI, NE, NM and NY], to allege that a defendant's anticompetitive conduct of the sort alleged here caused end-payor plaintiffs to pay overcharges in the form of higher prices for brand drugs ") (collecting cases). *Accord DDAVP*, 903 F. Supp. 2d at 222-23. Individual reliance on deceptive conduct is not necessary. *See Persky v. Turley*, 1991 WL 327434, at *10 (D. Ariz. 1991). Here, EPPs allege that defendants' unfair and deceptive conduct directly caused EPPs' injuries in the form of overcharges.[122]

**Idaho:** Under Idaho Code §§ 48-601 *et seq.*, claims based on anticompetitive conduct are sufficient. *See*, *e.g.*, *Loestrin*, 410 F. Supp. 3d at 380 (EPPs' allegations that defendant's "anticompetitive conduct . . . caused [EPPs] to pay overcharges in the form of higher prices for brand drugs" satisfies Idaho statute.); *DDAVP*, 903 F. Supp. 2d at 221, 224-25 ("Plaintiffs have plausibly pleaded misrepresentations that, although they may not have been made directly to consumers, had the kind of effect on end payors that [the Idaho statute] seek[s] to remedy."). *Accord In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 418 (D. Del. 2007). EPP claims premised on anticompetitive conduct are permitted.

**Illinois**: Under the Illinois consumer protection laws, EPP claims have been permitted. 815 Ill. Comp. Stat. Ann. 505/1 *et seq.*, 815 Ill. Comp. Stat. Ann. 505/10a *et seq.* and 740 Ill. Comp. Stat. Ann. 10/3(1) *et seq. See Sergeants Benevolent Ass'n*, 2018 WL 7197233, at *42 (denying dismissal of claim under Illinois consumer protection law). A showing of individual reliance is not required. *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 576 (7th Cir. 2001). *See Pharm. Indus. Average Wholesale*, 252 F.R.D. 83, 98 (D. Mass. 2008).

**Michigan**: Mich. Comp. Laws Ann. § 445.903(1)(a) and (z) prohibits "[u]nfair, unconscionable, or deceptive methods, acts or practices," including "[c]harging the consumer a price that is grossly in excess of the price at which similar property or services are sold." Allegations that "there was a 'gross disparity between the price that Plaintiffs and the End-Payor Class members paid for the brand product and the value received, given that a less expensive substitute generic product should have

---

[122] *See, e.g.*, Comp. ¶¶490-98, 501-06. As noted above, each state Count incorporates all of the complaint's detailed allegations.

been available,' . . . fit[] within the [statute]." *Solodyn*, 2015 WL 5458570, at *17. *Accord Suboxone*, 64 F. Supp. 3d at 701 (allowing Michigan Consumer Protection Act claim based on anticompetitive conduct); *Loestrin*, 410 F. Supp. 3d at 380. The MCPA does not require actual reliance on the unfair or deceptive act. *See Gasperoni v. Metabolife, Int'l Inc.*, 2000 WL 33365948, at *7 (E.D. Mich. Sept. 27, 2000) ("[R]eliance and causation are satisfied by proof that plaintiffs purchased and consumed the product."). EPPs have pled intent to the extent required.[123]

**Minnesota**: The Minnesota statute is "remedial in nature and [is] to be liberally construed in favor of protecting consumers." *Minnesota ex rel. Humphrey*, 490 N.W.2d at 892. Allegations that the plaintiff relied on the defendant's misconduct are not required. *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 912 (8th Cir. 2016). If EPPs are required to plead deceptive conduct under the Minnesota Consumer Fraud Act, they have done so.[124] *Suboxone*, 64 F. Supp. 3d at 701. *Accord Generic Pharms. Pricing*, 368 F. Supp. 3d at 846.

**Nevada**: The Nevada statute applies to any corporation that "[v]iolates a state or federal statute or regulation relating to the sale or lease of goods or services." Nev. Rev. Stat. § 598.0923(3). Actual reliance on the unfair or deceptive act is not required. *See Loestrin*, 410 F. Supp. 3d at 380 (EPPs' allegations that "defendant's anticompetitive conduct . . . caused end-payor plaintiffs to pay overcharges in the form of higher prices for brand drugs" satisfies the Nevada statute).

