SILLS CUMMIS & GROSS P.C.
Newark, NJ 07102

COVINGTON & BURLING LLP
Washington, DC 20001

*Counsel for Janssen Biotech, Inc.,*
*Janssen Oncology, Inc., and Janssen*
*Research & Development, LLC*

WALSH PIZZI O'REILLY FALANGA LLP
Newark, NJ 07102

WHITE & CASE LLP
New York, NY 10020-1095

*Counsel for Defendant BTG*
*International Limited*

(Counsel Detail Provided on Signature Page)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY D/B/A/ BLUE CROSS AND BLUE SHIELD OF LOUISIANA, and HMO LOUISIANA, INC., *et al.*, on behalf of themselves and all others similarly situated,<br><br>                          Plaintiffs,<br><br>       v.<br><br>JANSSEN BIOTECH, INC., JANSSEN ONCOLOGY, INC., JANSSEN RESEARCH & DEVELOPMENT, LLC, and BTG INTERNATIONAL LIMITED,<br><br>                          Defendants. | Civil Action No. 2:19-cv-14146 (KM) (ESK)<br><br>**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR JOINT MOTION TO DISMISS THE IPP COMPLAINT**<br><br>Motion Day: TBD |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................... 1

ARGUMENT ........................................................................................ 2

I.    The IPPs' Sherman Act Claim Is Barred by *Noerr-Pennington*. ................... 2

    A.    Sham Litigation Claims Should Be Assessed on the Pleadings Where, as Here, The Predicate Facts Are Not In Dispute................... 2

    B.    The IPPs Have Not Sufficiently Alleged "Objective Baselessness."............................................................................ 6

    C.    The IPPs' Attempts to Manufacture Factual Disputes to Avoid Dismissal Are Meritless. ..................................................... 9

II.    The IPPs' Federal Antitrust Claims Are Barred by *Illinois Brick*................ 12

III.    The IPPs' State Law Conspiracy Claims Fail Under *Copperweld*.............. 15

IV.    The Majority of IPPs' State Law Claims Fail for Additional Reasons........ 17

    A.    The IPPs' Failure to Allege Standing in 24 States, the District of Columbia, and Puerto Rico Should Be Addressed Now. .............. 17

    B.    The IPPs Fail to Adequately Plead Their State Antitrust Claims. ..... 18

        1.    The IPPs' State Antitrust Claims Should Be Dismissed. ........ 19

        2.    The IPPs' State Consumer Protection Claims Should Also Be Dismissed.................................................................. 21

        3.    The IPPs' Unjust Enrichment Claims Similarly Warrant Dismissal.................................................................... 24

CONCLUSION.................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**                                                             **Page(s)**

*Albers v. Mercedes-Benz USA, LLC*,
2020 WL 1466359 (D.N.J. Mar. 25, 2020) ......................................................14

*Apple Inc. v. Pepper*,
139 S. Ct. 1514 (2019) ....................................................................................12

*AstraZeneca AB v. Mylan Labs., Inc.*,
2010 WL 2079722 (S.D.N.Y. May 19, 2010) .....................................................6

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................14, 18

*In re Brand Name Prescription Drugs Antitrust Litigation*,
123 F.3d 599 (7th Cir. 1997) .............................................................................13

*Brown v. TD Bank, N.A.*,
2016 WL 1298973 (E.D. Pa. Apr. 4, 2016) .......................................................10

*BTG International Ltd. v. Amneal Pharmaceuticals LLC*,
923 F.3d 1063 (Fed. Cir. 2019) ...........................................................................5

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984) ..........................................................................15, 17, 20

*Covad Commcations Co. v. Bell Atlantic Corp.*,
398 F.3d 666 (D.C. Cir. 2005) ............................................................6, 7, 8, 10

*De Vito v. Liquid Holdings Group, Inc.*,
2018 WL 6891832 (D.N.J. Dec. 31, 2018) .........................................................18

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) .............................................................................15

*Duke University v. Akorn, Inc.*,
2019 WL 4410284 (D.N.J. Sept. 16, 2019) .......................................................11

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
536 F. Supp. 2d 1129 (N.D. Cal. 2008) .......................................................23, 24

*In re EpiPen (Epinephrine Injections, USP) Marketing, Sales*
  *Practices and Antitrust Litigation*,
  336 F. Supp. 3d 1256 (D. Kan. 2018)...............................................................16

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*,
  368 F. Supp. 3d 814 (E.D. Pa. 2019)........................................................20, 25

*Goshen v. Mutual Life Insurance Co.*,
  774 N.E. 2d 1190 (N.Y. 2002).......................................................................22

*Handgards, Inc. v. Ethicon, Inc.*,
  601 F.2d 986 (9th Cir. 1979) ...........................................................................8

*Highmark, Inc. v. Allcare Health Management Systems, Inc.*,
  701 F.3d 1351 (Fed. Cir. 2012) .......................................................................9

*Hoffman-La Roche Inc. v. Genpharm Inc.*,
  50 F. Supp. 2d 367 (D.N.J. 1999)....................................................................4

*Honeywell International, Inc. v. Universal Avionics Systems Corp.*,
  343 F. Supp. 2d 272 (D. Del. 2004)..................................................................8

*Howard Hess Dental Laboratories Inc. v. Dentsply Internaional, Inc.*,
  424 F.3d 363 (3d Cir. 2005) ...........................................................................13

*Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc.*,
  602 F.3d 237 (3d Cir. 2010) ...........................................................................14

*In re Humira (Adalimumab) Antitrust Litigation*,
  465 F. Supp. 3d 811 (N.D. Ill. 2020)..............................................................18

*Illinois Brick v. Illinois*,
  431 U.S. 720 (1977)..........................................................................12, 14, 15

*Indivior Inc. v. Dr. Reddy's Labs. S.A.*,
  2020 WL 4932547 (D.N.J. Aug. 24, 2020) .....................................................3

*In re K-Dur Antitrust Litigation*,
  2007 WL 5297756 (D.N.J. Sept. 25, 2007)....................................................22

*LaChance v. U.S. Smokeless Tobacco Co.*,
  156 N.H. 88 (2007) .........................................................................................22

*In re Lidoderm Antitrust Litigation*,
103 F. Supp. 3d 1155 (N.D. Cal. 2015)..............................................................24