**New Mexico**: N.M. Stat. Ann. §§ 57-12-1 *et seq.* ("NMUPA") prohibits "[u]nfair or deceptive trade practices and unconscionable trade practices," *id.* § 57-12-3, and defines "unconscionable trade practice" to include "an act or practice in connection with the sale . . . of any goods or services . . . that to a person's detriment . . . results in a gross disparity between the value received by a person and the price paid." *Id.* § 57-12-2(E). Courts permit claims based on anticompetitive conduct to proceed under NMUPA. *See, e.g., Loestrin*, 410 F. Supp. at 379 (allowing EPP claim under NMUPA); *New Motor Vehicles*, 350 F. Supp. 2d at 195-96 (anticompetitive conspiracy causing higher prices actionable under NMUPA). *Accord Liquid Aluminum*, 2017 WL 3131977, at *27. The Court in *In re Lipitor Antitrust Litigation*, 336 F. Supp. 3d 395, 424-25 (D.N.J. 2018), distinguished *In re Graphics Processing Units Antitrust Litigation*, 527 F. Supp. 2d 1011, 1029-1030 (N.D. Cal. 2007):

---

[123] *See, e.g.*, Comp. ¶¶490-98, 578-583.

[124] *See, e.g.*, Comp. ¶¶490-98, 575-583.

"Unlike *GPU*, . . . where the court dismissed the plaintiffs' [NMUPA claim] for failing to plead unequal bargaining power . . . EPPs have sufficiently pled enough facts to state a claim under [NMUPA] . . . and it is beyond cavil that the[] schemes [alleged in EPPs' complaint] resulted in consumers paying a substantial premium for goods that they would have otherwise paid a fraction for."

**New York** New York General Business Law §§ 349 *et seq.* prohibits deceptive acts or practices that cause consumer injury or harm to the public interest. The statute extends "far beyond the reach of common law fraud"; allegations of anticompetitive conduct state a claim where, as here, consumers were injured. *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002) (bid-rigging conspiracy); *Macquarie Grp. Ltd. v. Pac. Corporate Grp., LLC*, 2009 WL 539928, at *9 (S.D. Cal. Mar. 2, 2009) (conspiracy to prevent market entry thus allowing defendant to charge supracompetitive prices). *Accord DDAVP*, 903 F. Supp. 2d at 228. *See also In re Dynamic Access Memory Antitrust Litig.*, 536 F. Supp. 2d 1129, 1143 (N.D. Cal. 2008) ("*DRAM II*") ("plaintiffs need only allege—and ultimately show—that defendants' acts or practices have broader impact on consumers at large").

**Oregon:** Or. Rev. Stat. Ann. § 646.607 is to be construed liberally. *See Oregon ex rel. Rosenblum v. Johnson & Johnson*, 362 P.3d 1197, 1202-03 (Or. Ct. App. 2015), *review denied*, 369 P.3d 386 (Or. 2016). Courts have permitted claims based on anticompetitive conduct under Oregon's statute. *See Packaged Seafood*, 242 F. Supp. 3d at 1083-84; *Liquid Aluminum*, 2017 WL 3131977, at *27. Defendants' cited cases predate these decisions. The court in *Packaged Seafood* distinguished the case on which defendants rely, *In re Dynamic Access Memory Antitrust Litigation*, 516 F. Supp. 2d 1072, 1115-17 (N.D. Cal. 2007) ("*DRAM I*"), stating, "Plaintiffs here (unlike the *DRAM* Plaintiffs) plausibly allege affirmative misrepresentations regarding and concealment of the alleged conspiracy." *Packaged Seafood*, 242 F. Supp. 3d at 1084.

**Rhode Island**: R.I. Gen. Laws §§ 6-13.1-2 and 6-13.1-3 ("RIDTPA") prohibit "[u]nfair methods of competition and unfair or deceptive acts or practices." In *Ames v. Oceanside Welding & Towing Inc.*, 767 A.2d 677, 681 (R.I. 2001), the Rhode Island Supreme Court held that practices that violate other statutes and common law are actionable as "unfair" practices under the statute, including antitrust laws. *See*, *e.g.*, *Liquid Aluminum*, 2017 WL 3131977, at *28-29 (Sherman Act violations give rise to a claim under Rhode Island's consumer protection statute). *Accord Packaged Seafood*, 242 F. Supp. 3d at 1084; *In re Aftermarket Filters Antitrust Litig.*, 2010 WL 1416259, at *2 (N.D. Ill. Apr. 1, 2010). Defendants, and their cited cases, fail

to address *Ames*. And, subsequent to *DRAM I,* 516 F. Supp. 2d at 1116, the court in *DRAM II allowed* claims to proceed under RIDTPA. 536 F. Supp. 2d at 1145.