*In re Loestrin 24 FE Antitrust Litigation*,
410 F. Supp. 3d 352 (D.R.I. 2019) .....................................................................21

*Norwest Mortgage, Inc. v. Superior Court*,
72 Cal. App. 4th 214 (1999) ...............................................................................22

*In re Neurontin Antitrust Litigation*,
2009 WL 2751029 (D.N.J. Aug. 28, 2009) ..........................................................4

*In re Processed Egg Products Antitrust Litigation*,
851 F. Supp. 2d 867 (E.D. Pa. 2012)...................................................................25

*Professional Real Estate Investors, Inc. v. Columbia Pictures
Industries Inc.*,
508 U.S. 49 (1993).............................................................................1, 6, 9, 11

*In re Refrigerant Compressors Antitrust Litigation*,
2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) ....................................................23

*In re Remicade Antitrust Litigation*,
345 F. Supp. 3d 566 (E.D. Pa. 2018)...................................................................23

*Rickman v. BMW of North America*,
2020 WL 3468250 (D.N.J. June 25, 2020)...........................................................18

*Rivera-Muñiz v. Horizon Lines, Inc.*,
737 F. Supp. 2d 57 (D.P.R. 2010) .......................................................................20

*Rochester Drug Co-op, Inc. v. Braintree Labs.*,
712 F. Supp. 2d 308 (D. Del. 2010).......................................................................3

*Shady Grove Orthopedic Assoc. P.A. v. Allstate Insurance Co.*,
559 U.S. 393 (2010)............................................................................................20

*Sheet Metal Workers Local 441 Health & Welfare Plan v.
GlaxoSmithKline, PLC*,
263 F.R.D. 205 (E.D. Pa. 2009)...........................................................................22

*Shionogi Pharma, Inc. v. Mylan, Inc.*,
2011 WL 2550835 (D. Del. June 10, 2011) ...................................................16, 17

*Spinner Consulting LLC v. Bankruptcy Maanagement Solutions, Inc.*,
  604 B.R. 660 (D.N.J. 2019) ...............................................................................12

*Staley v. Gilead Sciences, Inc.*,
  446 F. Supp. 3d 578 (N.D. Cal. 2020) ...............................................................21

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust
  Litigation*,
  2017 WL 3967911 (E.D. Pa. Sept. 8, 2017) .......................................................4

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust
  Litigation*,
  64 F. Supp. 3d 665 (E.D. Pa. Dec. 3, 2014) .....................................................25

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust
  Litigation*,
  2017 WL 4910673 (E.D. Pa. Oct. 30, 2017) ...............................................16, 17

*Takeda Pharmaceutical Co. Ltd. v. Zydus Pharmaceuticals (USA)
  Inc.*,
  358 F. Supp. 3d 389 (D.N.J. 2018) .....................................................................3

*In re Thalomid and Revlimid Antitrust Litigation*,
  2015 WL 9589217 (D.N.J. Oct. 29, 2015) ...........................................................3

*Townshend v. Rockwell International Corp.*,
  2000 WL 433505 (N.D. Cal. Mar. 28, 2000) .....................................................16

*Trustees of University of Pennsylvania v. St. Jude Children's
  Research Hospital*,
  940 F. Supp. 2d 233 (E.D. Pa. 2013) .........................................................5, 9, 10

*UFCW v. Novartis Pharmaceuticals Corp.*,
  902 F.3d 1 (1st Cir. 2018) ...................................................................................7

*Warner Lambert Co. v. Purepac Pharmaceutical Co.*,
  2000 WL 34213890 (D.N.J. Dec. 22, 2020) ........................................................4

*Warren General Hospital v. Amgen Inc.*,
  643 F.3d 77 (3d Cir. 2011) ................................................................................14

*In re Wellbutrin SR Antitrust Litigation*,
  749 F. Supp. 2d 260 (E.D. Pa. 2010) ..................................................................3

*In re Wellbutrin XL Antitrust Litigation Indirect Purchaser Class*,
    868 F.3d 132 (3d Cir. 2017) ....................................................................6, 7, 8, 9

**Statutes**

D.C. Code § 28–3901(a)(2)(B)(i) ...........................................................................21

N.Y. Gen. Bus. Law § 349(a) ...............................................................................23

## INTRODUCTION

This is the paradigmatic case where the application of *Noerr-Pennington* immunity should be decided at the motion to dismiss stage. The Supreme Court has directed that in assessing a sham litigation claim, "[w]here . . . there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide probable cause as a matter of law." *Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus. Inc.*, 508 U.S. 49, 63 (1993) ("*PRE*"). As Defendants' opening brief demonstrated, the undisputed record in the underlying patent case conclusively establishes that Janssen and BTG had an objective basis for their patent claims. It is proper—and indeed encouraged—for the Court to consider that record on this motion to dismiss. IPPs point to no facts in dispute regarding their assertion that the patent case was a sham. Nor have IPPs pointed to any new facts that they claim to have discovered to support their sham claim.

On the basis of that undisputed record, IPPs fail to plausibly allege that Defendants lacked a "reasonable belief" that there was "a chance" that their patent claims "may be held valid upon adjudication." *Id.* at 62–63. As their Opposition makes clear, IPPs' sham claim is based solely on their assertion that Janssen and BTG sued knowing the '438 patent was invalid because of the supposed failure to "call the '213 blocking patent to the examiner's attention in presenting the

'commercial success' argument." Opp. at 11 n.22.[1]  Yet, IPPs admit that the '213 patent is referenced on the face of the '438 patent.  *Id.* at 5 n.4.  And IPPs do not dispute that this Court fully considered the parties' commercial success arguments, including the impact of the '213 patent, in making its validity determination, and yet still stated that determination was "a judgment call for sure, and one that could be made differently by another jurist."  Dkt. 581 at 60:13–14.[2]

IPPs' only rejoinder is that this Court's statements in the patent case should be "read in context."  Opp. at 17.  But, reading those statements in "context" leads to the same conclusion—IPPs have not met their burden to allege that Defendants pursued the underlying patent litigation with no expectation of success—and confirms this Court's observation that the positions of Janssen and BTG were "far from frivolous" (Dkt. 581 at 64:16–17), requiring dismissal of this case.

## ARGUMENT

### I.     The IPPs' Sherman Act Claim Is Barred by *Noerr-Pennington*.

#### A.     Sham Litigation Claims Should Be Assessed on the Pleadings Where, as Here, The Predicate Facts Are Not In Dispute.