**South Dakota**: The South Dakota Deceptive Trade Practices Act ("SDDTPA") provides that it is unlawful to "use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or . . . conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged." S.D. Codified Laws § 37-24-6(1). *See DDAVP*, 903 F. Supp. 2d at 229 (upholding SDDTPA claim where plaintiffs were "adversely affected" by paying higher prices as a result of defendants' misrepresentations to the PTO and FDA). EPPs' allegations concerning the filing of sham litigation distinguishes the allegations in this case from the cases cited by defendants.

**Utah**: Utah Code Ann. §§ 13-11-1 *et seq.* (West) is "liberally construed . . . to protect consumers," *id.* § 13-11-2 (West), and allegations are sufficient "if it . . . appears to the court that an act may be unconscionable." *Id.* § 13-11-5 (West). *See Packaged Seafood,* 242 F. Supp. 3d at 1087 (denying motion to dismiss price fixing claims under Utah Act). *Accord Microprocessor,* 496 F. Supp. 2d at 418. Defendants' cited cases, *DRAM I,* 516 F. Supp. 2d at 1117, and *In re Humira,* 465 F. Supp. 3d at 853, fail to recognize the breadth of the prohibition of "unconscionable" conduct.

**Virginia**: Va. Code Ann. § 59.1-200(14) (West) prohibits the use of "deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Anticompetitive conduct falls within the ambit of the Virginia Consumer Protection Act. EPPs' allegations that defendants' anticompetitive, fraudulent, deceptive, unfair, and/or unconscionable acts denied EPPs the opportunity to purchase lower priced generic versions of Zytiga and caused EPPs to pay higher prices for the branded product than they should have, satisfies Virginia's statute.[125]

**West Virginia**: West Virginia's statute ("WVCCP") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." W. Va. Code § 46A-6-104. The provisions are to be "liberally construed," and require "courts [to] be guided by the policies" of the FTC and

---

[125] *See* Comp. ¶¶490-498, 741-748.

interpretations of the FTC Act. *Id.* § 46A-6-101. Allegations of anticompetitive conduct state a claim under the statute. *See, e.g.*, *Packaged Seafood*, 242 F. Supp. 3d at 1087-88 (permitting price-fixing claims under WVCCPA); *Pharm. Indus. Average Wholesale*, 233 F.R.D. 229, 231 (D. Mass. 2006) (certifying class asserting claims in price-fixing case under West Virginia statute). *Accord FTC v. Mylan Lab'ys Inc.*, 99 F. Supp. 2d 1, 10 (D.D.C. 1999). *DRAM I* and *GPU*, cited by defendants, are inapplicable for the reasons discussed, *supra* at note 111. Moreover, both decisions *pre-date* FTC Act harmonization language, effective June 2015. *See Packaged Seafood*, 242 F. Supp. 3d at 1087 (discussing import of 2015 amendment); 2015 W. Va. Acts Ch. 64 (S.B. 315).

### 5.   Plaintiffs' unjust enrichment claims are adequately pled.

#### a)   Unjust enrichment claims proceed independently from antitrust claims.

Federal courts have long recognized that unjust enrichment ("UE") claims may proceed in concert with parallel antitrust claims as separate, independent causes of action.[126] Yet without any analysis, defendants contend that if the Court dismisses plaintiffs' federal antitrust claim, every one of their forty-one UE claims should be

---

[126] *See, e.g.*, *In re G–Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 46 (D.D.C. 2008) ("No reason or logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses a person not only of a statutory legal remedy for an antitrust violation, but also dispossesses the same person of his right to pursue a common law equitable remedy."); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 669 (E.D. Mich. 2000) (noting that common law claims may be successfully brought even where statutory or contract claims are unsuccessful and warning against confusing "[p]laintiffs' right to recover an equitable remedy under a common law claim based on principles of unjust enrichment with [their] right to recover a remedy at law for an alleged violation of a state's antitrust laws"), *aff'd*, 332 F.3d 896 (6th Cir. 2003). Using the same logic, plaintiffs' UE claims may proceed even if some (or all) of their statutory claims are dismissed.