As this Court has recognized, "[a] court may decide the applicability of the

---

[1] "Opp." refers to Corrected End-Payor Plaintiffs' Opposition to Defendants' Motion to Dismiss (ECF No. 158).  "MTD" refers to Defendants' Brief in Support of Their Joint Motion to Dismiss the IPP Complaint (ECF No. 155-1).

[2] All citations by docket number ("Dkt.") refer to filings in the prior patent proceeding in this Court, *BTG Int'l Ltd. v. Amneal Pharms. LLC*, Civil Action No. 15-cv-5909 (D.N.J.).

*Noerr-Pennington* doctrine on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) if no factual issues are present." *Indivior Inc. v. Dr. Reddy's Labs. S.A.*, 2020 WL 4932547, at \*8 (D.N.J. Aug. 24, 2020). The cases IPPs rely upon in an attempt to convince this Court that this sham litigation claim is inappropriate for dismissal are simply unpersuasive, because those cases all involved a dispute over the predicate facts of the underlying proceedings, where no such dispute is present here.

The cases on which IPPs rely largely fall into one of two categories. First, IPPs cite cases in which the lawsuit challenged as a sham had not been finally adjudicated. *See Takeda Pharm. Co. Ltd. v. Zydus Pharms. (USA) Inc.*, 358 F. Supp. 3d 389, 396 (D.N.J. 2018) ("the Court, here, lacks a factually developed record from which to conduct a sufficient *Noerr-Pennington* analysis, because this case remains in its procedural infancy"); *Indivior*, 2020 WL 4932547, at \*3, \*7–10 (challenging several patent actions as shams, some of which were ongoing); *In re Wellbutrin SR Antitrust Litig.*, 749 F. Supp. 2d 260, 266 (E.D. Pa. 2010) ("of the two infringement claims asserted [to be shams], there is a genuine issue of fact concerning one," where it was settled before resolution on the merits); *Rochester Drug Co-op, Inc. v. Braintree Labs.*, 712 F. Supp. 2d 308, 311, 314 (D. Del. 2010) (challenged patent case was voluntarily dismissed following claim construction one year after it was filed, before final disposition); *In re Thalomid and Revlimid Antitrust Litig.*, 2015 WL 9589217, at \*4, \*7, \*13 (D.N.J. Oct. 29, 2015) (challenging patent actions,

several of which settled, as part of broad anticompetitive scheme involving various actions).  That is not the case here, where the challenged patent litigation, as well as all related proceedings and all appeals, were litigated to final resolution.

Second, IPPs cite cases in which plaintiffs alleged objective baselessness on grounds that were not fully explored in an underlying suit, necessitating additional discovery into previously unexplored factual issues.  *See In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2017 WL 3967911, at *16–18 (E.D. Pa. Sept. 8, 2017) (challenging citizen petition submitted to FDA as part of broader anticompetitive scheme); *In re Neurontin Antitrust Litig.*, 2009 WL 2751029, at *22 n.47 (D.N.J. Aug. 28, 2009) ("Plaintiffs here allege that the decisions on which [defendant] now relies were based on similar misrepresentations, such that those decisions cannot be used to determine that the underlying lawsuits were objectively reasonable as a matter of law."); *Warner Lambert Co. v. Purepac Pharm. Co.*, 2000 WL 34213890, at *5 (D.N.J. Dec. 22, 2020) (summary judgment order upon which defendants sought dismissal of sham litigation claim "was based in part on unresolved discovery issues"); *Hoffman-La Roche Inc. v. Genpharm Inc.*, 50 F. Supp. 2d 367, 380 (D.N.J. 1999) (objective baselessness turned on "whether plaintiffs undertook a reasonable investigation before filing suit," which was outside the scope of the litigation record at that point).  These cases also have no bearing on whether the Court may assess objective baselessness on this motion to dismiss

because IPPs point to no facts that must be explored to determine whether the underlying patent case was a sham.

In particular, IPPs admit that the only basis for their sham allegations is Defendants' commercial success arguments, Opp. at 2, 5–6, 10, and those arguments were thoroughly litigated by the parties and adjudged by both this Court, *see* Dkt. 571 at 31, 40, 46–51, and the Federal Circuit, *see BTG Int'l Ltd. v. Amneal Pharms. LLC*, 923 F.3d 1063, 1076 (Fed. Cir. 2019).  Indeed, the argument that the '213 patent was not sufficiently called to the PTO's attention was previously made by the patent case defendants.  *See* Dkt. 533 at 60 ("the inventors never told the PTO about Cougar's exclusive license to the '213 blocking patent during prosecution").  As a result, unlike in IPPs' cited cases, all of the relevant predicate facts are contained within the record of the fully litigated patent case.[3]  It is thus appropriate here to assess whether Defendants had probable cause to institute the patent suit on this motion to dismiss because those predicate facts are not in dispute.  *See, e.g.*, *Trustees of Univ. of Pa. v. St. Jude Child. Rsch. Hosp.*, 940 F. Supp. 2d 233, 242–43 (E.D. Pa. 2013) ("all facts relevant to the determination of *Noerr-Pennington* applicability are undisputed and contained within the record we may consider in deciding this motion to dismiss") (collecting similar cases); *see also* MTD at 13–16.

---

[3] It is irrelevant if certain information from the patent case is sealed (Opp. at 2 n.3), when the relevant judicial opinions and publicly available case information directly address the challenged issues here.

**B.     The IPPs Have Not Sufficiently Alleged "Objective Baselessness."**

Turning to IPPs' allegations, IPPs claim that "Defendants' motion skirts the key questions:  Was the invention claimed in the '438 Patent obvious?  And if so, could that obviousness be overcome by Zytiga's commercial success?"  Opp. at 2. But those were the questions at issue in the *patent* suit; they are not the questions at issue in this antitrust suit.  Rather, here the Court must decide whether Janssen and BTG had an objective basis for filing the patent suit, a standard that requires only that they "could have perceived 'some likelihood of success' in their case at the time of filing."  *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 150 (3d Cir. 2017).  Indeed, the standard for finding that a lawsuit had an objective basis is much, much lower than the standard for winning the lawsuit:  "a court must 'resist the understandable temptation to engage in *post hoc* reasoning by concluding' that an ultimately unsuccessful 'action must have been unreasonable or without foundation.'"  *PRE*, 508 U.S. at 60 n.5; *see also Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005) ("That Covad ultimately prevailed, of course, tells us little about whether Bell Atlantic's patent suit lacked objective merit."); *AstraZeneca AB v. Mylan Labs., Inc.*, 2010 WL 2079722, at *4 (S.D.N.Y. May 19, 2010) ("[A]n unsuccessful lawsuit, without more, is not a sham.").