automatically tossed as well. MTD 59-61. Defendants cite no state authority supporting this blanket proposition.[127] Defendants' position is contradicted by their argument that there are only seven states in which plaintiffs cannot maintain "autonomous" or "stand-alone" UE claims, (MTD 62-63) tacitly admitting that plaintiffs' remaining thirty-four UE claims can proceed independently. The viability of plaintiffs' UE claims does not hinge on the Court sustaining their antitrust claim.

### b) *Illinois Brick* does not bar EPPs' unjust enrichment claims.

The Court should reject defendants' argument that plaintiffs can assert UE only in states that allow indirect purchaser antitrust and consumer protection claims. *Illinois Brick* addressed "the complexity associated with correctly apportioning

---

[127] Many federal courts disagree that a failure to state an antitrust claim precludes a plaintiff from succeeding on a related UE claim. *See, e.g.*, *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *20 (N.D. Ill. June 29, 2015). For example, at least one New York federal district court subsequent to *Kramer v. Pollock-Krasner Foundation*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995), cited at MTD 60, has interpreted New York law to permit standalone UE claims. *See Sergeants Benevolent Ass'n*, 2012 WL 4336218, at *8 (E.D.N.Y. Sept. 17, 2012), *report and recommendation adopted in part*, 20 F. Supp. 3d 305 (2014), *aff'd*, 806 F.3d 71 (2d Cir. 2015); *D.R. Ward Constr. Co. v. Rohm & Hass Co.*, 470 F. Supp. 2d 485, 506-07 (E.D. Pa. 2006) (viability of an UE claim "does not hinge upon the success of the state statutory antitrust claims"); *King Drug Co. v. Cephalon, Inc.*, 702 F. Supp. 2d 514, 540 (E.D. Pa. 2010) ("[UE] claims . . . are viable regardless of the applicable state antitrust laws."), *abrogated on other grounds by In re K-Dur Antitrust Litig.*, 686 F.3d 197 (3d Cir. 2012).

recovery among direct purchasers, middlemen, and ultimate consumers."[128] UE claims, by contrast, "focus on the gains of the defendants, not the losses of the plaintiffs."[129] "No reason or logic supports a conclusion that a state's adherence to *Illinois Brick* dispossesses a person not only of a statutory legal remedy for an antitrust violation, but also [] his right to pursue a common law equitable remedy."[130]

Defendants' argument that EPPs' common law UE claims effectively "end run" the decision by thirteen legislatures to accept the holding in *Illinois Brick* lacks any state-specific analysis. Nor do defendants show that such legislative efforts were intended to preclude indirect purchasers from using UE or other equitable remedies to vindicate antitrust injuries.[131] Absent any analysis specific to these thirteen UE

---

[128] *Generic Pharms. Pricing*, 368 F. Supp. 3d at 850 (citing *Illinois Brick*, 431 U.S. at 737).

[129] *Generic Pharms. Pricing*, 368 F. Supp. 3d at 850 (finding that *Illinois Brick* does not require dismissal of the UE claims) (internal citations omitted).

[130] *Id.* (quoting *In re G-Fees*, 584 F. Supp. 2d at 46). *See also King Drug Co.*, 702 F. Supp. 2d at 539-40 (rejecting attempt to dismiss the end payors' UE claim as an "end-run").