6

For these reasons, IPPs' assertions that Defendants went "0-for-10" and "1-for-7" (Opp. at 2, 10)—even overlooking IPPs' over-eager counting given that this case involves one alleged sham litigation—focus on the wrong metric: they purport to measure actual success, as opposed to whether a reasonable litigant "could have perceived some likelihood of success" at the time of the litigation. *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d at 150. IPPs' focus on the fact that the Federal Circuit did not accept Defendants' arguments on appeal, Opp. at 22–23, is misplaced for the same reasons; the relevant point is that the Federal Circuit took Defendants' arguments seriously, MTD at 24–25, which is all that is required to conclude that Defendants had an objective basis for filing suit. *See, e.g.*, *Covad Commn'cs Co.*, 398 F.3d at 677 ("Our review of the patent courts' opinions convinces us that Bell Atlantic's case against Covad was not objectively baseless.").

IPPs' assertion of "wrongful" conduct to convince the PTO to issue the '438 patent, Opp. at 11–14, also focuses on the wrong question. As they admit, IPPs do not allege fraud on the PTO. *Id.* at 11. And they cite no cases finding that objective baselessness was plausibly pled based on allegations that a defendant knew the patent it was suing to enforce was invalid, where those allegations did not rise to the level of fraud or inequitable conduct. *See id.* at 11 nn.23–24, 14 n.29; *see also UFCW v. Novartis Pharms. Corp.*, 902 F.3d 1, 15 (1st Cir. 2018) (affirming dismissal of sham claim where "plaintiffs have not identified a single precedent that

permitted an antitrust 'sham' litigation claim to go forward based on an allegation that the infringement litigation was objectively baseless because the underlying patent was alleged to be invalid due to anticipation or obviousness").[4]

Instead, the relevant question in assessing objective baselessness here is whether a reasonable litigant "could have perceived some likelihood" that the already-issued '438 patent would be held valid upon adjudication. *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d at 150. The fact that a patent examiner had accepted the same commercial success arguments that Janssen and BTG advanced in the patent litigation—and did so with knowledge of the '213 patent (*see* MTD at 27 & n.7)—and the fact that this Court and the Federal Circuit carefully considered those same arguments in assessing the validity of the patent demonstrates as a matter of law that Defendants' positions had some likelihood of success. *See Covad Commc'ns Co.*, 398 F.3d at 677 (affirming dismissal of "sham" litigation claim

---

[4] IPPs claim that *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986 (9th Cir. 1979), supports the notion that "[s]ham litigation does not depend on establishing inequitable conduct or fraud on the PTO." Opp. at 11. But *Handgards*, even if applicable in the Third Circuit, does not relieve IPPs of their obligation to satisfy the objective baselessness prong of the sham litigation test. *See, e.g., Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 343 F. Supp. 2d 272, 325 (D. Del. 2004) (finding objective conduct prong of *PRE* not met where party, relying on *Handgards*, argued that "to find bad faith in the context of an infringement suit, all that is required is evidence that the patent holder knew . . . that the patents were invalid"), *aff'd* 488 F.3d 982, 1000–01 (Fed. Cir. 2007).

because the patent plaintiff "advanced reasonable arguments that each court went to some lengths to reject"); MTD at 26–29.[5]

## C.     The IPPs' Attempts to Manufacture Factual Disputes to Avoid Dismissal Are Meritless.

Unable to plausibly plead that the underlying litigation was a sham, IPPs claim that "[a]t best, Defendants have pointed to a factual question—whether a reasonabl[e] litigant could have believed they had any chance of success in the litigation—that is not suitable for resolution now."   Opp. at 2.   But the reasonableness of Defendants' patent validity arguments is a quintessential question of law.   *See In re Wellbutrin XL Antitrust Litig.*, 868 F.3d at 151 (whether record of the underlying case "was sufficient to establish probable cause for the objective baselessness inquiry . . . is a legal question, not a factual one"); *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 701 F.3d 1351, 1353 (Fed. Cir. 2012) (Dyk, J., concurring in denial of reh'g *en banc*) ("Under *PRE*, the reasonableness of a legal position in the context of a probable cause determination is itself a question of law").

Nor do Defendants "ground their motion in a factual dispute," Opp. at 10, because they quote from the patent litigation record.   *See* MTD at 2 n.2, 13–15.   As

---

[5] Defendants have not challenged IPPs' allegations of subjective baselessness at this stage.   "Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation."   *PRE*, 508 U.S. at 60; *Trustees of Univ. of Pa.*, 940 F. Supp. 2d at 243 ("[T]he question of intent would only be relevant if we were to find that the action itself was a sham, which we do not.   Thus, we find that we may consider the application of *Noerr-Pennington* at this stage.").   If this Court finds the patent suit was not objectively baseless, that ends the inquiry.

explained in Defendants' opening brief, the Court may, and should, consider the record in the underlying litigation at the motion to dismiss phase when assessing whether a suit is subject to *Noerr-Pennington* immunity. *See, e.g.*, *Trustees of Univ. of Pa.*, 940 F. Supp. 2d at 242–43 (dismissing sham claim after examining record of underlying case); *Brown v. TD Bank, N.A.*, 2016 WL 1298973, at *7 n.3, *8 (E.D. Pa. Apr. 4, 2016) (dismissing sham claim after examining complaint in underlying lawsuit and concluding that it was not objectively baseless); *Covad Commc'ns Co.*, 398 F.3d at 677 (affirming dismissal of complaint because "[w]ith the opinions of the patent courts before us, we see no barrier to our determining now whether [the] suit was a sham"); MTD at 13–15 (collecting cases).