[131] *See* MTD 61-62. Defendants cite zero state law cases or statutes from Alaska, Georgia, Idaho, Illinois, Maryland, Massachusetts, Montana, New Hampshire, Pennsylvania, South Carolina, Virginia, Wyoming, and Puerto Rico to support their point, relying instead on a handful of federal court opinions espousing a general principle that a common law claim cannot "end run" a state's adoption of *Illinois Brick*, whether through legislative fiat or silence. Defendants' authorities lack any in-depth analysis of the extent to which the various states adopted the rationale of *Illinois Brick*, or whether they meant it to displace traditional common law claims such as UE. *See Processed Egg*, 851 F. Supp. 2d at 922 ("[E]ven if the general

claims, it would be inappropriate for the Court to dismiss them.[132]

### c) Plaintiffs' unjust enrichment claims should be sustained in those states where they have no other claims.

"Unjust enrichment [is] an independent basis of liability in common-law legal systems[.]"[133] Thus, a separate statutory claim is not required to bring a viable UE claim. Tellingly, defendants cite no state authority from the seven jurisdictions they claim bar Plaintiffs' claims.[134] In fact, courts have held that UE claims, which sound

---

principles, as expressed by those cases, are recognized across various state jurisdictions, that does not mean that a given jurisdiction . . . has adopted a particular legal principle or whether that principle is the only guidance that bears consideration.").

[132] *See id. Processed Egg*, 851 F. Supp. 2d at 921-24; *Generic Pharms. Pricing*, 368 F. Supp. 3d at 849-50 (sustaining UE claims).

[133] Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a (Am. L. Inst. 2011); George P. Roach, *How Restitution and Unjust Enrichment Can Improve Your Corporate Claim*, 26 Rev. Litig. 265, 275 (2007) ("[A]ll major authorities . . . affirm that [UE] can be an independent cause of action." (citing 1 Dan B. Dobbs, Law of Remedies § 4.1(2), at 557 (2d ed. 1993) (stating that UE can be its own cause of action))).

[134] There is ample authority from these seven states confirming that these UE claims stand alone. *See, e.g.*, **Alabama** - *Jewett v. Boihem*, 23 So. 3d 658, 661 (Ala. 2009) ("[UE] is founded upon the equitable principle that no one ought justly to enrich himself at the expense of another, and is maintainable in all cases where one has received money under such circumstances that in equity and good conscience he ought not to retain it because in justness and fairness it belongs to another." (internal citations omitted)); **Alaska** - *George v. Custer*, 862 P.2d 176, 180-81 (Alaska 1993) ("In determining the measure of damages in a claim of unjust enrichment the court focuses upon the amount of benefit which the defendant received which would be unjustly retained, and does not necessarily focus on the value of money, labor, and materials provided by the plaintiff to the defendant."); **Arkansas** - *Trickett v. Spann*,

in equity, are distinct from and do not depend on statutory claims.[135]

### d) Unjust enrichment claims do not require additional allegations of direct benefit.

Defendants misconstrue the "direct benefit" requirement they argue exists under the laws of six states, and federal courts have widely rejected their contention that it bars EPPs' claims. Plaintiffs allege a direct line between defendants' monopoly behavior and the overcharges suffered; that plaintiffs' overcharges were channeled through an intermediary is immaterial to these claims.[136] In fact, none of

---

2020 Ark. App. 552, at 4, 613 S.W.3d 773, 777 (2020) (listing the elements), *reh'g denied* (Jan. 13, 2021); *Gavilon Grain LLC v. Rice*, 2017 WL 3508721, at *1 (E.D. Ark. Aug. 16, 2017) (analyzing UE as a stand-alone claim); **Georgia -** *Tuvim v. United Jewish Cmtys., Inc.*, 680 S.E.2d 827, 829-30 (Ga. 2009) (a claim for UE is proper "when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for"), *reconsideration denied* (June 30, 2009); **Maryland -** *Clark Off. Bldg., LLC v. MCM Cap. Partners, LLLP*, 245 A.3d 186, 190 (Md. Ct. Spec. App. 2021) (UE is an independent basis of liability in Maryland); **Pennsylvania** - *Khawaja v. RE/MAX Cent.*, 2016 PA Super 261, 151 A.3d 626, 633 (2016) (a claim of UE may be raised in a separate count of a complaint); **Wyoming -** *Metz Beverage Co. v. Wyo. Beverages, Inc.*, 2000 WY 21, ¶ 36, 39 P.3d 1051, 1061 (Wyo. 2002) (holding that "unjust enrichment claims visualize a situation where a party receives something of value without payment").

[135] *See Cardizem*, 105 F. Supp. 2d at 669 (UE claims not to be confused with remedies at law, such as statutory antitrust claims); *D.R. Ward Constr. Co.*, 470 F. Supp. 2d at 506 ("equitable remedies for unjust enrichment claims are often awarded when state statutory claims prove unsuccessful").