Despite their bluster, IPPs do not actually dispute that all of the information cited in Defendants' opening brief is contained in the underlying record.  IPPs instead merely assert that the portions of the record that Defendants cite should be read in "context."  Opp. at 17.  There is nothing about the additional "context" that IPPs point to from the undisputed record, *id.* at 17–18, that changes the conclusion that the underlying litigation was not a sham lacking all objective merit.  Indeed, regarding the Court's statements, the best IPPs offer is that some of the statements "seem" to be in reference to the PTAB procedural issue, rather than the Court's validity determination.  *Id.* at 22.  This is not the case, and in fact, IPPs do not dispute that this Court specifically stated that its validity determinations were "a judgment

call for sure, and one that could be made differently by another jurist."  Dkt. 581 at 60:13–14; *see also id.* at 60:20–24 ("[E]ven where I determined that [certain] factors were in plaintiffs' favor, I did not find they did so heavily enough to overcome the showing of *obviousness from the prior art*.   Once again, a judgment call, one someone else could have made differently.") (emphasis added).

Similarly, on the sole issue that IPPs claim made the patent case a sham—the commercial success arguments regarding the '438 patent—IPPs admit that this Court acknowledged "the uncontroversial fact that Zytiga was commercially successful." Opp. at 18.   The Court then carefully balanced the factors before ultimately invalidating the patent, but noted thereafter that this was "a judgment call, one someone else could have made differently."   Simply put, contrary to IPPs' assertions, a review of the underlying record does not raise a factual dispute about whether the underlying litigation was a sham.  It leads to precisely the contrary conclusion:   that undisputed record demonstrates that this was the essence of litigation where Janssen and BTG could have perceived some likelihood of success, requiring dismissal of IPPs' sham claim.  *See PRE*, 508 U.S. at 60; *Duke Univ. v. Akorn, Inc.*, 2019 WL 4410284, at *7–10 (D.N.J. Sept. 16, 2019) (dismissing sham claim where it "is unquestionable that the lawsuits . . . had objective merit").[6]

---

[6] Because IPPs' federal antitrust claim fails on *Noerr-Pennington* grounds, IPPs' state law claims premised on those same allegations also fail.  *See* MTD at 34.

## II.    The IPPs' Federal Antitrust Claims Are Barred by *Illinois Brick*.

In addition to being barred by *Noerr-Pennington*, IPPs' Sherman Act claim against Janssen fails for the independent reason that it is barred by *Illinois Brick v. Illinois*, 431 U.S. 720 (1977).[7]   As the Supreme Court recently reaffirmed, "*Illinois Brick* established a bright-line rule that authorizes suits by direct purchasers but bars suits by indirect purchasers."   *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019); *see also Spinner Consulting LLC v. Bankr. Mgmt. Sols., Inc.*, 604 B.R. 660, 675 (D.N.J. 2019) (McNulty, J.) ("Only overcharged direct purchasers, and not others in the chain of manufacture or distribution, are parties 'injured in [their] business or property' within the meaning of the [Sherman] Act.") (quoting *Illinois Brick*, 431 U.S. at 729).   Because IPPs admittedly did not purchase Zytiga directly from Janssen, but from independent pharmacies (SCCAC ¶¶ 811, 822), IPPs are indirect purchasers under *Illinois Brick* and lack standing to assert a federal antitrust claim.[8]

Faced with this obvious threshold deficiency in their federal claim, IPPs disclaim reliance on the co-conspirator exception to *Illinois Brick*, Opp. at 28, and attempt to shoehorn their Sherman Act claim into the "control exception."   But, the

---

[7] Neither the Complaint nor IPPs' Opposition assert a federal Sherman Act claim against BTG, Janssen's licensor.   Second Consolidated Class Action Complaint (ECF No. 147) ("SCCAC" or "Complaint") ¶ 823; Opp. at 25–28.

[8] Indeed, as KPH's complaint in the simultaneously-pending direct purchaser action makes clear, IPPs' theory ignores an entire level of the distribution chain by neglecting wholesalers who sell to the specialty pharmacies. *See* MTD at 34.   As a result, IPPs are in reality at least *three* levels removed from Janssen, rather than the two levels they acknowledge.

Third Circuit has "applied the control exception only when the initial seller owned the direct purchaser." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 371 (3d Cir. 2005) ("*Hess*"); *see also* MTD at 30–32. IPPs do not allege that Janssen owns the specialty pharmacies. Opp. at 25–27. IPPs claim that the "'control exception' may apply where the manufacturer and the direct purchaser have 'functional economic or other unity,'" *id.* at 24 (quoting *Hess*, 424 F.3d at 372), selectively omits the Third Circuit's statement that only *other courts* have interpreted the control exception to extend so far. *See Hess*, 424 F.3d at 372.

Regardless, IPPs advance only conclusory allegations that Janssen controls the resale price of Zytiga through a network of specialty pharmacies; that these pharmacies do not actually make any money off downstream sales of Zytiga; and that the distribution network for Zytiga is "highly lucrative and carefully guarded" by Janssen. Opp. at 25–26. These allegations certainly do not suffice under the Third Circuit's strictly limited control exception, and they would not suffice even under the more permissive version adopted by some other courts. *See, e.g.*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997) (modes of control that might qualify for the control exception include "interlocking directorates, minority stock ownership, loan agreements that subject the wholesalers to the manufacturers' operating control, [or] trust agreements"); *Hess*, 424 F.3d at 372 ("Courts that have extended the control exception beyond a parent-subsidiary

relationship still require 'relationships involving such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser that there effectively has been only one sale.'") (citation omitted).[9]

Finally, IPPs argue that it is premature to dismiss their federal antitrust claim on standing grounds before they take discovery on the standing issue. Opp. at 28–29. That has it exactly backwards: it is the responsibility of IPPs to plead sufficient facts that would "nudge[] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007); *see also Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 258 (3d Cir. 2010) (affirming dismissal of antitrust claims at pleading stage because the "allegations . . . rest not on facts but on conclusory statements strung together with antitrust jargon"). And, courts routinely dismiss claims for lack of antitrust standing at the pleading stage without permitting plaintiffs to take discovery in circumstances where their allegations fail to demonstrate that an exception to *Illinois Brick* applies. *See, e.g.*, *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 82 (3d Cir. 2011) (affirming dismissal under *Illinois Brick* when "at the motion to dismiss stage, it became clear

---

[9] IPPs' reliance on this Court's ruling in the RICO case *Albers v. Mercedes-Benz USA, LLC*, 2020 WL 1466359 (D.N.J. Mar. 25, 2020), is misplaced for at least two reasons. First, the decision does not address the exceptions to *Illinois Brick*. *Id.* at *7–8. Second, this Court's determination that the *Albers* plaintiffs' injury was "direct" was based on the law of causation specific to RICO claims. *See id.* at *7 ("Thus, Plaintiffs have established a sufficiently direct relationship between Bosch and the alleged RICO injury for purposes of RICO causation.").

that Warren General Hospital in practice purchases [defendant's] drugs through an independent middleman wholesaler"); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 215 (4th Cir. 2002) (affirming dismissal and rejecting argument that "*Illinois Brick* is inapplicable when any conspiracy has been alleged" because otherwise "the *Illinois Brick* rule would be inverted solely based upon artful pleading").