[136] This direct line between a defendant's wrongful acts and the effects suffered by plaintiffs has long been recognized as sufficient for a UE claim. *See, e.g.*, *In re Auto. Parts*, 50 F. Supp. 3d 869, 897 (E.D. Mich. 2014) (citing states' laws holding the "critical inquiry" is "the relationship between his detriment and the defendant's

the states identified by defendants requires additional allegations of a "direct benefit."

**Florida:** No Florida authority requires that a direct benefit be conferred only through direct contact; to the contrary, direct contact is not required to state a claim for unjust enrichment. *In re Takata Airbag Prods. Liab. Litig.*, 462 F. Supp. 3d 1304, 1328 (S.D. Fla. 2020) (refusing to dismiss unjust enrichment claims because "[a] plaintiff may confer a direct benefit through indirect contact with a defendant through an intermediary" (internal citation omitted)). *See also Processed Egg*, 851 F. Supp. 2d at 929 ("*[S]ome* benefit must *flow* to the party sought to be charged." (quoting *Coffee Pot Plaza P'ship v. Arrow Air Conditioning and Refrigeration, Inc.*, 412 So. 2d 883, 884 (Fla. Dist. Ct. App. 1982)) (emphasis in original)).

**Georgia:** Courts in Georgia have never imposed a "direct benefit" requirement for unjust enrichment. *See Terrill v. Electrolux Home Prods., Inc.*, 753 F. Supp. 2d 1272, 1290 (S.D. Ga. 2010) (finding that nothing under Georgia law restricts unjust enrichment claims to direct benefits, and that a "marginal" benefit conferral is sufficient). Defendants' cases found that no traceable benefit was conferred between plaintiff and defendant; *not* that a direct benefit is required. *Scott v. Mamari Corp.*, 530 S.E.2d 208, 212 (Ga. Ct. App. 2000); *Brenner v. Future Graphics, LLC*, 258 F.R.D. 561, 576 (N.D. Ga. 2007).

**Idaho:** Idaho does not require allegations of a direct benefit to sustain an unjust enrichment claim. *Hausam v. Schnabl*, 887 P.2d 1076, 1080-81 (Idaho Ct. App. 1994) (allowing unjust enrichment claim by plaintiff creditor who conferred indirect benefit to defendant through loan to third party); *see also Ellmaker v. Tabor*, 377 P.3d 390, 399 (Idaho 2015) (stating elements). In contrast with *DDAVP*, plaintiffs

---

benefit flow from the challenged conduct.") (internal quotation marks and citation omitted)); *Sheet Metal Workers Loc. 441*, 737 F. Supp. 2d at 428 ("[P]laintiffs mean to argue that, while they had no direct dealings, contractual or otherwise, with GSK, they may still assert that they conferred a benefit on GSK by purchasing Wellbutrin SR at inflated prices. Plaintiffs present the stronger argument here."); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) ("Defendants' . . . argument that an unjust enrichment [UE] claim requires an allegation that Plaintiffs dealt directly with Defendants, is . . . without merit.").

here allege that defendants profit directly from the revenue generated by the class members' demand for Zytiga.

**Maine:** Maine does not prohibit indirect purchasers from bringing unjust enrichment claims. *See Chocolate Confectionary*, 749 F. Supp. 2d at 237 (finding that neither the statute nor caselaw "hold[s] that an indirect purchaser may not measure its recovery by the defendant's illicit benefit"). Defendants' argument relies on a single unpublished trial court opinion, *Rivers v. Amato*, 2001 WL 1736498, at *4 (Me. Super. June 22, 2001),[137] but as numerous federal courts have observed, the *Rivers* plaintiff never bought anything, in contrast to the allegations here, where plaintiffs purchased Zytiga, from intermediaries, that was manufactured by defendants. *See, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 270-71 (S.D.N.Y. 2019), *reconsideration denied*, 2019 WL 2603187 (S.D.N.Y. June 25, 2019).