In addition to being incorrect on the law, IPPs' assertion that Janssen exercised functional control over these companies—some of the largest in America with diverse pharmaceutical businesses and separate corporate boards—is not plausible on its face.  And it would come as a surprise to at least one of the specialty pharmacies in question—KPH, which has sued Janssen in a parallel complaint alleging that Janssen charged supracompetitive prices for Zytiga.  IPPs' suggestion that "[p]ermitting the indirect purchasers to sue for damages is . . . likely the only such mechanism" for efficiently enforcing the antitrust laws, Opp. at 27, is thus belied by the proceedings in the consolidated cases pending before this Court.

## III.   The IPPs' State Law Conspiracy Claims Fail Under *Copperweld*.

IPPs argue that their conspiracy claims are not barred by *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), because they are based "not on the patent relationship itself, but on conduct that is ancillary to it," Opp. at 30. However, IPPs fail to explain why patent co-owners would not have a unified economic interest in protecting their patent from infringement through litigation.

*See, e.g.*, *Shionogi Pharma, Inc. v. Mylan, Inc.*, 2011 WL 2550835, at *5 (D. Del. June 10, 2011) ("parties with unified interests, such as a patent holder and licensee, are incapable of conspiring").  Nor is there any way in which the defense of the patent could be viewed as "ancillary" to Janssen and BTG's relationship.

The cases to which IPPs analogize their claims are unpersuasive.  *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litigation*, 2017 WL 4910673 (E.D. Pa. Oct. 30, 2017), involved allegations that one defendant approached the owner of a drug and proposed modifications to the delivery method of the drug to extend the life of its patent exclusivity, in exchange for royalty fees. *Id.* at *9.  This alleged anticompetitive scheme was thus the very *genesis* of the exclusive licensing relationship between the defendants.  *See id.*  IPPs similarly mischaracterize *In re EpiPen (Epinephrine Injections, USP) Marketing, Sales Practices and Antitrust Litigation*, 336 F. Supp. 3d 1256 (D. Kan. 2018), which did not involve an exclusive licensee relationship at all, but allegations "that defendants had separate interests" because "the Class Complaint alleges that both compete in the [relevant] market." *Id.* at 1301–02.  *Townshend v. Rockwell Int'l Corp.*, 2000 WL 433505 (N.D. Cal. Mar. 28, 2000), also did not involve patent co-owners, or even an exclusive licensee relationship at the time of the patent case. *Id.* at *1.

In fact, *Suboxone* recognized that "[n]umerous courts . . . have found that where the alleged anticompetitive behavior is purely derivative of the legal patent

monopoly and exclusive distributorship, there can be no claim for an antitrust conspiracy." *Id.* at *8 (internal quotation marks omitted). That is precisely the situation here. IPPs do not even attempt to identify any independent economic interests between Defendants (Opp. at 30–34)—presumably because IPPs recognize that any such allegations would fail given the co-ownership of the patent. *See Shionogi Pharma*, 2011 WL 2550835, at *5 (conspiracy must involve a "'sudden joining of two independent sources of economic power previously pursuing separate interests'") (quoting *Copperweld*, 467 U.S. at 771).

Finally, IPPs' attempt to distinguish *Shionogi Pharma*, Opp. at 35, is unavailing. Defendants do not attempt to extract a blanket rule that a patent holder and its licensee can *never* conspire in violation of the antitrust laws, *cf.* Opp. at 33, but the economic unity of interest between co-owners of a patent, such as Janssen and BTG, is even more complete than that at issue in *Shionogi Pharma* between a patent holder and an exclusive licensee, requiring dismissal of the conspiracy claim.

## IV.  The Majority of IPPs' State Law Claims Fail for Additional Reasons.

### A.  The IPPs' Failure to Allege Standing in 24 States, the District of Columbia, and Puerto Rico Should Be Addressed Now.

For the reasons stated in Defendants' opening brief, *see* MTD at 39–44, IPPs lack Article III standing to bring their state law claims in jurisdictions where no named plaintiff resides or does business. IPPs' argument that these issues should be deferred to class certification, Opp. 36–37, does not account for the fact that "[t]he

named class representatives' inability to establish standing and a viable cause of action stand at the threshold as a potential bar to further proceedings, including class certification." *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *14 (D.N.J. Dec. 31, 2018) (McNulty, J.).  Although this Court took a different approach in *Rickman v. BMW of North America*, 2020 WL 3468250, at *11 (D.N.J. June 25, 2020) (McNulty, J.), Defendants submit that the more prudent approach in this case is to consider this issue at the motion to dismiss stage before allowing IPPs to proceed with antitrust claims in 29 jurisdictions, consumer protection claims in 27 jurisdictions, and unjust enrichment claims in 41 jurisdictions.

### B.    The IPPs Fail to Adequately Plead Their State Antitrust Claims.

IPPs insist that their formulaic state law claims that fail to connect any specific allegations to the myriad statutes they assert satisfy their pleading burden.  But IPPs must provide supporting factual allegations at the pleading stage.  *Twombly*, 550 U.S. at 555–56; *see also* MTD at 46–47.  IPPs' pleading failures are most evident as to their consumer protection claims, where IPPs do not explain "what was unfair or unconscionable about [the] conduct beyond its potential to restrain competition or effect an unlawful monopoly . . . ." *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 848 (N.D. Ill. 2020).  For these reasons, and the ones below, the majority of IPPs' state law claims should be dismissed.

18

### 1.   The IPPs' State Antitrust Claims Should Be Dismissed.

Many of IPPs' state antitrust claims must be dismissed because the claims (1) fail to allege a sufficient intrastate nexus; (2) fail to allege the requisite concerted activity; or (3) cannot be brought by indirect purchasers.  *See* MTD at 48–51.