**Michigan:** Michigan's Supreme Court recently emphasized that unjust enrichment is for "correct[ing] against one party's retention of a benefit at another's expense," and "correct[ing] for a benefit received by the defendant rather than compensating for the defendant's wrongful behavior." *Wright v. Genesee Cnty.*, 934 N.W.2d 805, 810-11 (Mich. 2019). *Wright* "suggests that the focus is on the benefit, rather than how that benefit was transferred." *In re Pork Antitrust Litig.*, 2020 WL 6149666, at *26 (D. Minn. Oct. 20, 2020).[138] This is consistent with numerous federal courts decisions confirming that "[a] claim for unjust enrichment under Michigan law does not require that the plaintiff confer a direct benefit on the defendant." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5094289, at *7 (N.D. Cal. Dec. 8, 2010) (citing *Kammer Asphalt Paving Co., v. E. China Twp. Schs.*, 504

---

[137] Defendants' citations to two unpublished decisions simply build on the *Rivers* problem. *Aftermarket Filters*, 2010 WL 1416259, at *2, relies entirely on *Rivers* and *In re Refrigerant Compressors Antitrust Litigation*, 2013 WL 1431756, at *25 (E.D. Mich. Apr. 9, 2013), merely references the *Aftermarket Filters*' holding in summary fashion.

[138] The Michigan Supreme Court's opinion in *Wright* also undermines the holding in *Schechner v. Whirlpool Corp.*, which is based on lower state court decisions finding that "[c]ustomarily," the defendant in an UE action must "directly receive[] a benefit from the plaintiff." 237 F. Supp. 3d 601, 617 (E.D. Mich. 2017) (quoting *Smith v. Glenmark Generics, Inc.*, *USA*, 2014 WL 4087968, at *1 (Mich. Ct. App. Aug. 19, 2014)).

N.W.2d 635 (Mich. 1993)).[139] *See also*, *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 904 (Mich. Ct. App. 2006).

**New York:** New York's unjust enrichment law does not require allegations of a direct benefit. *See Chocolate Confectionary*, 749 F. Supp. 2d at 240-41 (New York does not require "direct dealings" or "an actual, substantive relationship") (citing *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40-41, 778 N.Y.S.2d 147, 149 (N.Y. App. Div. 2004)). New York only requires that "the relationship between the plaintiff and the defendant . . . not be 'too attenuated.'" *Suboxone*, 64 F. Supp. 3d at 709 (citation omitted); *see also Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007) (privity not required; "the essential inquiry" is whether retaining benefit is "against equity and good conscience" (citation omitted)). Unjust enrichment claims by indirect purchasers satisfy this standard. *See Waldman v. New Chapter Inc.*, 714 F. Supp. 2d 398, 403-04 (E.D.N.Y. 2010).[140] Moreover, "whether [defendants] received any benefit from [indirect purchasers] is a question of fact not properly resolved on a motion to dismiss." *In re Canon Cameras Litig.*, 2006 WL 1751245, at *2 (S.D.N.Y. June 23, 2006).

Accordingly, EPPs' unjust enrichment claims should be upheld.

## V.    CONCLUSION

For all of the foregoing reasons, the motion to dismiss should be denied.

---

[139] *See Generic Pharms. Pricing*, 368 F. Supp. at 850 (sustaining Michigan UE claim); *In re Opana*, 2016 WL 4245516, at *2-3 (N.D. Ill. Aug. 11, 2016) (same); *Suboxone*, 64 F. Supp. 3d at 707 (direct benefit is not required to bring a Michigan UE claim); *In re Auto. Parts*, 50 F. Supp. at 897 ("Michigan law does not require a benefit to be conferred directly by plaintiff to a defendant.").

[140] *See also Tyman v. Pfizer, Inc.*, 2017 WL 6988936, at *20 (S.D.N.Y. Dec. 27, 2017) (applying *Waldman* and holding that indirect purchasers conferred a benefit on drug manufacturer through payment at inflated prices, albeit through intermediary retailers), *report and recommendation adopted*, 2018 WL 481890 (S.D.N.Y. Jan. 18, 2018); *Suboxone*, 64 F. Supp. 3d at 709-10 (applying *Waldman* and holding an EPP is not foreclosed "from pursuing an unjust enrichment claim against the manufacturer of the product itself").