**(1) Failure to Allege a Sufficient Intrastate Nexus.**  IPPs acknowledge that they must "sufficiently plead[] an intrastate nexus" under the antitrust laws of the D.C., Mississippi, South Dakota, Tennessee, and West Virginia.  Opp. at 41.  IPPs argue that the state nexus requirement is satisfied through their allegation that "defendants engaged in a nationwide antitrust violation by initiating sham patent infringement litigation for the purpose of delaying generic competition, thereby increasing prices paid by [IPPs] in each state."  *Id.* at 43.[10]  This reasoning ignores that, for instance, under the D.C. statute, IPPs must identify "a connection between the District of Columbia and the wrongful conduct," or that West Virginia law requires the anticompetitive conduct to be "directed towards intrastate commerce." *See* MTD at 48–49.  IPPs do not allege that any anticompetitive conduct occurred in these states or explain how their allegation satisfies these states' nexus requirements.

**(2) Failure to Allege Concerted Activity.**  IPPs do not dispute that they must allege "concerted activity" under the antitrust laws of California, Kansas, New York,

---

[10] The cases IPPs invoke to support this argument, Opp. at 42, do not address the relevant statutory language or engage in a state-specific analysis.

and Tennessee.  Opp. at 43.  As explained *supra* in Section III, under *Copperweld* and its progeny, Janssen and BTG are considered a single economic entity for purposes of enforcing their patent rights and are thus incapable of conspiring in violation of the antitrust laws.  *See also* MTD at 49–50.

   **(3) Prohibition on Indirect Purchaser Suits.**  IPPs have abandoned their Massachusetts and New Hampshire antitrust claims, Opp. at 44 n.104.

   IPPs assert that *Shady Grove Orthopedic Assoc. P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010), supports their Illinois antitrust claim.  Opp. at 44.  Only the Illinois Attorney General may bring class actions on behalf of indirect purchasers.  *See* MTD at 50 (citing 740 Ill. Comp. Stat. § 10/7(2)).  Thus, "[t]he prevailing view of the District Courts that have considered this issue within [the Third] Circuit is that the Illinois Antitrust Act prohibits indirect purchaser class actions" because the IAA's "'indirect purchaser restrictions . . . are intertwined with the underlying substantive right.'"  *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 834 (E.D. Pa. 2019) (citation omitted).

   On Puerto Rico, IPPs argue that Defendants ignored *Rivera-Muñiz v. Horizon Lines, Inc.*, 737 F. Supp. 2d 57 (D.P.R. 2010).  Opp. at 44–45.  This single decision is an outlier; more recent decisions confirm that "the majority of courts [have concluded] that [indirect purchasers] do not have standing to bring antitrust claims

under Puerto Rico law." *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 373 (D.R.I. 2019); *see also* MTD at 51.

### 2. The IPPs' State Consumer Protection Claims Should Also Be Dismissed.

Many of IPPs' consumer protection claims must be dismissed because they: (1) are only available to "consumers" under the relevant statutes; (2) fail to allege a sufficient intrastate nexus; or (3) fail to allege an unconscionable, unfair, or deceptive act, and consumer reliance on such an act. *See* MTD at 51–59.

**(1) Cause of Action Limited to Consumers.** IPPs argue that the consumer protection laws of District of Columbia, Hawaii, Massachusetts, Minnesota, Missouri, Montana, Nevada, Oregon, Rhode Island, and Vermont "are to be construed liberally and permit claims involving any consumer injury or harm to the public interest." Opp. at 45. They then claim that IPPs make purchases "for the personal use of their members and beneficiaries." *Id.* at 46. IPPs concede, however, that as insurers, they do not purchase pharmaceuticals for their own use. *See id.* at 46 n.111.[11] And IPPs' position that business entities, rather than end-consumers, may sue under the consumer protection statutes of these ten jurisdictions is belied by unambiguous statutory language and case law interpreting that language, as

---

[11] IPPs cite *Staley v. Gilead Sciences, Inc.*, 446 F. Supp. 3d 578, 638 (N.D. Cal. 2020), on the DC statute, but *Staley* overlooks a key portion of the definition of "consumer" under the D.C. Code—a person who purchases and uses the good "for personal, household, or family purposes," D.C. Code § 28–3901(a)(2)(B)(i).

detailed in Defendants' opening brief.  *See* MTD at 52–54; *cf. In re K-Dur Antitrust Litig.*, 2007 WL 5297756, at *17 (D.N.J. Sept. 25, 2007) (rejecting notion that a health plan and its members are "joint purchasers" for antitrust injury purposes).

    **(2) Failure to Allege a Sufficient Intrastate Nexus.**  IPPs do not dispute that the consumer protection laws of New Hampshire, New York, and California require allegations of intrastate effects, and that the North Carolina consumer protection law demands heightened allegations of "substantial effects."  Opp. at 49–51.  IPPs are incorrect that overcharges paid in each of those states satisfy the nexus requirement.

**New Hampshire**:  IPPs fail to rebut two key decisions from the District of New Hampshire establishing that the NHCPA only provides a remedy for conduct that occurs within the state.  *See* MTD at 55.  IPPs' reliance on *LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88 (2007), is misplaced because that case involved conduct that indisputably targeted the state (sales of smokeless tobacco products in the state and conduct in connection with such sales), not whether a theory of injury can rely on conduct occurring outside the state.  *See id.* at 95.

**New York**:  The only intrastate nexus to New York that IPPs allege are the overcharges paid in the state, which is insufficient.  *See* Opp. at 51.  IPPs misstate the holding of *Goshen v. Mutual Life Insurance Co.*, 774 N.E. 2d 1190, 1195 (N.Y. 2002), which held that a New York CPA claim requires that "the transaction in which the consumer is deceived must occur in New York."  *See also* S*heet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 263 F.R.D. 205, 214 (E.D. Pa. 2009) (dismissing because "in the instant case, the End–Payor Plaintiffs have made no allegation that any deceptive conduct took place in New York").  Here, there are no well-pleaded allegations of deceptive conduct in New York.

**California**:  IPPs' argument as to California overlooks and oversimplifies state law requirements.  *See, e.g.*, *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 227 (1999) ("claims by non-California residents where none of the alleged misconduct or injuries occurred in California" do not state a claim).