Dated: May 6, 2021          /s/ James E. Cecchi

James E. Cecchi
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY &
AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
JCecchi@carellabyrne.com

*Interim Liaison Counsel for the Proposed
End-Payor Class*

Thomas M. Sobol
Lauren G. Barnes
Gregory T. Arnold
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: 617) 482-3003
tom@hbsslaw.com
lauren@hbsslaw.com
grega@hbsslaw.com

Sharon K. Robertson
Donna M. Evans
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
srobertson@cohenmilstein.com
devans@cohenmilstein.com

*Co-Chairs of the Co-Interim Lead Counsel Committee
for the Proposed End-Payor Class*

68

James R. Dugan II
David S. Scalia
TerriAnne Benedetto
THE DUGAN LAW FIRM, LLC
One Canal Place, Suite 1000
365 Canal Street
New Orleans, LA 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-0181
jdugan@dugan-lawfirm.com
dscalia@dugan-lawfirm.com
tbenedetto@dugan-lawfirm.com

*Counsel for Plaintiffs Louisiana Health Service &
Indemnity Company d/b/a Blue Cross and Blue Shield
of Louisiana, HMO Louisiana, Inc. and Co-Interim
Lead Counsel for the Proposed End-Payor Class*

Joseph H. Meltzer
Terence S. Ziegler
Donna Siegel Moffa
KESSLER TOPAZ MELTZER & CHECK LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jmeltzer@ktmc.com
tziegler@ktmc.com
dmoffa@ktmc.com

*Counsel for Plaintiff Iron Workers District Council
(Philadelphia and Vicinity) Health Benefit Plan and
Co-Interim Lead Counsel for the Proposed End-Payor
Class*

Joe P. Leniski, Jr.
J. Gerard Stranch, IV
James G. Stranch, III
BRANSTETTER, STRANCH & JENNINGS, PLLC
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
joeyl@bsjfirm.com
gerards@bsjfirm.com
jims@bsjfirm.com

*Council for Plaintiff Kentucky Laborers District
Council Health and Welfare Fund and Co-Interim Lead
Counsel for the Proposed End-Payor Class*

Richard A. Sherburne, Jr.
Jessica W. Chapman
LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY,
D/B/A BLUE CROSS AND BLUE SHIELD OF LOUISIANA
5525 Reitz Avenue (70809)
P.O. Box 98029
Baton Rouge, LA 70809-9029
Telephone: (225) 298-1144
Facsimile: (225) 297-2760
Richard.Sherburne@bcbsla.com
Jessica.Chapman@bcbsla.com

Bryan F. Aylstock
Justin G. Witkin
AYLSTOCK WITKIN KREIS OVERHOLTZ PLLC
17 East Main Street
Pensacola, FL 32502
Telephone: (850) 202-1010
Facsimile: (850) 916-7449
baylstock@awkolaw.com
jwitkin@awkolaw.com

*Counsel for Plaintiffs Louisiana Health Service &
Indemnity Company d/b/a Blue Cross and Blue Shield
of Louisiana, HMO Louisiana, Inc.*

Christopher J. Cormier
BURNS CHAREST LLP
5290 Denver Tech Center Pkwy., Suite 150
Greenwood Village, CO 80111
Telephone: (720) 630-2092
ccormier@burnscharest.com

Warren T. Burns
Spencer Cox
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75201
Telephone: (469) 904-4550
wburns@burnscharest.com
scox@burnscharest.com

Amanda Klevorn
BURNS CHAREST LLP
65 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
lwright@burnscharest.com

*Counsel for Plaintiff the Mayor and City Council of
Baltimore and the Proposed End-Payor Class*

Jane Lewis
CITY OF BALTIMORE DEPARTMENT OF LAW
City Hall, Room 109
100 N. Holiday Street
Baltimore, MD 21202
Telephone: (443) 388-2190
Jane.Lewis@baltimorecity.gov

*Counsel for Plaintiff the Mayor and City Council
of Baltimore*

72

Heidi M. Silton
Karen H. Riebel
Jessica N. Servais
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue S., Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
hmsilton@locklaw.com
khriebel@locklaw.com
jnservais@locklaw.com

Daniel C. Hedlund
Michelle J. Looby
GUSTAFSON GLUEK PLLC
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com

*Counsel for Plaintiff Pipe Trades Services
MN Welfare Fund and the Proposed End-Payor Class*