**North Carolina**:  IPPs acknowledge that the North Carolina consumer protection statute requires a "substantial effect" in-state.  Opp. at 51.  The better-reasoned cases on this issue find that simply alleging that the conduct resulted in an overcharge within the state is inadequate because "incidental in-state injury" does not suffice to state a claim under the statute.  *See In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *19 (E.D. Mich. Apr. 9, 2013).

### (3) Failure to Allege Deceptive, Unfair, and Unconscionable Conduct.

IPPs must allege deceptive, unconscionable, or unfair conduct to bring claims under the consumer protection laws of Arizona, Idaho, Illinois, Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Rhode Island, South Dakota, Utah, Virginia, and West Virginia.  But IPPs' allegations sound only in antitrust law.  *See* MTD at 56.  IPPs' argument that the state consumer protection statutes "grant broad remedies" and are "disjunctive," Opp. at 52, neglects specific pleading requirements under each state's law, such as an intent to deceive consumers, as detailed in Defendants' opening brief.  *See* MTD at 56–59.

A few illustrative examples highlight the inadequacy of IPPs' position, and Defendants incorporate their arguments from their opening brief on the remaining states.  N.Y. Gen. Bus. Law § 349(a) requires "a plaintiff to allege . . . a deceptive act or practice *directed toward consumers*," *In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 589 (E.D. Pa. 2018) (emphasis added), which IPPs do not adequately allege here.  IPPs gloss over this requirement with selective citations to inapposite case law.  For example, they cite *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129 (N.D. Cal. 2008), for the notion that, under

New York law, "plaintiffs need only allege . . . that defendants' acts . . . have broader impact on consumers at large," Opp. at 56, while omitting that in *DRAM*, "defendants secretly agreed to raise prices by direct agreements on bids to customers located in New York and through artificial supply restraints on the entire DRAM market" and "that New York consumers were targets of the conspiracy." *DRAM*, 536 F. Supp. 2d at 1144. No such New York-specific allegations are present here. Similarly, IPPs fail to rebut that courts have dismissed claims under Michigan's consumer protection law where plaintiffs alleged only "conduct in prosecuting [a] Patent," rather than "wide-spread dissemination of false information to the public." *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1169 (N.D. Cal. 2015).

### 3. The IPPs' Unjust Enrichment Claims Similarly Warrant Dismissal.

IPPs argue that the viability of their unjust enrichment claims "does not hinge on the Court sustaining their antitrust claim." Opp. at 59. IPPs are incorrect. Third Circuit precedent, which the IPPs fail to address, leaves no doubt that the failure of IPPs' underlying antitrust claim would defeat any claim of unjust enrichment derived from the same factual allegations of "sham litigation." MTD at 60 (collecting Third Circuit cases). And, IPPs misinterpret Defendants' argument that seven states do not allow stand-alone unjust enrichment claims: IPPs' unjust enrichment claims under Alabama, Alaska, Arkansas, Georgia, Maryland, Pennsylvania, and Wyoming law fail because they have not even *alleged* an antitrust

or consumer protection claim under those states' laws, so they could not proceed even if IPPs' sham litigation claim survived Defendants' motion. *Compare* Opp. at 58–59, *with* MTD at 62–63.   Finally, IPPs' reliance on *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, 368 F. Supp. 3d 814, to argue that they can assert unjust enrichment claims even in states that bar indirect purchaser suits, *see* Opp. at 59–60 & nn.128–32, goes against the weight of authority in this Circuit. *See* MTD at 61–62.[12]  And IPPs' argument that they have conferred a benefit directly on Defendants by virtue of paying allegedly supracompetitive prices is contrary to reason, given multiple intervening levels in the distribution chain, and is insufficient to allege a "direct benefit" under the unjust enrichment laws of Florida, Georgia, Idaho, Maine, Michigan, and New York.   *See* MTD at 64–65; *see also In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 706 (E.D. Pa. Dec. 3, 2014) ("By virtue of being indirect purchasers, the End Payors cannot establish that they directly conferred a benefit.").

## CONCLUSION

For the foregoing reasons, as well as the reasons in Defendants' opening brief, IPPs' Complaint should be dismissed for failure to state a claim.

---

[12] *In re Processed Egg Products Antitrust Litigation*, 851 F. Supp. 2d 867, 921–24 (E.D. Pa. 2012), merely urges state-specific analysis, and does not take a position on the viability of unjust enrichment claims in such states.

Dated:  June 7, 2021

/s/ *Liza M. Walsh*

Liza M. Walsh
Katelyn O'Reilly
William T. Walsh, Jr.
**WALSH PIZZI O'REILLY**
**FALANGA LLP**
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
Phone: (973) 757-1100
Facsimile: (973) 757-1090
lwalsh@walsh.law
koreilly@walsh.law
wwalsh@walsh.law

Jack E. Pace III (*pro hac vice*)
jpace@whitecase.com
Alison Hanstead (*pro hac vice*)
ahanstead@whitecase.com
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY 10020

Peter J. Carney (*pro hac vice*)
pcarney@whitecase.com
Adam M. Acosta (*pro hac vice*)
adam.acosta@whitecase.com
**WHITE & CASE LLP**
701 Thirteenth Street, NW
Washington, DC 20005

Kevin M. Bolan (*pro hac vice*)
kevin.bolan@whitecase.com
**WHITE & CASE LLP**
75 State Street
Boston, MA 02109

*Attorneys for BTG International*
*Limited*

/s/ *Jeffrey J. Greenbaum*

Jeffrey J. Greenbaum
Gregory E. Reid
**SILLS CUMMIS & GROSS P.C.**
One Riverfront Plaza
Newark, NJ 07102
Phone: (973) 643-7000
Facsimile: (973) 643-6500
jgreenbaum@sillscummis.com
greid@sillscummis.com

Timothy C. Hester (*pro hac vice*)
thester@cov.com
Ashley E. Bass (*pro hac vice*)
abass@cov.com
Carol A. Szurkowski (*pro hac vice*)
cszurkowski@cov.com
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Phone: (202) 662-6000
Facsimile: (202) 662-6291

*Attorneys for Janssen Biotech, Inc.,*
*Janssen Oncology, Inc., and Janssen*
*Research & Development, LLC*

2